**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| ROY COCKRUM; SCOTT COMER; and ERIC SCHOENBERG, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) )   Civil Action No. 3:18-cv-484-HEH |
| | ) |
| DONALD J. TRUMP FOR PRESIDENT, INC., | ) ) ) |
| Defendant. | ) ) |

## AMENDED COMPLAINT

## INTRODUCTION AND SUMMARY

1.      Plaintiffs bring this suit to recover for injuries that they suffered when their stolen private information was published to the entire world during the 2016 presidential campaign.

2.      The illegal release of Plaintiffs' private information was the direct and intended result of a conspiracy between Defendant, the Russian regime,[1] and WikiLeaks.  In short: Russian intelligence infiltrated the computer servers of the Democratic National Committee (DNC).  The Kremlin alerted the Trump Campaign that it was in possession of stolen DNC emails and could publicize them in order to harm the DNC and Mr. Trump's opponent, Hillary Clinton, and help the Trump Campaign.  The Russian regime initially targeted its overtures at

---

[1] Throughout this Amended Complaint, Plaintiffs use the terms "Russia," "Russian regime," "the Kremlin," and "Russian government" interchangeably.  The Russian government often operates through quasi-government and non-government agents.  The Russian-affiliated individuals identified herein as participating in this scheme were acting as agents of the Russian government or, at the very least, were acting as co-conspirators in this conspiracy to influence the election in favor of Defendant's candidate.

lower level Campaign employees and quickly escalated them to the very highest levels as the Campaign proved receptive.  The Trump Campaign and the Russian regime agreed that Russia would release the stolen emails in order to help the Campaign and the Campaign would provide political benefits to Russia in return.  Agents of the Campaign and Russian agents were in frequent contact in order to coordinate the release of the stolen emails and the corresponding benefits that the Trump Campaign would provide to the Russian regime.  At the direction of these co-conspirators, the emails were then released by WikiLeaks, which joined the conspiracy as a trusted Russian intermediary.  The release was timed to maximize the harm to Mr. Trump's opponent, including by harming and deterring her political supporters, and thus maximize the benefit to Mr. Trump.  The Campaign then publicly and repeatedly welcomed the disclosure of the stolen emails and cited them as often as possible.  The Campaign also followed through on its promise to provide benefits to the Russian regime.

3. The illegal acts taken by these co-conspirators in furtherance of the conspiracy formed between Defendant and the Russian regime for their mutual and respective benefit included not only the publication of the emails that are the focus of the claims in this lawsuit, but also the illegal interference by a foreign power, and the illegal acceptance of that interference by a candidate's campaign, in the election for the highest office in the United States.  This collusion violated not only Plaintiffs' rights as victims of this conspiracy, but also myriad other laws, including federal campaign finance law and provisions of the criminal code.

4. Defendant and its agents and associates have spent two years actively concealing and misrepresenting their coordination with Russian government officials.  They first repeatedly denied having had contacts with Russians at all.  When that denial became implausible, they tried to conceal the substance of those contacts.  For example, Mr. Trump dictated an inaccurate

public statement on behalf of his son claiming that a June 2016 meeting between Russian government agents and the highest levels of the Campaign was really about adoption policy (and Mr. Trump's lawyer and the White House press secretary then falsely denied Mr. Trump's involvement in crafting the statement—denials later revealed to be untrue).  They have continually cast doubt on the Kremlin's involvement in the theft and release of the stolen emails, despite overwhelming evidence that the Russian regime orchestrated the hacking and release. More recently, as the repeated denials have been shown to be false and the scope of the contact between agents of the Campaign and Russian agents has become clear, agents and associates of the Campaign have changed course to argue that there is nothing wrong or illegal about accepting "dirt" on a political opponent from a hostile foreign power that is actively trying to interfere in a U.S. election.  Indeed, on August 5, 2018, President Trump expressly confirmed that the Campaign accepted the Russian government's offer to aid the Campaign by providing it with "information on an opponent."  That conspiracy harmed the Plaintiffs in this suit.

5.      Plaintiffs are all private American citizens who exercised their right to participate in our democracy during the 2016 election.  Until the publication of their private information, Plaintiffs were unknown to the general American public.  At the time that their private information was published, none was a public official or public figure.  None was a candidate for public office.  None was a high-ranking campaign official or close personal advisor of a presidential candidate.  None expected that his private information would be shared with the world, particularly as part of an illegal quid pro quo to influence the 2016 election for the benefit of a candidate and a foreign power.

6.      Roy Cockrum is a former Episcopal monk.  He left the brotherhood in 2007 to care for his ailing parents.  In 2014, he won the Tennessee Powerball lottery and decided to give

away the bulk of his winnings.  In 2016, he donated to multiple candidates for public office, as well as to the DNC.

7.       Eric Schoenberg is a successful businessman who served as a Foreign Service Officer during the Reagan Administration.  At different times, he has been registered to vote as a Republican and as a Democrat.  In the 2016 election cycle, he contributed to the DNC.

8.       Scott Comer is a former mid-level staffer on the finance team of the DNC.  A childhood trip to Washington, D.C. left him in awe of American democracy in action.  He and his father attended a Senate Armed Services Committee hearing, and he realized he was seeing history being made.  He knew from that moment that he wanted to be a part of what happened in the nation's capital, which led him to attend college in D.C. and, eventually, to work for political candidates and causes he believed in.

9.       Defendant is Donald J. Trump for President, Inc. (the "Trump Campaign"), a Virginia corporation formed for the purpose of electing Donald Trump to the presidency.

10.      On one or more occasions before the summer of 2016, computer hackers working on behalf of the Russian government hacked into the email systems of the DNC and obtained voluminous amounts of data, including emails and other documents sent to and from thousands of individuals.  Some of those individuals were staff members of the DNC; some were donors; and some were other supporters, members of the media, or other private citizens.

11.      Among the materials obtained by the hackers were Mr. Comer's emails; Mr. Schoenberg's and his wife's social security numbers, dates of birth, home address, phone number, and banking relationships; and Mr. Cockrum's social security number, date of birth, address, and phone number.

12.     As the United States government has reported, the Russian government sought to use the information it had stolen from the DNC as part of a deliberate operation to interfere in the U.S. election and tilt its outcome in favor of Donald Trump.

13.     On information and belief, Russia typically consults and involves domestic political actors to increase the utility of its political hacking activity aimed at targets in other countries.  Those local actors function as Russia's partners by helping to decide which extracted information to publish, how to time the release of the stolen information, and how to disseminate it in a way that would maximize the political impact.

14.     Multiple agents and associates of the Trump Campaign have long-standing financial connections and relationships with Russian individuals and entities, including several who are agents of the Russian regime and who are close to the Russian President and government.  On information and belief, trading on those connections and seeking to maximize the impact of the hacked materials, the Russian regime consulted with Defendant and its agents to better understand how the hacked materials could be used to greatest political effect.

15.     Agents of the Trump Campaign, acting on behalf of the Campaign, met with— and were otherwise in contact with—Russian officials or their agents on numerous occasions during the spring and summer of 2016.  For example, in April 2016—before the DNC was aware that it had been hacked—the Campaign was informed by a Russian agent that the Kremlin had obtained "dirt" on Secretary Clinton, Mr. Trump's opponent in the election, in the form of thousands of emails stolen from the DNC and that Russia could help disseminate those emails. Rather than inform law enforcement, the Campaign was receptive to this overture.  In June 2016, six weeks after learning that the Russians had "dirt" that they were willing to use to benefit the Campaign, senior Trump Campaign officials met with an agent of the Russian regime, a

Kremlin-connected lawyer, after being informed in an email that the meeting concerned information gathered as part of a Russian government effort to aid the Trump Campaign. According to email correspondence regarding the meeting that Donald Trump Jr. made public on his Twitter account, rather than avoiding coordination with a foreign government that was attempting to interfere in a U.S. election, Mr. Trump Jr. responded over email: "If it's what you say I love it especially later in the summer." According to recent revelations, Mr. Trump Sr. was informed of and approved the meeting. In a tweet on August 5, 2018, President Trump described this meeting's purpose as "get[ting] information on an opponent."

16.     As is typical of conspiracies, specific information about when and how the conspirators reached their agreement is exclusively in the hands of the conspirators. But on information and belief, and consistent with the Campaign's apparent willingness to coordinate with Russian operatives to benefit its campaign, an agreement arose out of the many meetings and contacts between agents of the Campaign and agents of the Russian regime. Defendant entered into an agreement with other parties, including agents of Russia and WikiLeaks, to have information stolen from the DNC publicly disseminated in a strategic way that would benefit the campaign to elect Mr. Trump as President.

17.     On information and belief, Defendant, in turn, provided benefits to the Russian government. These benefits have included intervening in the drafting of the Republican Party platform to protect Russian interests, shifting Republican Party and U.S. priorities regarding NATO, changing the U.S. position on Russia's participation in the G7, attempting to lift or weaken U.S. sanctions on Russia, and generally providing a positive communications posture toward Russia to improve its image among Americans.

18.     On information and belief, in furtherance of this conspiracy, Defendant and its co-conspirators arranged for the hacked information to be provided to WikiLeaks, which published it on July 22, 2016 and thereafter.  In particular, the DNC finance team's emails, which contained correspondence with donors as well as donors' personal information, were singled out for publication.  Of the seven email accounts whose contents were released, six were the accounts of finance team members.

19.     Defendant's and their co-conspirators' targeting of the finance team and release of the finance team's emails had several intended, direct, and foreseeable effects: First, it intimidated and deterred existing donors from further supporting the DNC's financial efforts. Defendant knew to a substantial certainty that release of the finance team's emails would reveal the private information of DNC donors, including information like social security numbers, financial account numbers, home addresses, and the like, and Defendant intended such disclosure in order to injure DNC donors and to intimidate and deter other potential donors from giving to the DNC.  Second, by demonstrating that anyone who communicated by email with members of the DNC finance team was at risk of having their communications, and personal information contained therein, published to the entire world, it intimidated and deterred existing or potential donors from communicating with Mr. Comer or others at the DNC to support the Democratic Party's candidate for president.  Third, it intimidated and deterred individuals, including Mr. Comer, from using email to advocate the election of their preferred candidate for the presidency, for fear that their communications would be publicly disclosed.  As a result of the conspiracy, all of the Plaintiffs suffered substantial harm—set forth in detail below—on account of their support for a particular candidate for president.

20.     As a result of the publication of hacked information pursuant to the conspiracy, Mr. Cockrum's social security number, address, and phone number were published to the world and remain permanently available to anyone with access to the Internet.  As a result, Mr. Cockrum has seen multiple strangers attempt to obtain credit in his name, and at least one of these attempts was successful.  Each new attempt requires a new round of extensive communications with creditors and credit agencies in an effort to prevent substantial financial loss.  These circumstances have led to significant distress and anxiety and will require lifelong vigilance and expense.  In addition, Mr. Cockrum has been chilled in the extent to which he supports and contributes to national political organizations.

21.     As a result of the publication of hacked information pursuant to the conspiracy, Mr. Schoenberg's and his wife's social security numbers, address, phone number, and banking relationships were published to the world and remain permanently available to anyone with access to the Internet.  As a result, Mr. Schoenberg's identity was stolen and his information used in fraudulent attempts to get credit cards, some of which have been successful.  On multiple occasions, American Express has issued credit cards in Mr. Schoenberg's name in response to fraudulent requests.  In one instance, two new credit cards arrived together at his home—one in his wife's name, and the other in the name of an unknown woman.  To this day, Mr. Schoenberg remains concerned that his and his family's credit and financial information are permanently in jeopardy.  These circumstances led to significant distress and anxiety and will require lifelong vigilance and expense.

22.     As a result of the publication of hacked information pursuant to the conspiracy, thousands of Mr. Comer's emails were published to the world and remain available to anyone with access to the Internet.  These emails included information about conflicts with coworkers

and collaborators, frank statements about certain individuals that were intended to remain private, and health information.  These revelations strained his relationships with coworkers, family, and friends, and ended some of Mr. Comer's relationships altogether.  Publication of private statements about other individuals caused damage to his personal and professional reputation.  Potential clients and employers have reviewed these emails when considering whether to hire him for political finance work.  In his chosen field, being a target of the DNC hack and associated with emails leaked by WikiLeaks became a stain—so much so that he ultimately abandoned both this work and the city he has dreamed of living in since childhood, beginning a new career in California.

23.     Because his emails were disclosed, Mr. Comer received phone calls threatening violence, calling him "faggot," and wishing him dead.  These circumstances led to severe emotional distress, anxiety, and depression.  He found himself unable to sleep, haunted by nightmares, and unable to focus.  He recognized the severity of the injury to his mental health and sought treatment, generating significant costs for medication and medical care.

24.     Recently, a psychiatrist diagnosed Mr. Comer with Post Traumatic Stress Disorder stemming from the massive invasion of his privacy and the disruption it caused to the career in politics he had envisioned for himself since he was 11 years old.

25.     In addition, Mr. Comer has felt intimidated regarding how he communicates with others in his advocacy for candidates for federal office out of a fear that his communications will be publicly disclosed.

26.     None of the above-described private information disclosed about Plaintiffs was newsworthy or involved any public policy matter at issue in the campaign.  Although a handful of the released emails unrelated to Plaintiffs received a significant amount of news coverage, the

vast majority of the tens of thousands of emails and attachments dumped on the Internet in furtherance of the conspiracy were not of public interest.

27.     The publication of Plaintiffs' private information caused each of them concrete and tangible injuries.

28.     Ever since and in furtherance of the conspiracy, Defendant and its co-conspirators have undertaken efforts to hide evidence of their coordination.  Defendant's agents and associates have repeatedly shifted their explanations of the reasons and process for revising a proposed amendment to the Republican Party platform in a Russia-friendly direction.  Agents of the Trump Campaign, including close advisor and then-Senator Jeff Sessions and Mr. Trump's son-in-law Jared Kushner, failed to disclose on security clearance forms and in sworn testimony a series of meetings one or both held with top Russian officials during the campaign and the transition.  Mr. Trump Jr. provided inconsistent accounts—one dictated by his father—of his meeting with a Russian government-linked attorney, whom he agreed to meet on the understanding that she would cooperate with his efforts to damage the Clinton Campaign; he participated in the meeting knowing (according to emails released on his Twitter account) that the meeting was "part of Russia and its government's support for Mr. Trump."  Campaign advisor Michael Flynn failed to properly report contractual arrangements and interactions with Russian entities in both the U.S. and Russia.  He also lied to the FBI about his conversations with Russian agents, falsely claiming that they were not about relief from sanctions.  When testifying before Congress, Roger Stone, an advisor to Mr. Trump and the Campaign, failed to disclose a meeting with a Russian man offering to sell "dirt" on Secretary Clinton.  Three Trump Campaign officials—Deputy Campaign Chairman Richard Gates and foreign policy advisers Mr. Flynn and George Papadopoulos—have pleaded guilty to lying to federal prosecutors investigating

connections between the Trump Campaign and the Russian attack on the 2016 election. A fourth—former Campaign Chairman Paul Manafort—had his bail revoked for working with a Russian agent to attempt to influence witness testimony. Mr. Manafort was recently convicted of federal financial crimes related to his work for a Kremlin-linked Ukrainian political party.

29.     In furtherance of the conspiracy, Defendant and its agents have publicly and falsely denied or dismissed Russia's role in the hacking, seeking to absolve Russia of any accountability for its actions to harm Plaintiffs and interfere in the U.S. election. Mr. Trump himself, who benefitted the most from this conspiracy, has repeatedly denied personal relationships with Russia that he had previously admitted. He has also sought to discredit reporting on the underlying events discussed in this Complaint and to block attempts to investigate those events, including by firing the lead investigator looking into the affair, former FBI Director James Comey. On July 16, 2018, at a summit with Mr. Putin in Helsinki, Finland, Mr. Trump claimed to believe Mr. Putin's denials of Russian interference with the 2016 election—including the hacking of the DNC, the Democratic Congressional Campaign Committee (DCCC), and the Clinton Campaign—rather than the contrary conclusion of the U.S. intelligence community and law enforcement. A grand jury, however, indicted 12 Russian military intelligence agents for the above-mentioned hacking just three days before the summit. At the Helsinki press conference, Mr. Putin also confirmed that he had wanted Mr. Trump to win the presidency.

30.     Defendant's conspiratorial conduct was intended to intimidate eligible voters in a manner designed to prevent them "from giving [their] support or advocacy in a legal manner, toward or in favor of the election of [a] lawfully qualified person as an elector for President," and

to injure American citizens in person and property "on account of such support or advocacy," all in violation of 42 U.S.C. § 1985(3).

31.     In addition, Defendant's conduct violated Plaintiffs' privacy rights under the laws of the states in which they lived: New Jersey, Tennessee, and Maryland.

32.     Defendant aided and assisted the violation of these rights and conspired with others known and unknown to commit this violation.  The direct victims included Mr. Cockrum, Mr. Schoenberg, and Mr. Comer.

33.     Plaintiffs bring this suit to seek accountability and redress for the harms that they suffered from the release of their personal information, and to help prevent such harms from ever befalling anyone else.

## JURISDICTION AND VENUE

34.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

35.     This Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367.

36.     This Court also has jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1332.  Plaintiffs and Defendant are citizens of different states.  There is complete diversity between the parties and the amount in controversy for each Plaintiff exceeds $75,000 (exclusive of interest and costs).

37.     Venue in this case is proper under 28 U.S.C. § 1391.  This forum is a proper venue because the Trump Campaign is incorporated in Virginia and maintains an agent registered in the Richmond Division.

## PARTIES

38.     Mr. Cockrum contributed to the DNC during the 2016 campaign.  Mr. Cockrum

joined The Society of St. John the Evangelist, an Episcopal monastery, after the terrorist attacks

of September 11, 2001.  He left the monastery several years later to care for his elderly parents in

Tennessee, where he won the Tennessee Powerball lottery and began a new career as a

philanthropist.  Mr. Cockrum has lived in Tennessee since 2009; he has a driver's license issued

by the State of Tennessee; he owns his home, through a revocable living trust, in Tennessee; his

family is in Tennessee; he intends to remain in Tennessee indefinitely; and he has no other

home.  He is a domiciliary and citizen of the State of Tennessee.

39.     Mr. Schoenberg contributed to the DNC during the 2016 campaign.  Mr.

Schoenberg has served as a Foreign Service Officer, held executive positions with an investment

banking firm, and is now Chairman of a technology services firm.  Mr. Schoenberg has lived in

New Jersey for the last 24 consecutive years and for a total of 42 years; he has a driver's license

issued by the State of New Jersey; he owns his home in New Jersey; his family is in New Jersey;

he intends to remain in New Jersey indefinitely; and he has no other home.  He is a domiciliary

and citizen of the State of New Jersey.

40.     Mr. Comer is a former employee of the DNC, where he worked as the Finance

Office's Chief of Staff between April 2015 and October 2016.  In June 2016, he also assumed

the role of LGBT Finance Director, which he kept until he left in October 2016.  Mr. Comer

attended college at George Washington University and the University of Maryland, and worked

for Democratic candidates and advocacy organizations from the time he graduated college until

April 2018.  Mr. Comer lived in Maryland from 2011 until April 2018.  At all times relevant to

this litigation, including at the time of the dissemination of his private emails, he was a

domiciliary and citizen of the State of Maryland.  He recently moved to Los Angeles, California, and he is now a domiciliary and citizen of the State of California.

41.     Defendant Donald J. Trump for President, Inc. (the "Trump Campaign"), is a Virginia corporation with a registered address within the Richmond Division, and with its permanent headquarters in New York, New York.

42.     The Trump Campaign's purpose during the times relevant to this complaint was to elect Donald J. Trump to the presidency.  Agents of the Trump Campaign include but are not limited to:

- Mr. Manafort, previously a lobbyist for Russian-linked entities, joined the Campaign on March 29, 2016; he became Campaign Chairman on April 20, 2016 and served in that capacity until his resignation on August 19, 2016.

- Mr. Gates, Mr. Manafort's lobbying partner on Russian-linked accounts, was Deputy Campaign Chairman and remained a key advisor to Mr. Trump through the presidential transition.

- Mr. Flynn, J.D. Gordon, Carter Page, and Mr. Papadopoulos served as foreign policy advisors to the Campaign during the relevant period.

- Mr. Sessions, then a U.S. Senator and now U.S. Attorney General, was chair of the Campaign's national security advisory committee.

- Mr. Kushner, Mr. Trump's son-in-law, was a close advisor to Mr. Trump during the campaign and is a senior advisor in the White House.

- Mr. Trump Jr. is Mr. Trump's son.  He acted and continues to act on behalf of the Campaign.

- Mr. Stone is a lobbyist and political strategist, who has been a friend, associate, and business advisor to Mr. Trump since 1979.  Mr. Stone left official employment with the Trump Campaign in August 2015, but he continued to play an important role in the Trump Campaign as an advisor even after his departure, and he remained in regular contact with Mr. Trump throughout the campaign.  At all times relevant to this Complaint, he acted as an agent of the Trump Campaign or as a co-conspirator.  In early 2016, Mr. Stone helped arrange for his longtime friend and former business partner Mr. Manafort to become Chairman of the Trump Campaign.

## **FACTUAL ALLEGATIONS**

I.   **Plaintiffs' Private Information Was Shared with the World, Causing Plaintiffs Substantial Harms**

A.   Emails Containing Plaintiffs' Private Information Were Disseminated on the Internet

43.     On July 22, 2016, WikiLeaks posted thousands of private emails on the Internet.  These emails were made available to anybody in the world with access to a web browser.  According to the WikiLeaks website:

> Starting on Friday 22 July 2016 at 10:30am EDT, WikiLeaks released over 2 publications 44,053 emails and 17,761 attachments from the top of the US Democratic National Committee—part of our new Hillary Leaks series. The leaks come from the accounts of seven key figures in the DNC: Communications Director Luis Miranda (10520 emails), National Finance Director Jordon [sic] Kaplan (3799 emails), Finance Chief of Staff Scott Comer (3095 emails), Finance Director of Data & Strategic Initiatives Daniel Parrish (1742 emails), Finance Director Allen Zachary (1611 emails), Senior Advisor Andrew Wright (938 emails) and Northern California Finance Director Robert (Erik) Stowe (751 emails). The emails cover the period from January last year until 25 May this year.

44.     Emails containing private information belonging to each of the Plaintiffs—and many others—were included in the information published by WikiLeaks beginning on July 22, 2016.  These private details revealed personally identifying information, such as social security

numbers, dates of birth, home addresses, cell phone numbers, and bank account details; personal health information ranging from doctor's appointments to life-threatening illnesses; information about conflicts with co-workers, collaborators, friends, and family members; sexual orientation and/or information about romantic relationships; and myriad private details about day-to-day experiences that were never intended for publication to the Internet for the whole world to see.

45.     The emails containing Plaintiffs' private information remain on the Internet to this day.[2]  They are publicly searchable through the WikiLeaks site, allowing anybody to type an individual's name in order to browse emails to, from, or about that person.  Plaintiffs' social security numbers, and those of dozens of other potential identity theft victims, are available to the world.

46.     Plaintiffs are illustrative of dozens of American citizens whose lives were directly affected when this information was published on the Internet.  Because so many of the published emails came from the DNC's finance team, numerous donors and prospective donors to the DNC had their private information, financial information, and communications published.

47.     Before their publication beginning on July 22, 2016, none of the Plaintiffs' private emails had been posted on the Internet or made available to the public.  Before the publication beginning on July 22, 2016, none of the Plaintiffs' social security numbers had been posted on the Internet or made available to the public.

---

[2] Attached as Exhibit A to this Amended Complaint is a sample of the more than 3,000 private emails from Mr. Comer's account that were stolen from the Democratic National Committee's servers and published on WikiLeaks, as well as a handful of emails (and attachments) that contain Mr. Cockrum's and Mr. Schoenberg's social security numbers and other private information.  The attached emails contain minor redactions (such as all but the last four digits of Social Security Numbers), which have been made in order to comply with Federal Rule of Civil Procedure 5.2 and Local Civil Rule 7(C)(1).

48.     The published emails were not curated or redacted to remove private facts about Plaintiffs or any other victims of the release.

49.     The published emails contained detailed private factual information concerning dozens of DNC donors and employees, including each Plaintiff.

50.     For example, Mr. Cockrum's social security number, date of birth, address, and other personally identifying information appeared in the leaked emails.  Mr. Cockrum was required to provide most of this information to the DNC in order to obtain Secret Service clearance to attend an event with President Obama.  Mr. Cockrum's private information remains on the Internet to this day.

51.     Mr. Schoenberg's and his wife's social security numbers, dates of birth, address, banking relationships, and other personally identifying information appeared in the leaked emails.  Mr. Schoenberg was required to provide this information to the DNC in order to obtain Secret Service clearance to attend an event with President Obama.  Mr. Schoenberg's private information remains on the Internet to this day.

52.     Mr. Comer had the entire contents of his email account made available for anyone to read.  His emails included frank, sensitive, and private discussions about other individuals.  Those emails sometimes reflected frustration or conflict—unsurprising in a tight-knit office under a great deal of stress—or the kind of offhand remarks or gossip that many of us make in private but are never intended for sharing with the entire world.  The revelation of private details about his life and work caused immediate and lasting strain on personal and professional relationships.

53.     Mr. Comer also had private medical information disseminated.  A May 17, 2016 email from Mr. Comer to his boss, with whom he was close, describes his bodily functions

during a virus, a topic that Mr. Comer, like most people, would never raise in public communications.

B. The Private Information Disseminated About Plaintiffs Was of No Legitimate Concern to the Public

54.    Plaintiffs were private Americans who did not hold and have not sought political office.

55.    Some information dumped by WikiLeaks was the subject of news reporting and political controversy.  But most of the information published, including sensitive private facts related to the Plaintiffs, was not the subject of news reporting, and was of no public interest, but was nevertheless made available for the whole world to see.

56.    The published information about Plaintiffs on topics such as medical conditions, private relationships, conflicts with colleagues, social security numbers, and personal financial information was not of any relevance to the political campaign or at all newsworthy.

57.    There is no legitimate public concern in these intimate details about private individuals' personal relationships.

58.    There is no legitimate public concern in Plaintiffs' medical information.

59.    There is no legitimate public concern in Plaintiffs' personally identifying information such as banking information or social security numbers.

C. Plaintiffs Suffered Concrete and Tangible Harms from the Publication of Their Private Information, Including Injuries to Their Person and Property

60.    The publication of the private facts caused the Plaintiffs to suffer greatly, as would any reasonable person who had such private details about his or her personal life published with fanfare on the Internet.

61.     Shortly after the DNC emails were published on WikiLeaks, Mr. Cockrum learned that his social security number and other personally identifying information were available online for the world to see.

62.     Immediately thereafter, and ever since, Mr. Cockrum has received notices of strangers attempting to obtain credit in his name, some successfully.

63.     After his personal information was published, Mr. Cockrum feared identity theft—and worse—so he directed his personal assistant to take extra precautions when admitting visitors to his office and speaking with strangers on the phone.

64.     Mr. Cockrum continues to experience anxiety over actual and potential future identity theft, and especially the ability of sophisticated hackers to gain access to his personal or business financial accounts.  He feels that protecting himself, his family, and his philanthropy will require extreme vigilance with no end in sight.

65.     Shortly after emails hacked from the DNC servers were published on WikiLeaks, Mr. Schoenberg learned that his and his wife's social security numbers, dates of birth, home address, phone numbers, banking relationships, and other personally identifying information had been broadcast to the world.

66.     As a result of the mass publication of this private information, Mr. Schoenberg began getting phone calls and letters about fraudulent applications for credit in his and his wife's names.  On multiple occasions, American Express has issued credit cards in Mr. Schoenberg's name in response to fraudulent requests.

67.     Mr. Schoenberg has been required to spend countless hours speaking with creditors and other financial and reporting institutions to rectify the problems caused by the disclosure of his social security number.

68.     Mr. Schoenberg continues to experience anxiety and fear over potential future identity theft, and especially the ability of sophisticated hackers to gain access to his financial accounts using personally identifying information that is now readily available online.  Even if his social security number is removed from the WikiLeaks archive available online, Mr. Schoenberg will forever be concerned that it has now been substantially disseminated among criminal enterprises.  He fears that these risks to his and his family's financial security will never go away.

69.     Mr. Comer's working environment deteriorated rapidly after his emails' release.  He perceived that his counterparts in the Clinton Campaign viewed him as damaged goods; they did not want him or others on the finance team to appear on behalf of the campaign publicly.  In the wake of the WikiLeaks posting, he was marginalized and isolated by his colleagues and saw a major DNC event that he had eagerly anticipated leading instead taken away from him and given to Clinton Campaign staff.

70.     Not only did Mr. Comer see his working relationships and professional reputation suffer, but he suffered broader reputational harm as well.  Emails taken out of context, in which he made colloquial references about other gay individuals to friends who understood that those references were made without animus or disrespect, generated press reports labeling Mr. Comer as homophobic and racist.  Mr. Comer's deep commitment to civil rights made these allegations predictably and particularly painful, and they also risked damage to his reputation in the advocacy community.

71.     Mr. Comer received constant harassing phone calls and social media messages.  For several weeks in the aftermath of the publication of his emails, he received as many as 20 threatening phone calls per day.  While the quantity of hostile messages tapered over

time, this experience still affects his comfort in answering the phone.  And Mr. Comer continues to experience online harassment to this day.  Many of his harassers have threatened violence and used vile language, calling him "a faggot," wishing he would "fucking die," or saying that "the world would be better off if [he] were dead."  This barrage of insults and threats makes him feel like a pariah.

72.     After being marginalized at work as a result of the publication of his hacked emails, Mr. Comer determined that he was required to leave his dream job, leading to lost wages and emotional upheaval, and ultimately leading to a diagnosis of PTSD.

73.     Mr. Comer suffered damage to his professional reputation as a result of the publication of his emails.  Discord created by the public airing of his private communications continues to harm Mr. Comer's career.  During interviews for positions at several political organizations, potential employers have questioned Mr. Comer about the release and content of his emails and/or consequences arising from their release.  Potential employers asked Mr. Comer to provide paper copies of the emails posted to WikiLeaks for their review, and others asked about them in interviews.

74.     He applied and interviewed for jobs with political organizations where he had longstanding, positive relationships, but even there he could not escape the stigma that accompanied the release of his emails.

75.     After many final-round interviews for political finance positions, but no job offers, Mr. Comer determined he would be more successful if he left the world of political advocacy.  His association with the DNC hack and the presence of thousands of his "leaked" emails on the Internet harmed his prospects for employment in what had long been a dream

career.  In April 2018, Mr. Comer accepted a job in philanthropy at a community services center in Los Angeles.

76.     This significant personal and professional upheaval in the aftermath of the WikiLeaks publication caused Mr. Comer significant emotional distress, including anxiety and depression.  He has incurred and continues to incur substantial medical expenses for treatment for distress caused by the Defendant and its co-conspirators.

77.     The injuries suffered by all three Plaintiffs were the direct result of their having taken steps to advocate for and support candidates running for federal office.  As a result of the conspiracy alleged herein, they were punished for their advocacy.

## II.     The Injuries Suffered by Plaintiffs Were Caused by a Conspiracy Involving the Defendant and Others

78.     On information and belief, the publication of Plaintiffs' private information and the injuries described above resulted from a conspiracy between Defendant, Russian government agents, and other parties to disseminate information hacked from the DNC.

79.     Public reporting from U.S. intelligence and law enforcement officials, and other sources, establishes all the hallmarks of a conspiracy between Defendant and its co-conspirators, including Russian actors.  Each party had motive to act in concert with the other conspirators; agents of the parties met and communicated many times, creating ample opportunities to reach agreement; each party took actions that would be illogical absent a conspiracy; each party benefited from these actions; and each party took steps to conceal what had occurred.

80.     U.S. government officials have opened a series of law enforcement and bipartisan congressional investigations into Russian interference in the election and links to the Trump Campaign.  In particular, on March 20, 2017, in public testimony to the House Intelligence Committee, then-FBI Director James Comey stated that the FBI investigation into Russian

interference with the election includes the "nature of any links between individuals associated with the Trump Campaign and the Russian government and whether there was any coordination between the campaign and Russia's efforts." On May 3, 2017, in testimony before the Senate Judiciary Committee, Mr. Comey again confirmed the existence of an ongoing investigation into possible collusion between the Trump Campaign and Russia to interfere with the 2016 election. Mr. Comey was fired six days later. According to news reports based on information from U.S. officials, "[t]he FBI has information that indicates associates of President Donald Trump communicated with suspected Russian operatives to possibly coordinate the release of information damaging to Hillary Clinton's campaign."

81.     On May 17, 2017, Robert Mueller was appointed as Special Counsel to continue the investigation acknowledged by Mr. Comey. That investigation included assessing "any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump." To date, the Special Counsel has obtained 35 indictments (including of the Campaign's Chairman) and five guilty pleas (including from Mr. Gates, Mr. Flynn, and Mr. Papadopoulos).

82.     Plaintiffs seek accountability and redress for the harms they suffered from the American political campaign that participated in this conspiracy.

A.  The Russian Government Engaged in a Campaign to Interfere in the U.S. Election and Tilt the Outcome to Mr. Trump

83.     According to an unclassified public report released by the U.S. intelligence community (hereinafter "the U.S. Intelligence Community Report"):

> Russian efforts to influence the 2016 US presidential election represent the most recent expression of Moscow's longstanding desire to undermine the US-led liberal democratic order, but these activities demonstrated a significant escalation in directness, level of activity, and scope of effort compared to previous operations.

We assess Russian President Vladimir Putin ordered an influence campaign in 2016 aimed at the US presidential election. Russia's goals were to undermine public faith in the US democratic process, denigrate Secretary Clinton, and harm her electability and potential presidency. We further assess Putin and the Russian Government developed a clear preference for President-elect Trump. We have high confidence in these judgments.

84.     According to former Director of National Intelligence James Clapper, the U.S. intelligence community has "concluded first that President Putin directed an influence campaign to erode the faith and confidence of the American people in our presidential election process. Second, that he did so to demean Secretary Clinton, and third, that he sought to advantage Mr. Trump."

85.     In July 2018, the Senate Select Committee on Intelligence released a report based on its own bipartisan investigation, which affirmed the assessment of the intelligence community that the Russian regime interfered in the 2016 election in order to help Mr. Trump.

B. As Part of That Campaign, Russian Operatives Hacked the Servers of U.S. Political Entities, Including the DNC

86.     In order to defeat Secretary Clinton and help elect Mr. Trump, hackers working on behalf of the Russian government broke into computer networks of U.S. political actors involved in the 2016 election, including the DNC and the Clinton Campaign.  Elements of Russian intelligence gained unauthorized access to DNC networks in July 2015 and maintained that access until at least June 2016.  By March 2016, the Russian General Staff Main Intelligence Directorate (GRU) gained unauthorized access to DNC networks, DCCC networks, and the personal email accounts of Democratic Party officials and political figures.

87.     By May 2016, the GRU had copied large volumes of data from DNC networks, including email accounts of DNC staffers.  Much of the GRU's activity within the DNC

networks took place between March and June 2016, at the very same time its agents were intensifying their outreach to and securing meetings with agents of the Trump Campaign.

88.     On July 13, 2018, a grand jury indicted 12 named GRU officers for "knowingly and intentionally conspir[ing] with each other, and with persons known and unknown to the Grand Jury (collectively, 'the Conspirators'), to gain unauthorized access (to 'hack') into the computers of U.S. persons and entities involved in the 2016 U.S. presidential election, steal documents from those computers, and stage releases of the stolen documents to interfere with the 2016 U.S. presidential election."  According to the indictment, "in and around April 2016, the Conspirators began to plan the release of materials stolen from the Clinton Campaign, DCCC, and DNC."  And "in or around June 2016," when the Trump Campaign was taking meetings with Russian agents to "get information on an opponent," the indicted Russians and their co-conspirators began to "stage[] and release[]" the stolen emails.

C.     Through a Series of Secret Meetings in the Spring and Summer of 2016, Defendant and its Co-Conspirators Agreed to Disseminate Certain Hacked DNC Emails, and Russia Sought to Obtain Policy Concessions

a.     Defendant and its agents and associates engaged in a series of meetings and other contacts with Russian operatives throughout 2016

89.     Russian actors and agents of the Trump Campaign who were acting on behalf of the Campaign held multiple secret meetings throughout the campaign, including around the time that Russian operatives were stealing material from the DNC servers and in the days and weeks leading up to the publication of Plaintiffs' private information.

90.     The Government Communications Headquarters (GCHQ), a British intelligence agency, first became aware of suspicious interactions between members of the Trump Campaign and Russian intelligence operatives in late 2015.  German, Estonian, and Polish agencies— among others—also detected such interactions between late 2015 and early 2016.

91.     In the summer of 2016, U.S. intelligence officials collected information indicating that senior Russian intelligence operatives and political figures were discussing exerting influence over the Trump Campaign.  The American officials considered this intelligence to be sufficiently credible that they passed it on to the FBI, which opened a counterintelligence investigation that continues to this day into whether the Trump Campaign aided Russian interference in the 2016 election.

92.     Trump Campaign associates met or otherwise communicated with Russian officials and agents on dozens of occasions during the campaign.  Many of these meetings and other contacts occurred in the five months prior to the release of the stolen emails.  Defendant and its agents and associates have routinely attempted to deny and conceal these contacts.

93.     Russian Deputy Foreign Minister Ryabkov has acknowledged contacts between Russian officials and Mr. Trump's "immediate entourage" during the campaign.

> i.  Russia informed the Trump Campaign that it had stolen emails that could be released to benefit the Trump Campaign, and the Campaign demonstrated that it was receptive to coordination with the Kremlin

94.     On March 14, 2016, shortly after joining the Trump Campaign as a foreign policy adviser, George Papadopoulos was traveling in Italy when he met Joseph Mifsud, a London-based professor with connections to the Kremlin.  Mifsud expressed great interest in Papadopoulos's work for the Campaign and told Papadopoulos he had substantial connections with Russian officials.  Mr. Papadopoulos arranged a second meeting with Mr. Mifsud in London on March 24, 2016.  This time the professor was joined by a woman described as "Putin's niece."  After the meeting, Mr. Papadopoulos sent an email to several high-ranking Campaign officials and other members of the Campaign's national security advisory committee, including Mr. Page, offering to set up a meeting with Russian leadership, including Mr. Putin,

"to discuss US-Russia ties under President Trump." Mr. Papadopoulos represented that he was acting as an intermediary of the Russian government and that his "Russian contacts welcomed the opportunity." "Great work," Mr. Papadopoulos's Campaign supervisor responded. Over the next several months, Mr. Papadopoulos continued to have regular contact with Russian agents and continued to report on these discussions to the highest levels of the Campaign.

95. On March 31, 2016, a week after Mr. Papadopoulos sent his initial email, Mr. Trump met with his national security advisory committee at the not-yet-opened Trump International Hotel in Washington, D.C. That meeting was attended by Mr. Papadopoulos (who had a week earlier revealed himself to be an intermediary for the Kremlin), Mr. Sessions (the chair of the committee), and Mr. Gordon, among others. At this meeting, Mr. Papadopoulos offered to arrange a meeting between Trump and Putin.

96. In the days after the Trump Hotel meeting, Mr. Papadopoulos maintained frequent contact with Mr. Mifsud, "Putin's niece," and other agents of the Russian government, who reported on their interactions with high-ranking Russian officials with the goal of arranging a meeting with the Campaign.

97. On April 26, 2016, Mr. Mifsud informed Mr. Papadopoulos that the Russian government had "dirt" on Mr. Trump's opponent in the form of "thousands of emails," which they could help disseminate anonymously to benefit Mr. Trump's Campaign. The next day, Mr. Papadopoulos updated high-ranking Campaign officials on his communications with Russian operatives.

98. That same day, April 27, 2016, Mr. Trump gave his first major foreign policy speech, which included language remarkably favorable to Russia and Russian interests. Russian

Ambassador Kislyak attended the speech.  On information and belief, Mr. Trump, Mr. Kushner, Mr. Sessions, and Mr. Kislyak held a private conversation during that event.

99.     On May 4, 2016, one of Mr. Papadopoulos's Russian contacts—an individual with connections to the Russian Ministry of Foreign Affairs who was acting as an agent of the Russian government—informed Mr. Papadopoulos that the Russian regime was "open for cooperation."  Mr. Papadopoulos passed this information on to high-level Campaign officials— specifically, then-campaign manager Corey Lewandowski and campaign national co-chair Sam Clovis.

100.    So, by May 2016, the Kremlin had informed the Campaign that it had obtained "dirt" that could be helpful to Mr. Trump and had established the Campaign's willingness to cooperate.  The parties significantly escalated their communications beginning in June 2016.

101.    On June 3, 2016, Rob Goldstone—acting on behalf of Aras Agalarov, a Russian oligarch and agent of the Kremlin who is close with Mr. Putin, and who had cultivated a relationship with the Trump family beginning in 2013; and Emin Agalarov, Aras's son—emailed Mr. Trump Jr. offering a meeting in order "to provide the Trump campaign with some official documents and information that would incriminate Hillary and her dealings with Russia and would be very useful to your father" as "part of Russia and its government's support for Mr. Trump."  Rather than refuse to be part of an effort by Russia to interfere in the election through the release of Russian-obtained information and alert law enforcement, Mr. Trump Jr. responded within minutes and with enthusiasm, stating: "[I]f it's what you say I love it especially later in the summer."

102.    From June 6 to June 8, 2016, Mr. Trump Jr. and Mr. Goldstone exchanged further emails to set up the meeting.  In one of those emails, Mr. Goldstone described one of the meeting

attendees as "a Russian government attorney who is flying over from Moscow"—referring to Natalia Veselnitskaya, a Kremlin-connected Russian lawyer.  During this same period, Mr. Trump Jr. and Emin Agalarov exchanged multiple calls about the meeting.  Mr. Trump Jr. also called a blocked number after each call with Agalarov.  Mr. Trump Sr.'s primary residence has a blocked number.

103.    On June 7, Mr. Trump Jr. indicated to Mr. Goldstone that Mr. Manafort and Mr. Kushner would also attend the June 9 meeting.  That same day, agents of the Campaign held a strategy meeting to plan for the June 9 meeting.  The following day, Mr. Trump Jr. forwarded the entire email chain with Mr. Goldstone to Mr. Manafort and Mr. Kushner.  Mr. Manafort and Mr. Kushner went to the meeting fully aware that it was part of Russian efforts to influence the election in favor of Mr. Trump.

104.    Hours after the June 7 email exchange setting the time and place for the June 9 meeting, Mr. Trump gave a speech in which he stated: "I am going to give a major speech on probably Monday of next week, and we're going to be discussing all of the things that have taken place with the Clintons."

105.    Just 40 minutes after the June 9 meeting was scheduled to begin, Mr. Trump said on Twitter, in a tweet about Secretary Clinton: "[W]here are your 33,000 emails that you deleted?"

106.    The meeting itself was attended by Mr. Trump Jr.; Mr. Manafort; Mr. Kushner; Ms. Veselnitskaya; Mr. Goldstone; Rinat Akhmetshin, a Russian-American lobbyist with suspected ties to Russian intelligence and the Kremlin and who has previously been accused of involvement with computer hacking schemes; Irakly Kaveladze, a close associate of the

Agalarov family; and an interpreter.  Ms. Veselnitskaya; Mr. Goldstone; Mr. Akhmetshin, and Mr. Kaveladze were acting as agents of the Russian regime.

107.    According to Mr. Akhmetshin's account of the meeting, Ms. Veselnitskaya produced documents that she claimed would show illegal payments to the DNC.

108.    Mr. Kaveladze spoke by phone with Aras Agalarov immediately after the meeting.  The outcome of the meeting was sufficiently important and newsworthy that the day after it took place, June 10, 2016, Mr. Kaveladze flew to Moscow to brief Mr. Agalarov about the meeting face-to-face.  In his original testimony to the Senate Judiciary Committee on November 3, 2017, Mr. Kaveladze stated that he flew to Los Angeles (where he lives) rather than Moscow on June 10.  He only corrected his story when confronted with evidence undermining his claim that he flew to Los Angeles.

109.    At the time of the June 9 meeting, Russian intelligence had already stolen large volumes of material from the DNC, including material that would soon be published on WikiLeaks.  Based on the aforementioned communications between Russian agents and agents of the Campaign, including Mr. Papadopoulos, the Campaign was well aware that the Russian regime was in possession of the stolen emails and that Russia could disseminate those emails to benefit Mr. Trump.

110.    The day before the June 9 meeting, Russian agents launched the website DCleaks.com, which was subsequently used to release stolen emails.

111.    On June 14, 2016, the DNC reported that it had been hacked by agents of the Russian government.  That same day, Guccifer 2.0, a hacker working as an agent of Russian military intelligence but falsely claiming to be a Romanian hacker unaffiliated with the Russian regime, claimed responsibility for the hack and began posting and offering to reporters

documents stolen from the DNC servers.  Guccifer 2.0 later provided the stolen DNC emails to WikiLeaks.

112.    Although the Trump Campaign officials who attended the June 9 meeting knew that the meeting was part of Russian attempts to interfere in the U.S. election, none of them reported the meeting to law enforcement authorities.  Indeed, Defendant deliberately tried to conceal and misrepresent the meeting—though it was eventually forced to acknowledge the meeting's actual purpose, including in Mr. Trump's August 5, 2018 tweet.

> ii.  Other contacts between agents and associates of the Trump Campaign and Russian agents leading up to the release of the stolen DNC emails are indicative of a conspiracy

113.    All told, during the four months and eight days between March 14, 2016, when Mr. Papadopoulos first made contact with a Russian agent, and July 22, 2016, when the stolen DNC emails were released on WikiLeaks, agents and associates of the Trump Campaign had at least 41 separate contacts with Russian agents.  (These 41 separate contacts between March 14 and July 22 of 2016 are just a subset of the considerably larger number of contacts that Defendant had with its co-conspirators during all of 2015 and 2016).

114.    For example, on April 11, 2016, shortly after joining the Trump Campaign, Mr. Manafort corresponded by email with Konstantin Kilimnik, a Russian-Ukrainian operative and agent of the Russian regime with ties to Russian intelligence.  Mr. Manafort asked Mr. Kilimnik if Oleg Deripaska, a Russian billionaire with close ties to Mr. Putin and to whom Mr. Manafort was deep in debt, was aware that Mr. Manafort had joined the Trump Campaign.  When Mr. Kilimnik answered affirmatively, Mr. Manafort asked "How do we use to get whole?" According to Mr. Lewandowski, at the time of these communications, Mr. Manafort was in "operational control" of the Trump Campaign.  (Mr. Manafort was publicly promoted to

Campaign Chairman and Chief Strategist in May 2016, and then to Campaign Manager in June 2016).

115.    In May of 2016, Mr. Kilimnik traveled from Ukraine to the United States to meet with Mr. Manafort in person.  They met again in August of 2016.  On information and belief, Mr. Manafort discussed the hacking of DNC emails with Mr. Kilimnik, and Mr. Kilimnik has claimed that he played a role in preventing adoption of a version of an amendment to the Republican Party platform regarding military aid to Ukraine.  While he was Campaign Chairman, Mr. Manafort sent emails from his Campaign account to Mr. Kilimnik in which Mr. Manafort emphasized his influence in the Trump Campaign and discussed potential new business opportunities in Ukraine.

116.    On July 7, 2016, Mr. Manafort sent an email through Mr. Kilimnik to Oleg Deripaska, a Russian billionaire with close ties to Mr. Putin who acts as an agent of the Russian government, offering to brief Mr. Deripaska about the campaign.  The email stated: "[I]f he needs private briefings we can accommodate."  In the same email exchange, Mr. Kilimnik informed Manafort that "there is lately significantly more attention to the campaign in [Mr. Deripaska's] mind, and he will be most likely looking for ways to reach out to you pretty soon, understanding all the time sensitivity."

117.    Federal law enforcement obtained a Foreign Intelligence Surveillance Act (FISA) warrant to conduct electronic surveillance of Mr. Manafort during the campaign based on intercepted conversations about the campaign among Russians and between Mr. Manafort and Russian individuals.  This was the second such warrant federal law enforcement officials had obtained to surveil Mr. Manafort's interactions with Russia-linked entities since 2014.

118.    Mr. Gates was also in contact with Mr. Kilimnik throughout the summer and fall of 2016.

119.    On May 10, 2016 a political activist named Paul Erickson emailed senior campaign official Rick Dearborn about arranging a meeting between the Campaign and Russian agents at the upcoming National Rifle Association (NRA) annual convention in order to "cultivat[e] a back-channel to President Putin's Kremlin."  Mr. Erickson's outreach was on behalf of Aleksander Torshin, a deputy governor of Russia's central bank with close ties to Mr. Putin who acts as an agent of the Russian regime, and Maria Butina, Mr. Torshin's deputy and a Russian agent with close ties to the NRA who was recently indicted as part of the Special Counsel's investigation.  According to Mr. Erickson's email, "for reasons that we can discuss in person or on the phone, the Kremlin believes that the only possibility of a true re-set in this relationship would be with a new Republican White House."  Mr. Dearborn passed the request on to high-level Campaign officials, including Mr. Manafort, Mr. Gates, and Mr. Kushner.  Mr. Trump Jr. then met with Mr. Torshin at the NRA's annual convention.

120.    On or about July 7, 2016, as Mr. Manafort was offering to provide a private briefing to a close Putin ally, Mr. Page visited Moscow and met with Putin confidants and Russian government agents Igor Sechin and Igor Divyekin.  According to the FBI's application for a FISA warrant for Mr. Page, he met with Igor Divyekin regarding the "release[]" of Russian-gathered "kompromat"—or "dirt"—on Secretary Clinton to the Trump Campaign.  Despite denials by the Campaign and Mr. Page, who claimed that he took the trip as a "private citizen," the trip was approved by Mr. Lewandowski while he was the campaign manager for the Trump Campaign, and Mr. Page emailed Campaign officials about "incredible insights" from the trip

while he was in Russia. Mr. Page also informed Mr. Sessions of his travel plans in advance of the trip.

121. On or about July 18 and July 20, 2016, during the Republican National Convention and days before Plaintiffs' private data was dumped to the world, representatives of the Trump Campaign, including Mr. Sessions, Mr. Page, and Mr. Gordon, met with Mr. Kislyak. Mr. Page has acknowledged that the subject of sanctions may have come up in his conversation with Mr. Kislyak on July 20.

122. The June 9, 2016 meeting was not the only meeting that Trump Campaign officials are known to have had with Russian-linked officials or agents to seek information that could undermine Mr. Trump's opponent. Around the time that WikiLeaks published the information hacked from the DNC, a British security consultant named Matt Tait was approached by Peter Smith, a Republican political operative with links to the Trump Campaign, about an operation to obtain emails allegedly taken from Secretary Clinton's private server.

123. According to Mr. Tait's public representation, Mr. Tait warned Mr. Smith that if such emails existed, they had likely been obtained by Russian agents as part of wider efforts to interfere with the U.S. election. According to Mr. Tait:

> Smith . . . didn't seem to care. From his perspective it didn't matter who had taken the emails, or their motives for doing so. He never expressed to me any discomfort with the possibility that the emails he was seeking were potentially from a Russian front, a likelihood he was happy to acknowledge. If they were genuine, they would hurt Clinton's chances, and therefore help Trump. . . . Given the amount of media attention given at the time to the likely involvement of the Russian government in the DNC hack, it seemed mind-boggling for the Trump campaign—or for this offshoot of it—to be actively seeking those emails.

124. According to Mr. Tait, Mr. Smith was closely connected to the Trump Campaign and its agents:

> [I]t was immediately apparent that Smith was both well connected within the top echelons of the campaign and he seemed to know both Lt. Gen. Flynn and his son well.  Smith routinely talked about the goings on at the top of the Trump team, offering deep insights into the bizarre world at the top of the Trump campaign.

In September 2016, Mr. Smith sent Mr. Tait a document entitled "A Demonstrative Pedagogical Summary to be Developed and Released Prior to November 8, 2016."  The document "detailed a company Smith and his colleagues had set up as a vehicle to conduct the research: 'KLS Research', set up as a Delaware LLC 'to avoid campaign reporting,' and listing four groups who were involved in one way or another.  The first group, entitled 'Trump Campaign (in coordination to the extent permitted as an independent expenditure)' listed a number of senior campaign officials: Steve Bannon, Kellyanne Conway, Mr. Clovis, Lt. Gen. Flynn and Lisa Nelson."  According to Tait, "this document was about establishing a company to conduct opposition research on behalf of the campaign, but operating at a distance so as to avoid campaign reporting. Indeed, the document says as much in black and white."  On information and belief, this entity was established and Mr. Smith's activities were conducted in coordination with the Trump Campaign.  On information and belief, the willingness Mr. Smith showed to coordinate with potential Russian agents to obtain and disclose hacked data reflects Defendant's general approach to such coordination.

125.    The Trump Campaign has also demonstrated a willingness to enter into illegal conspiracies in violation of U.S. law, and particularly federal campaign finance law.  On August 21, 2018, Michael Cohen, Mr. Trump's personal attorney, pleaded guilty to an eight-count Bill of Information.  Counts Seven and Eight of the Bill of Information charge violations of federal campaign finance law.  The Bill of Information notes that Mr. Cohen coordinated the illegal payments in conjunction with members of the Trump Campaign.  The Bill of Information

further explains in Count Eight that Mr. Cohen made an illegal expenditure "in cooperation, consultation, and concert with, and at the request and suggestion of one or more members of the campaign."

126.    Mr. Cohen's lawyer, Lanny Davis, has indicated that Mr. Cohen has testified under oath that President Trump "directed him to commit a crime by making payments to two women for the principal purpose of influencing an election."

> b.  *Long-standing relationships between agents of the Trump Campaign and Russia provided a critical foundation for these contacts, which would have been anathema to any other U.S. presidential campaign*

127.    The Russian regime had good reason to believe that its overtures to the Trump Campaign would be welcome, given that many of the agents and associates of the Campaign, including several top advisors and Mr. Trump himself, had longstanding and extensive financial and personal ties to Russia and the Kremlin.

128.    Mr. Trump and the Trump businesses have deep financial ties to Russia that date back to at least the mid-1990s.  As early as 1987, Mr. Trump traveled to Russia to explore building properties there.

129.    Throughout the 2000s, Mr. Trump tried, ultimately unsuccessfully, to develop real estate ventures in Russia.  In 2007, he declared with respect to his building plans, "we will be in Moscow at some point."

130.    Russian investors have played a key role in financing many of Mr. Trump's real estate projects.  Members of the Russian elite have invested hundreds of millions of dollars in Trump properties in the United States, including nearly $100 million in properties in Florida alone.  When Trump World Tower in Manhattan was completed in 2001, approximately one-third of the most expensive units were purchased by Russian buyers.

131.    In the mid-2000s, Mr. Trump partnered with two development companies—the Bayrock Group LLC and the Sapir Organization—with deep ties to Russian oligarchs to develop the Trump International Hotel and Tower in SoHo (known as "Trump SoHo"), in lower Manhattan.

132.    In September 2008, at a real estate conference in New York, Mr. Trump Jr., an official and agent of the Trump businesses, stated, "[I]n terms of high-end product influx into the United States, Russians make up a pretty disproportionate cross-section of a lot of our assets; say in Dubai, and certainly with our project in SoHo and anywhere in New York.  We see a lot of money pouring in from Russia."

133.    In 2013, Mr. Trump concluded an agreement to hold the Miss Universe pageant in Russia.  The deal was financed in part by Aras Agalarov.  (Mr. Agalarov subsequently signed a preliminary deal with Mr. Trump to build a tower with Mr. Trump's name on it in Moscow.)  During an interview in Moscow at the time of the pageant, Mr. Trump stated: "I do have a relationship [with Putin] and I can tell you that he's very interested in what we're doing here today. . . .  I do have a relationship with him. . . .  He's done a very brilliant job in terms of what he represents and who he's represented."  While in Moscow for the pageant, Mr. Trump met with several other oligarchs with close ties to Mr. Putin.  After that meeting, Mr. Trump stated: "I have a great relationship with many Russians, and almost all of the oligarchs were in the room."

134.    On September 21, 2015, Mr. Trump told the radio host Hugh Hewitt on his program: "The oligarchs are under [Putin's] control, to a large extent.  I mean, he can destroy them, and he has destroyed some of them. . . .  Two years ago, I was in Moscow . . . with the top-

level people, both oligarchs and generals, and top-of-the-government people.  I can't go further than that, but I will tell you that I met the top people, and the relationship was extraordinary."

135.    On November 10, 2015, during a Republican primary debate, Mr. Trump stated: "I got to know [Putin] very well because we were both on *60 Minutes*.  We were stablemates, and we did very well that night."

136.    Mr. Trump's business relationships in Russia continued through the 2016 presidential campaign.  The Trump Organization—with Mr. Trump's knowledge and approval— was actively pursuing plans to build a Trump Tower in Moscow during the campaign, beginning in October 2015, months after Mr. Trump had announced his candidacy.  Mr. Cohen was in communication with the Kremlin about the proposed project.

137.    Between April and December of 2016, the Russian patent office granted 10-year extensions to six Trump trademarks that were set to expire in 2016.

138.    Beyond Mr. Trump himself, Mr. Manafort, Mr. Page, Mr. Flynn, and Mr. Kushner all also had long-standing interests in and ties to Russia that, on information and belief, made them similarly receptive to Russian overtures.

139.    On information and belief, in 2005, Mr. Manafort proposed to Mr. Deripaska a plan for Mr. Manafort to influence politics inside the United States to benefit Mr. Putin's government.  Mr. Manafort eventually signed a $10 million annual contract with Mr. Deripaska beginning in 2006.  Mr. Manafort later advised Ukrainian President Viktor Yanukovych and his pro-Russia political party and helped him win several elections until Mr. Yanukovych was ousted from power in 2014.  After Mr. Yanukovych was forced to flee, Ukrainian government investigators obtained a ledger showing millions of dollars in undisclosed cash payments from Mr. Yanukovych and his pro-Russia political party to Mr. Manafort between 2007 and 2012.

140.    In 2008, Mr. Manafort partnered with Mr. Deripaska and a Ukrainian billionaire to explore the possibility of purchasing the Drake Hotel in New York.

141.    In March 2016, Mr. Trump identified Mr. Page as one of his campaign's foreign policy advisors.  Mr. Page was an investment banker with Merrill Lynch in Moscow from 2004 to 2007.  In that capacity, he was an adviser to Gazprom, a Russian state-owned energy company.

142.    In October 2016, the FBI obtained a FISA warrant for Mr. Page, on the basis that there was probable cause to believe that he "has been the subject of targeted recruitment by the Russian Government," designed to "undermine and influence the outcome of the 2016 U.S. Presidential election in violation of U.S. criminal law."  The application for that warrant cited Mr. Page's July 2016 meeting with Igor Sechin, "a close associate of Russian President Putin," to discuss, among other things, a "move to lift Ukraine-related Western sanctions against Russia," and a meeting with Igor Divyekin regarding the "release[]" of Russian-gathered "kompromat"—or "dirt"—on Secretary Clinton to the Trump Campaign.  According to the application, the FBI believed that illegal Russian interference with U.S. elections, including a trade of "dirt" for policy concessions, was "being coordinated with Page and perhaps other individuals associated with" the Trump Campaign.

143.    Mr. Flynn also served as an advisor to the Trump Campaign and was considered as a possible running mate for Mr. Trump.  Following the election, he briefly served as Mr. Trump's National Security Advisor.  In 2015, Mr. Flynn was paid $11,250 by the U.S. subsidiary of a Russian cybersecurity firm and the same amount by a U.S. air cargo company affiliated with the Russian-owned Volga-Dnepr Group.  On December 10, 2015, Mr. Flynn was paid $45,000 to speak at an RT (formerly *Russia Today*) anniversary gala in Moscow, where he sat at the same

table as Mr. Putin and Mr. Putin's chief of staff, Sergei Ivanov.  The U.S. Intelligence

Community Report describes RT as "[t]he Kremlin's principal international propaganda outlet"

and also notes that RT "has actively collaborated with WikiLeaks."

144.    On information and belief, Mr. Kushner and his family have financial and

personal ties with Russian investors, including Lev Leviev and Roman Abramovich, two Russian

oligarchs who are close Putin confidants.

> c.  *Defendant and its co-conspirators all had interests in coordinating on the
>     dissemination of the hacked DNC emails*

145.    On information and belief, Russia's practice when it engages in cyber-attacks

related to an election in another country is to partner with aligned parties who are indigenous

actors within the target country.  Russia has extensive experience entering into and extracting

information from computer networks, but its modus operandi for interfering in other countries'

elections is to seek out domestic political operatives and other domestic actors who can provide

necessary political expertise.

146.    According to former CIA Director John Brennan, based on his long career in

intelligence, "[e]lectoral politics in Western democracies present an especially inviting target [for

Russia], as a variety of politicians, political parties, media outlets, think tanks and influencers are

readily manipulated, wittingly and unwittingly, or even bought outright by Russian intelligence

operatives."  Mr. Brennan is "well aware of Russia's ability to work surreptitiously within the

United States, cultivating relationships with individuals who wield actual or potential power."

As Mr. Brennan has put it, "I know what the Russians try to do.  They try to suborn individuals

and try to get individuals, including U.S. individuals, to act on their behalf, wittingly or

unwittingly."

147.    As Mark Galeotti of the European Council on Foreign Relations has explained, while the precise tactics used by the Russian regime vary depending on particular features specific to each country, Russia consistently seeks to partner with sympathetic domestic actors when engaging in active measures in another country.  *See* Mark Galeotti, *Controlling Chaos: How Russia manages its political war in Europe* (Sept. 1, 2017), *available at* https://www.ecfr.eu/publications/summary/controlling_chaos_how_russia_manages_its_political_war_in_europe#_ftnref27.  For example, leading up to national elections in the Czech Republic earlier this year, the Russian regime supported and appears to have coordinated with Czech President Milos Zeman.  According to Mr. Galeotti, Russia has established a "powerful networks of allies and clients" within Bulgaria.  And the Kremlin has built alliances with far right-wing parties and paramilitaries in Slovakia, Hungary, and the Czech Republic.

148.    On information and belief, and consistent with Russia's modus operandi for such operations, Russia's interest in maximizing the political impact of the hacked emails gave Russia a reason to coordinate its activities with Defendant and its agents.

149.    On information and belief, Russia also had an interest in extracting concessions from and obtaining leverage over Defendant and its agents in exchange for the dissemination of the information it had hacked from the DNC servers.

150.    Defendant also had an interest in coordinating with its co-conspirators to disseminate the information that Russian operatives had stolen from the DNC.

151.    Defendant had a strong interest in coordinating with its co-conspirators to publicize the emails that Russian operatives had stolen from the DNC, and to maximize the political impact of the publication, in order to damage the campaign of Mr. Trump's opponent.

152.    On information and belief, the Chairman of the Campaign, Mr. Manafort, also had a personal incentive to coordinate with Russia.  According to financial records, Mr. Manafort was in debt to Russian interests by as much as $17 million just months before he joined the Trump Campaign.  Mr. Manafort offered to work for the Trump Campaign for free, apparently intending to extract far greater value from a Trump Campaign position by using the access and influence he would have in such a position to serve Russian interests as a way to pay back at least part of his debts.

           *d.*   *On information and belief, Defendant and its co-conspirators reached an agreement to disseminate the hacked DNC emails*

153.    As described above, agents of the Campaign and their co-conspirators had a long history of financial and personal entanglements, extensive contact during the time period relevant to the dissemination of the hacked DNC emails, ample motive to coordinate regarding such dissemination, and a demonstrated inclination to coordinate to benefit Mr. Trump's campaign and undermine support for his opponent.

154.    On information and belief, during contacts between Russian agents and agents for the Campaign, the parties did in fact reach an agreement regarding the publication of hacked DNC material, including emails involving the DNC finance staff and operations (which included Plaintiffs' private information).  On information and belief, this agreement included policy concessions to Russian interests by Defendant.  U.S. intelligence officials deemed reports describing the contours of the agreement between Defendant and the Russian regime to be important enough to brief both the outgoing and incoming Presidents about it.

D.  The Trump Campaign Provided a Series of Beneficial Concessions to Russia

155.    In the midst of the extensive contacts between Russian agents and Defendant during the relevant time period, not only was Plaintiffs' hacked information disclosed, but in

furtherance of the conspiracy the Campaign caused the Republican Party to reverse its long-standing position vis-à-vis Russia and adopt a more pro-Russia approach.

156.   For many years prior to 2016, the Republican Party had taken strong positions opposed to Russia and the government of Mr. Putin.

157.   During the 2008 presidential campaign, for example, Republican nominee John McCain made opposition to Russian aggression a centerpiece of his platform.   In particular, the Republican Party firmly opposed Russian actions against neighboring states.

158.   In his speech at the 2008 Republican National Convention, Mr. McCain criticized Russian aggression: "Russia's leaders, rich with oil wealth and corrupt with power, have rejected democratic ideals and the obligations of a responsible power.   They invaded a small, democratic neighbor to gain more control over the world's oil supply, intimidate other neighbors, and further their ambitions of re-assembling the Russian empire."   Mr. McCain added: "[W]e can't turn a blind eye to aggression and international lawlessness that threatens the peace and stability of the world and the security of the American people."

159.   During the 2012 presidential campaign, Republican nominee Mitt Romney called Russia "our number one geopolitical foe."   During a presidential debate, Mr. Romney stated: "I have clear eyes on this. I'm not going to wear rose-colored glasses when it comes to Russia, or Mr. Putin."

160.   During his acceptance speech at the 2012 Republican National Convention, Mr. Romney again challenged Mr. Putin.   Mr. Romney promised: "Under my administration, our friends will see more loyalty, and Mr. Putin will see a little less flexibility and more backbone."

161.   The Trump Campaign took a dramatically different approach to Russia, marking a stark departure from its party's traditional stance.

162.    On or about July 18, 2016—four days before DNC emails containing Plaintiffs'

private information were dumped publicly, and the same day that Mr. Sessions, Mr. Page, and

Mr. Gordon met with Mr. Kislyak near the site of the Republican National Convention—the

Trump Campaign worked to remove strong language criticizing Russia's actions in Ukraine from

the Republican platform.

163.    Specifically, at a Republican platform meeting, one member proposed an

amendment stating: "Today, the post-Cold War ideal of a 'Europe whole and free' is being

severely tested by Russia's ongoing military aggression in Ukraine."  The proposed amendment

continued: "The Ukrainian people deserve our admiration and support in their struggle."

Accordingly, the amendment called for maintaining or increasing sanctions against Russia,

increasing aid for Ukraine, and "providing lethal defensive weapons" to Ukraine.  But, according

to reporting, Trump Campaign staffers in the room "intervened" and "were able to get the issue

tabled while they devised a method to roll back the language."  The Campaign staffers wrote an

alternate amendment "with softer language," which was ultimately adopted.

164.    Mr. Gordon initially denied any involvement in shaping this part of the

platform.  He later would admit that he was personally involved in softening the language on

Ukraine on behalf of the Trump Campaign.

165.    Despite Russia's recent aggression in Ukraine, and in contrast to the convention

speeches of Senator McCain and Governor Romney in 2008 and 2012, Mr. Trump did not

mention Russia at all during his convention speech.

166.    The Trump Campaign took other steps to benefit Russia.  The Trump Campaign

advanced a significant Russian foreign policy interest by casting doubt on the U.S.'s

commitment to its NATO allies.  Mr. Trump repeatedly declined to support NATO's historical

commitment to defend members who are under attack, refused to offer support to Baltic countries if they were attacked by Russia, and instead criticized NATO members.  In response to Mr. Trump's comments regarding NATO, Republican Senator Lindsey Graham stated: "The Republican nominee for President is essentially telling the Russians and other bad actors that the United States is not fully committed to supporting the NATO alliance."

167.     Mr. Trump and his associates also have undertaken efforts to lift sanctions imposed on Russia in response to its interference with the 2016 election.

168.     On December 29, 2016, three weeks before Mr. Trump became President, the United States imposed economic sanctions on Russian actors in response to Russia's interference in the election.  The United States also expelled certain Russian diplomats and seized Russian-owned facilities in New York and Maryland.  On information and belief, on that same day, in a phone conversation with Russian ambassador Kislyak, Mr. Flynn urged Russia not to respond to the U.S.-imposed sanctions, indicating that Mr. Trump would roll them back once in office.  Mr. Flynn subsequently lied about the substance of the conversation.  Mr. Flynn's December 29 conversation with Mr. Kislyak was one of several contacts between the two in late December 2016.

169.     Immediately upon taking office, the Trump administration undertook efforts to lift economic sanctions imposed on Russia.  Mr. Trump opposed a bill sanctioning Russia that Congress eventually passed with more than enough bipartisan support to override any veto, thus forcing Mr. Trump to sign the bill to avoid having his first ever veto overridden.  But even then the Trump Administration failed to meet a congressionally imposed deadline for implementing the sanctions.

170.     Another of Russia's foreign policy goals has been to improve Russia's and Mr. Putin's image within the United States.  Mr. Trump made a series of comments supportive of Mr. Putin, all consistent with this Russian policy desire.  For example, in December 2015, Mr. Trump said of Mr. Putin: "It is always a great honor to be so nicely complimented by a man so highly respected within his own country and beyond."  Mr. Trump elsewhere during the campaign described Mr. Putin as "very much of a leader" with "very strong control over his country," adding that "he's been a leader, far more than our president has been a leader."

171.     On July 15, 2018, the day before the summit in Helsinki, Mr. Trump tweeted: "Our relationship with Russia has NEVER been worse thanks to many years of U.S. foolishness and stupidity."  At the summit, Mr. Trump again blamed the United States for poor relations with Russia.  When asked whether he believes Mr. Putin's false claim that Russia did not interfere in the U.S. election over contrary findings by the U.S. intelligence community, Mr. Trump said, "I have confidence in both parties."

172.     This public relations campaign has been effective.  According to a February 2017 Gallup poll, Americans at that time saw Russian President Vladimir Putin much more favorably than they had before the 2016 presidential campaign.

173.     Mr. Trump also sought to minimize Mr. Putin's negative human rights record.  In response to questions about Mr. Putin arranging the deaths of opponents, Mr. Trump responded, "I haven't seen any evidence that he killed anybody."

174.     These actions and others by the Trump Campaign helped to further Russia's foreign policy objectives.

E.   Pursuant to the Conspiracy, Certain Hacked DNC Emails, Containing Plaintiffs' Private Information, Were Published to the World on WikiLeaks

175.   On July 22, 2016, four days after the change to the Republican Party platform and in furtherance of the conspiracy, actors in control of the stolen materials obtained by Russia caused WikiLeaks to post on the Internet thousands of private emails hacked from the DNC.  As set forth above, the emails published on WikiLeaks included private information about each of the Plaintiffs—and about dozens of other private Americans.  The information about Plaintiffs was not newsworthy and its release caused them substantial injuries.

176.   WikiLeaks was chosen as the intermediary for the release of the material stolen from the DNC because of WikiLeaks' close ties with Russia and Russian intelligence.  Secretary of State Mike Pompeo has described WikiLeaks as a "non-state hostile intelligence service often abetted by state actors like Russia."

177.   Defendant and its Russian co-conspirators did not cause all of the hacked emails in their possession to be published on WikiLeaks.  Instead, on information and belief, Defendant and its co-conspirators together decided to select a subset of the hacked emails to be released in order to obtain maximum political benefit for the Trump Campaign.

178.   The conspirators focused on releasing emails from the accounts of DNC finance staff, which included private information from and about donors.  By causing emails with such private donor information to be posted on the Internet, Defendant showed that anyone donating to, attending events in support of, and otherwise supporting their candidate for the White House would be at risk of having their private information hacked and released.  In so doing, Defendant conspired to use intimidation and threats to deter eligible voters from giving support to Secretary Clinton's presidential campaign.

179.    Defendant coordinated with its co-conspirators to choose the time for releasing the hacked emails so as to obtain maximum political advantage for the Trump Campaign.

180.    According to Omarosa Manigault Newman, a former aide to Mr. Trump on both the Campaign and in the White House, Mr. Trump knew about the hacked emails before they were released.

181.    On information and belief, Russian agents had possessed large volumes of DNC data for some time prior to July 2016, but the DNC emails were not published on WikiLeaks until the timing was politically optimal to benefit the Trump Campaign.  As Mr. Trump Jr. indicated in an email, the release of information would be helpful to the Trump Campaign "especially later in the summer."  The Grand Jury indictment of Russian agents describes the significance of the timing of the DNC email release, quoting co-conspirator correspondence stressing the value of release just prior to the DNC convention.

182.    On information and belief, in furtherance of this conspiracy, Mr. Stone communicated with WikiLeaks regarding the publication of the DNC emails prior to the publication.  Mr. Stone was in close contact with both Mr. Trump and Mr. Manafort at this key time.  Shortly after the DNC emails were published, Mr. Stone publicly admitted in an interview that he had communicated with WikiLeaks founder Julian Assange but said that he was "not at liberty" to discuss aspects of those communications.   Mr. Stone later admitted that he had "backchannel communications" with Mr. Assange "through an intermediary—somebody who is a mutual friend," and revealed that person to be Randy Credico, who in 2018 received a grand jury subpoena in connection with the Special Counsel's investigation.

183.    At around the time the DNC emails were published, Mr. Stone engaged in public and private Twitter conversations with Guccifer 2.0, who several weeks earlier had claimed credit for the DNC hack.

184.    According to the U.S. Intelligence Community Report, Guccifer 2.0 was working as an agent of Russian military intelligence.  The report states that GRU (Russian intelligence) "used the Guccifer 2.0 persona, DCLeaks.com, and WikiLeaks to release US victim data obtained in cyber operations publicly and in exclusives to media outlets."  The "GRU relayed material it acquired from the DNC and senior Democratic officials to WikiLeaks."

185.    The strategic timing and content of the publication of DNC emails right before the Democratic National Convention aggravated tensions and internal disagreements within the Democratic Party in order to assist Mr. Trump's chances in the upcoming election, as intended.  Headlines from around the time of the Convention demonstrated the effect of the publication.  *The New York Times* reported that "the publication of 20,000 Democratic National Committee emails by WikiLeaks this weekend provided a disastrous prelude to the convention."  An article in the *National Review* similarly proclaimed: "WikiLeaks blows up the party's hopes for a smooth convention week."

186.    Releasing emails from the DNC finance team on the eve of the Democratic National Convention showed a deep knowledge of American politics.  Particularly in the twenty-first century, party conventions are an important tool for gathering and rallying campaign donors for the final stretch of the campaign.  Thus, the personal information of the finance team and donors was leaked at the precise time where they would cause the most possible harm.

F.   Throughout the Remainder of the Campaign, Defendant and its Agents Amplified and
     Drew Attention to Hacked Emails that Had Been Published

187.    The Trump Campaign sought to maximize its advantage from the release of the

hacked emails by further publicizing and amplifying the released information.  According to Ms.

Manigault Newman, the Campaign instructed its agents and associates to bring up the emails at

every possible opportunity.  In the last months of the campaign, Mr. Trump mentioned

WikiLeaks more than 160 times during campaign appearances, drawing increased attention to

the released Russian-hacked emails.

188.    For example, on July 23, 2016, the day after the release of the DNC emails, Mr.

Trump sought to amplify and gain further political benefit from the timing of the release of the

emails.  "The Wikileaks e-mail release today was so bad to [Senator Bernie] Sanders that it will

make it impossible for him to support [Secretary Clinton], unless he is a fraud," Mr. Trump

tweeted.

189.    On October 27, 2016, during an appearance on *Good Morning America*, Mr.

Trump said that the media should be "talking about . . . WikiLeaks and the horrible things that

have come out about Hillary Clinton, the horrible things."

190.    Defendant and its agents also continued to communicate with Russia and others

regarding the hacking and release of additional emails that could harm Secretary Clinton.

191.    On July 27, 2016, during the Democratic National Convention, Mr. Trump held a

press conference in Florida.  During his remarks, Mr. Trump called on Russia to continue its

cyberattacks, stating, "Russia, if you're listening, I hope you're able to find the 30,000 [Secretary

Clinton] emails that are missing."  Although the Trump Campaign—and later, then-White House

press secretary Sean Spicer—claimed that Mr. Trump was "joking," when Mr. Trump was asked

at the time to clarify his remark and whether he was serious, Mr. Trump stated: "If Russia or

China or any other country has those emails, I mean, to be honest with you, I'd love to see them."

192.    According to the July 13, 2018 indictment of twelve Russian nationals filed by the Special Counsel, agents of the Russian government attempted that same day—July 27, 2016—"to spearfish for the first time email accounts at a domain hosted by a third-party provider and used by Clinton's personal office."  In other words, on the day that Mr. Trump publicly said that he hoped Russia would be able to find missing emails related to Secretary Clinton, Russian intelligence for the first time attempted to hack email accounts on Secretary Clinton's own server.

193.    Mr. Stone subsequently engaged in a series of exchanges with one of the Russian hackers culminating in the release of a second tranche of emails, this time from the DCCC and Clinton Campaign Chairman John Podesta's account.

194.    In August and September 2016, Mr. Stone and Guccifer 2.0 engaged in an exchange of direct messages over Twitter.

195.    On August 12, 2016, Guccifer 2.0 released documents obtained from the DCCC and tweeted to Mr. Stone: "thanks that u believe in the real #Guccifer2."  Guccifer 2.0 subsequently tweeted "paying u back," in reply to a tweet from Mr. Stone.

196.    On August 18, 2016, Mr. Stone admitted in a C-SPAN interview that he was in touch with Assange "through an intermediary."

197.    On August 21, 2016, Mr. Stone tweeted: "Trust me, it will soon the [sic] Podesta's time in the barrel.  #CrookedHillary."

198.    In mid-September, Mr. Stone said on a radio interview that he expected "Julian Assange and the Wikileaks people to drop a payload of new documents on a weekly basis fairly soon."

199.    On October 1, 2016, Mr. Stone tweeted: "Wednesday @HillaryClinton is done."

200.    Two days later, on October 3, 2016, Mr. Stone tweeted: "I have total confidence that @wikileaks and my hero Julian Assange will educate the American people soon #LockHerUp."

201.    Then, on October 4, 2016, Mr. Stone tweeted: "Payload coming. #Lockthemup."

202.    Just three days later, on October 7, 2016, WikiLeaks published the first batch of emails hacked from Mr. Podesta.

203.    The WikiLeaks publication of those hacked Podesta emails came just one hour after an Access Hollywood video surfaced on which Mr. Trump made lewd remarks about sexually assaulting women.  The timing of the release was highly opportune for the Trump Campaign, because it deflected attention from the Access Hollywood video, the discovery of which was potentially badly damaging to Mr. Trump.

204.    Later, Mr. Trump himself previewed disclosures in order to elevate attention to them.  For example, on November 2, 2016, he declared: "So today, I guess WikiLeaks, it sounds like, is going to be dropping some more."

205.    Other Trump Campaign agents and associates also communicated with WikiLeaks in the months leading up to the election.

206.    Cambridge Analytica, the company that ran the Campaign's digital operations (and thus another agent of the Campaign), communicated with WikiLeaks in July 2016.

Cambridge Analytica asked WikiLeaks to help obtain emails allegedly deleted from Secretary Clinton's private sever.

207.    Mr. Trump Jr. exchanged Twitter direct messages with WikiLeaks agents on several occasions in September and October of 2016 and informed high-level Campaign officials—including Ms. Conway, Mr. Bannon, Mr. Kushner, and others—about these interactions.  Mr. Trump Jr. also repeatedly amplified materials leaked by WikiLeaks through social media.  On one occasion, WikiLeaks suggested directly to Mr. Trump Jr. that Mr. Trump Sr. help amplify a release of a batch of the emails stolen from Mr. Podesta's account.  In response, fifteen minutes later, Mr. Trump Sr. publicized a link to the emails through Twitter.

208.    As set forth above, the release of Plaintiffs' private information, as well as the subsequent amplification by Defendant and its agents, was intended to and caused them real and substantial harm as a result of their participation in the political process and their support and advocacy for a particular presidential candidate.  This harm to Plaintiffs was a direct and foreseeable consequence of the dissemination of the hacked emails.  The publication of the emails also directly and foreseeably served to intimidate eligible voters who were potential donors to and supporters of Mr. Trump's opponent, including Plaintiffs, as it put them on notice that their support and advocacy could expose them to the release of their private information.

G.  Defendant and Its Agents and Associates Then Sought to Deny and Conceal Any Evidence of the Conspiracy

209.    Defendant and its agents and associates have repeatedly tried to deny or conceal all aspects of this conspiracy.  First, they have denied, attempted to conceal, or otherwise misrepresented their contacts during the campaign with Russian agents and WikiLeaks.  Second, they have failed to disclose contacts with Russian agents even when such failure violates or circumvents the law.  Third, they have sought to conceal the nature of their personal and business

relationships with Russia.  Fourth, they have sought to dismiss and undermine the unanimous conclusions of the U.S. government that Russia interfered with the 2016 election, doing nothing to hold Russia accountable for its attack on both the election and on the privacy of Plaintiffs and others like them.  Fifth, they have concealed their involvement in softening the Republican Party platform to Russia's benefit.  Sixth, since becoming President, Mr. Trump has taken actions to block the law enforcement investigation into any involvement by his Campaign and associates in Russian attempts to interfere with the 2016 election.

> *a.  Defendant and its agents and associates attempted to conceal contacts with Russian actors*

210.    Defendant and its agents and associates have repeatedly denied or attempted to conceal contacts during the campaign with Russian actors.

211.    For example, Defendant attempted to conceal the June 9, 2016 meeting between Mr. Trump Jr., Mr. Manafort, Mr. Kushner, and Russian agents, as well as Mr. Trump's advance knowledge of that meeting.

212.    On July 24, 2016, during a CNN interview, Mr. Trump Jr. said that reports that Russia was trying to help the Trump Campaign by damaging his opponent were "disgusting" and "so phony," despite having attended a recent meeting with Russian agents for precisely that purpose.  When news of the meeting came to light nearly a year later, Mr. Trump Jr. offered differing and incomplete explanations of the origins and purpose of the meeting.  In his initial account of the meeting, Mr. Trump Jr. stated that he "was asked to attend the meeting by an acquaintance, but was not told the name of the person I would be meeting with beforehand," and that "[w]e primarily discussed a program about the adoption of Russian children that was active and popular with American families years ago and was since ended by the Russian government, but it was not a campaign issue at the time and there was no follow up."  That initial statement

was personally dictated by Mr. Trump Sr., whose authorship of the statement was initially concealed.  Only later—after the true reason for the meeting had come to light—did Mr. Trump Jr. acknowledge that the purpose of the meeting was to discuss information about Mr. Trump Sr.'s opponent that would benefit the Trump Campaign.  Mr. Trump Jr. acknowledged in a tweet issued on July 10, 2017 that he took the "meeting to hear info about" Mr. Trump's opponent. His father described it the same way in a tweet earlier this month.

213.    Mr. Trump and other agents and associates of the Campaign have repeatedly denied that Mr. Trump knew about the June 9 meeting in advance.  However, according to recent news reports, Michael Cohen, Mr. Trump's former lawyer and longtime associate, has stated and will testify that Mr. Trump knew about the meeting in advance and approved of it.  In the wake of this revelation, Rudolph Giuliani, Mr. Trump's current attorney, has shifted from claiming that Mr. Trump did not know about the meeting in advance to claiming only that he did not *attend* the meeting.

214.    Similarly, Mr. Giuliani—along with others associated with the Campaign, including Mr. Trump himself—has also shifted from denying that the Trump Campaign had ongoing contacts with Russian agents to arguing, repeatedly, that "collusion" with the Kremlin is not a crime.

215.    Notwithstanding Mr. Giuliani's claim to the contrary, conspiring with the Kremlin to affect a U.S. election by accepting "dirt" on opposing candidates or other campaign assistance violates several federal laws.  For example, it is "unlawful for . . . a foreign national, directly or indirectly, to make . . . a contribution or donation of money or other thing of value, or to make an express or implied promise to make a contribution or donation, in connection with a Federal, State, or local election," and for "a person to solicit, accept, or receive a contribution or donation

. . . from a foreign national." 52 U.S.C. § 30121(a). Opposition research, including stolen

emails, constitute "things of value" under federal law. Thus, Defendant's co-conspirators,

including foreign nationals, contributed a "thing of value" in connection with the 2016 election

in the form of the dissemination of hacked private emails. And Defendant solicited, accepted,

and received a "thing of value" from foreign nationals. In addition, federal election regulations

prohibit U.S. nationals from giving foreign nationals "substantial assistance" in connection with

donations or provision of "thing[s] of value" to candidates in American elections. 11 C.F.R.

§ 110.20(h). Defendant knowingly provided foreign nationals substantial assistance in advising

on the dissemination of the hacked emails. Federal law also outlaws any conspiracy to interfere

with or obstruct a lawful government function. 18 U.S.C. § 371. There is no more vital

government function that ensuring that Americans can select their representatives in government.

Indeed, Special Counsel Robert Mueller has already indicted 16 Russians and Russian entities

for this crime based on their efforts to ensure that the Trump Campaign was successful. It is also

a crime to accept information known to be obtained through unauthorized access to a computer

network. 18 U.S.C. § 1030(a)(2)(c).

216.    The attempt to conceal and then misrepresent the June 9 meeting is just one

example of repeated denials by Defendant and its agents and associates of contacts between the

Trump Campaign and Russian agents that have later proven false.

217.    To take another example, on July 24, 2016—the same day that Mr. Trump Jr.

issued his denial—Mr. Manafort stated that allegations of links between the Trump Campaign

and Russia were "absurd" and that "there's no basis to it."

218.    On September 25, 2016, in response to a question about Mr. Page's contacts with

Russian agents, Kellyanne Conway, a senior advisor to Mr. Trump, stated: "If he's doing that,

he's certainly not doing it with the permission or knowledge of the campaign . . . . He is certainly not authorized to do that."

219. On November 11, 2016, Campaign spokeswoman Hope Hicks stated that contacts between the Campaign and Russian actors "never happened." She added: "There was no communication between the Campaign and any foreign entity during the campaign."

220. On December 18, 2016, Ms. Conway was asked whether "anyone involved in the Trump Campaign [had] any contact with Russians trying to meddle with the election." She replied: "Absolutely not. And I discussed that with the president-elect just last night. Those conversations never happened."

221. On January 11, 2017, Mr. Trump denied that anyone in his Campaign or any of his associates had contact with Russia leading up to or during the campaign.

222. On January 15, 2017, then Vice President-elect Mike Pence denied any contacts between the Trump Campaign or its associates and Russian operatives.

223. On February 20, 2017, then deputy press secretary Sarah Huckabee Sanders said that allegations about contacts between Trump associates and Russia are "a non-story because to the best of our knowledge, no contacts took place, so it's hard to make a comment on something that never happened."

224. In March 2017, Mr. Trump Jr. stated: "Did I meet with people that were Russian? I'm sure, I'm sure I did. But none that were set up. None that I can think of at the moment. And certainly none that I was representing the campaign in any way, shape, or form."

225. Mr. Cohen lied to Congress about the efforts to develop a Trump Tower in Moscow, falsely claiming that he had stopped working on the proposal in January 2016 when he

had, in fact, pursued the project—with Mr. Trump's knowledge and approval—for months thereafter.

226.     Agents and associates of the Campaign have also denied any contact with WikiLeaks.  In a July meeting with congressional investigators, Mr. Kushner stated that he did not recall any contact between the Campaign and WikiLeaks, despite the fact that he was aware of the communications between WikiLeaks and Mr. Trump Jr.

> *b.   Defendant and its agents and associates failed to disclose contacts with Russian agents even when such failure violated or circumvented the law*

227.     Not only have Defendant and its agents and associates sought to conceal their contact with Russian agents, but they have done so even where their failure to disclose such contacts violated or circumvented the law.

228.     Mr. Kushner failed to disclose his meetings with Russian agents, and other contacts with foreign government officials, in security clearance forms as required by law.  On information and belief, in December 2016, Mr. Kushner and Mr. Flynn discussed with Mr. Kislyak the establishment of a communication back channel with Russia, which would use Russian diplomatic facilities in an apparent attempt to avoid detection by American intelligence agencies.  Also in December 2016, Mr. Kushner met in New York with Sergey Gorkov, the chairman of Vnesheconombank, a Russian state-owned bank that is subject to U.S. sanctions.  Mr. Kushner did not disclose these meetings.

229.     Mr. Sessions failed to disclose during his Senate confirmation hearing and in security clearance forms at least three meetings during the campaign with Mr. Kislyak.  Those meetings included discussions of campaign-related matters, including Mr. Trump's position on issues important to Russia, which Mr. Sessions had previously denied.  Mr. Sessions was also

aware of, and failed to disclose, other contacts between agents and associates of the Campaign and Russian agents, including Mr. Page's trip to Russia in June 2016.

230.     Mr. Flynn failed to disclose payments from foreign sources, including Russian sources, as required by law.

231.     Mr. Manafort failed to register with the Department of Justice as a foreign agent while working for Mr. Yanukovych.  In June 2017, Mr. Manafort retroactively filed foreign agent registration forms showing that his firm had been paid over $17 million from Mr. Yanukovych's pro-Russian Ukrainian political party over a two-year period.  This failure was a federal crime for which he will be on trial next month.

   c.   *Defendant and its agents and associates concealed aspects of their personal and business relationships with Russian agents*

232.     Defendant and its agents and associates have also concealed the nature of their personal and business relationships with Russian agents.  For example, during the campaign, Mr. Trump walked back his repeated boasts about his Russia connections.  On July 27, 2016, the same day that he called on Russia to hack Secretary Clinton's emails, Mr. Trump insisted that "I never met Putin. I've never spoken to him."  In a television interview, he reiterated: "But I have nothing to do with Russia, nothing to do, I never met Putin, I have nothing to do with Russia whatsoever."  Despite his considerable business interests in Russia, Mr. Trump further stated: "I have nothing to do with Russia.  I don't have any jobs in Russia.  I'm all over the world but we're not involved in Russia."

233.     On October 24, 2016, at a campaign rally in Florida, Mr. Trump stated: "I have nothing to do with Russia, folks, I'll give you a written statement."

234.     On October 26, 2016, at a rally in Kinston, North Carolina, Mr. Trump declared, "First of all, I . . . have no business whatsoever with Russia, have nothing to do with Russia."

235.    On January 11, 2017, Mr. Trump tweeted: "Russia has never tried to use leverage over me. I HAVE NOTHING TO DO WITH RUSSIA—NO DEALS, NO LOANS, NO NOTHING!"

236.    On February 7, 2017, Mr. Trump posted a tweet that claimed, in part, "I don't know Putin, have no deals in Russia, and the haters are going crazy."

237.    On February 16, 2017, during a press conference in the White House, Mr. Trump claimed, when asked about contacts with Russia: "I had nothing to do with it.  I have nothing to do with Russia.  I told you, I have no deals there.  I have no anything."

238.    To date, despite questions about his business relationships and financial ties to Russia, Mr. Trump—in a stark break from the practice of prior presidential candidates, who disclosed ten years of prior tax returns, and despite considerable political pressure—has refused to disclose any of his tax returns.  He has done this notwithstanding the obvious opportunity to put to rest some of the damaging speculation about Russian dealings that may or may not be indicated on these returns.

>   d.   *Defendant and its agents and associates have sought to deny any Russian interference with the 2016 election*

239.    Mr. Trump and his associates have repeatedly questioned or denied Russia's involvement in the hacking of the DNC emails and its interference with the 2016 election, despite the overwhelming consensus of the U.S. intelligence community and others that Russia was responsible.

240.    For example, on June 15, 2016, shortly after the hacking of the DNC became public, Mr. Trump suggested that the DNC hacked itself to get attention.

241.    On July 26, 2016, Mr. Trump tweeted that Democrats were blaming Russia to "deflect the horror and stupidity of the WikiLeaks disaster."

242.    On September 8, 2016, in an interview on the Russian-controlled media outlet RT, Mr. Trump stated that it is "probably unlikely" that Russia interfered with the election. He further stated: "I think maybe the Democrats are putting that out. Who knows? But I think that it's pretty unlikely."

243.    On September 26, 2016, during the first presidential debate, Mr. Trump dismissed accusations that Russia was behind the DNC hacks and stated: "It also could be somebody sitting on their bed that weighs 400 pounds, okay?"

244.    On October 9, 2016, during the second presidential debate, Mr. Trump claimed that "[Secretary Clinton] doesn't know if it's the Russians doing the hacking. Maybe there is no hacking."

245.    On November 28, 2016, in an interview after the election with *Time* magazine, Mr. Trump stated: "I don't believe [Russia] interfered. That became a laughing point, not a talking point, a laughing point."

246.    On July 6, 2017, while traveling in Poland, Mr. Trump remarked to reporters, "I think it very well could be Russia but I think it could very well have been other countries," continuing, "no one really knows for sure." In fact, U.S. intelligence agencies are unanimous in the view that it was indeed Russia.

247.    On July 7, 2017, Mr. Trump met personally with Mr. Putin and reportedly accepted Mr. Putin's denial of involvement in trying to disrupt the U.S. election. Secretary of State Rex Tillerson indicated that the two leaders had agreed that continued focus on this issue would be a hindrance and thus agreed to move on.

248.    Mr. Trump's unsupported denials continue to this day. On July 16, 2018, at a summit with Mr. Putin in Helsinki, Finland, Mr. Trump publicly accepted Mr. Putin's word that

Russia was not involved in election interference over the unanimous conclusion of the U.S. intelligence community and overwhelming evidence to the contrary.  In response to a question about whether he would denounce Russian interference in the 2016 election, Mr. Trump stated: "I have President Putin.  He just said it's not Russia.  I will say this.  I don't see any reason why it would be . . . .  I have confidence in both parties."  In the face of intense criticism, Mr. Trump later claimed that he meant to say, "I don't see any reason why it *wouldn't* be [Russia]," but offered no explanation for his statement that his confidence in the Kremlin is on par with his confidence in the U.S. intelligence community.

249.    Other Trump Campaign agents and associates have issued similar denials of Russian involvement.  For example, in a speech on July 11, 2017, Mr. Stone stated, incorrectly, that there is no evidence of Russian interference in the 2016 election.  He also dismissed allegations of collusion with Russia as a "fairy tale," argued that it was a false narrative invented to distract from the fact that Secretary Clinton, rather than Mr. Trump, was the presidential candidate "in bed" with the Russians, and dismissed the June 9 meeting at Trump Tower as insignificant.

   *e.   Defendant concealed its involvement in the platform change to benefit Russia*

250.    Defendant has also attempted to conceal its involvement in the change in the Republican Party's platform language about Ukraine.  Mr. Trump and Mr. Manafort initially denied any campaign involvement in the platform language.  In January 2017, Mr. Gordon, the Trump Campaign's national security policy representative at the Republican National Convention, also denied involvement.  But in March 2017, Mr. Gordon admitted that he was personally involved in softening the language on Ukraine.  Indeed, on July 14, 2016—mere days

after the platform change—Mr. Page emailed Mr. Gordon and others to congratulate them on the platform language on Ukraine.

> f. *Mr. Trump took actions to block the law enforcement investigation into involvement by his Campaign and associates in Russian attempts to interfere with the 2016 election*

251.    After assuming the presidency, Mr. Trump made repeated efforts to ingratiate himself with FBI Director Comey, who was overseeing an investigation into Russian interference in the 2016 election and possible Trump Campaign involvement.  According to Director Comey, at a private dinner in Washington, D.C., Mr. Trump asked for Director Comey's personal loyalty.  In a later meeting in the White House, Mr. Trump requested that Director Comey let go of his investigation into wrongdoing by Mr. Flynn.  Mr. Trump and his staff also made several efforts to have members of the U.S. law enforcement and intelligence communities publicly rebut claims of the Campaign's coordination with Russia.

252.    On May 9, 2017, Mr. Trump fired Director Comey.  He initially offered a reason for the firing—Mr. Comey's handling of the investigation into whether Secretary Clinton had mishandled classified information—that was widely understood as mere pretext.  Indeed, the day after Director Comey was fired, at a meeting in the Oval Office, Mr. Trump told Russian Foreign Minister Sergey Lavrov and Ambassador Kislyak that he "faced great pressure because of Russia," and that as a result of firing Director Comey, "That's taken off."  The next day, in an interview with NBC News, Mr. Trump said of the decision to fire Director Comey: "But regardless of recommendation, I was going to fire Comey knowing there was no good time to do it.  And in fact, when I decided to just do it, I said to myself—I said, you know, this Russia thing with Trump and Russia is a made-up story.  It's an excuse by the Democrats for having lost an election that they should've won."

253.     On at least two occasions, Mr. Trump has tried to fire Special Counsel Mueller to halt the investigation.  In June 2017, he ordered that the Special Counsel be fired, but backed down when the White House Counsel threatened to resign.  In December 2017, he again instructed aides to fire the Special Counsel, but was then dissuaded.  Mr. Trump regularly attacks the FBI, the Special Counsel and his team, and the Special Counsel's investigation.  He has repeatedly—and to this day—referred to the investigation as a "hoax" and a "witch hunt."

*     *     *     *     *

254.     In sum, as set forth above, Russia adopted at its highest levels of government a strategy to interfere with the 2016 U.S. election and successfully executed that strategy by, among other things, stealing and conspiring with Defendant and others to disseminate DNC emails, in exchange for Defendant's ongoing political and policy support of Russia.

255.     That strategy, as executed together with Defendant and its co-conspirators, injured Plaintiffs on account of their participation in the democratic process.  The threat that actors like Defendant and its co-conspirators might again seek to steal and disseminate employee and supporter information hangs over our democratic process, imposing a chilling effect on the willingness of Americans to exercise their rights to support and advocate for candidates for office.

256.     Defendant and its agents and associates have engaged in extensive efforts to deny Russia's role in the hack, to undermine efforts to hold Russia accountable for its cyberattack on the DNC and release of Plaintiffs' personal information, and to conceal their contacts with Russian agents in order to conceal their own involvement in the conspiracy.

<u>**COUNT I**</u>
**Conspiracy to Intimidate Lawful Voters from Giving Support or Advocacy to Electors for President and to Injure Citizens in Person or Property on Account of Such Support or Advocacy in Violation of 42 U.S.C. 1985(3)**

257.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

258.    Plaintiffs are U.S. citizens who are lawfully entitled to vote.

259.    Plaintiffs communicated with persons at the DNC, and made and solicited contributions to the DNC, for the purpose of giving support and advocacy in a legal manner in favor of the election of candidates for federal office, including in the 2016 presidential election.

260.    Defendant agreed with other parties, including Russian agents and WikiLeaks, to participate in the public disclosure on the Internet of private email communications that were stolen, or hacked, from the DNC for the purpose of influencing the 2016 presidential election.

261.    Defendant assisted in the project of public disclosure of the stolen or hacked emails by helping its co-conspirators decide which emails to release and when to release them to maximize impact on the 2016 election and deter support for Secretary Clinton.  Defendant also provided benefits to the Russian government in exchange for the Russian government's using the stolen or hacked emails to damage the political campaign of Defendant's opponent.

262.    Defendant and its co-conspirators knew that the hacked DNC emails were private and intended to publicly disclose the private emails.

263.    In furtherance of the scheme, one or more conspirators caused to be published on the Internet hacked DNC emails containing private facts about Plaintiffs and others, including information regarding, personal health matters, social security numbers, credit cards, personal relationships, banking relationships, home addresses, and telephone numbers, as well as information about eligible voters', including Plaintiffs', lawful support and advocacy for a

candidate for President.  Also in furtherance of the scheme, Defendant drew attention to the disseminated DNC emails containing eligible voters', including Plaintiffs', private information.

264.    Defendant and its co-conspirators specifically chose to release emails hacked from the DNC finance team, knowing that those emails contained private facts about citizens lawfully eligible to vote who had given support or advocacy in favor of Secretary Clinton's campaign for the presidency.

265.    By deliberately exposing citizens eligible to vote to significant harm as a result of their activities in support of a presidential campaign, and thereby making clear that others who supported that campaign could be subject to the same or similar harms, Defendant and others conspired to prevent by intimidation eligible voters from giving their support or advocacy in a legal manner for a candidate in the presidential election.

266.    By deliberately exposing American citizens to significant harm as a result of their activities in support of a presidential campaign, Defendant and others conspired to injure American citizens in their persons and property on account of their support or advocacy in a legal manner for a candidate in the presidential election.

267.    In so doing, Defendant and others also conspired to intimidate members of the DNC finance team from giving further support and advocacy in a legal manner in favor of a candidate for President of the United States.

268.    As a natural and foreseeable result of the conspiracy, Plaintiffs, among other persons, were injured in their persons and property.

269.    As a direct and proximate result of the conduct of Defendant and its co-conspirators, Plaintiffs have sustained significant harm, entitling them to damages in an amount to be proven at trial.

270.    The outrageous, malicious, and willful misconduct of Defendant—conspiring with a hostile foreign government to publish Plaintiffs' stolen and private information to the world as part of a conspiracy to influence a presidential election—also entitles Plaintiffs to receive punitive damages so that Defendant and others in its position are deterred from repeating such outrageous actions in the future.

## COUNT II
### Public Disclosure of Private Facts as to Mr. Cockrum in Violation of Tennessee Law (Civil Conspiracy and Aiding and Abetting Liability)

271.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

272.    Defendant agreed with other parties, including Russian government officials and WikiLeaks, to participate in the public disclosure on the Internet of private email communications that were stolen, or hacked, from the DNC for the purpose of influencing the 2016 presidential election.

273.    Defendant also aided and abetted the above-described public disclosure.

274.    Defendant and its co-conspirators knew that the hacked DNC emails were private and intended to publicly disclose the private emails.

275.    Defendant and its co-conspirators knew, were plainly indifferent to the fact, or consciously disregarded the foreseeable risk that the hacked DNC emails contained private facts, in which the public had no legitimate concern, about Mr. Cockrum and other individuals similarly situated, and that publication of such information would cause suffering, shame, or humiliation to a person of ordinary sensibilities.

276.    In furtherance of the conspiracy, one or more conspirators caused to be published on the Internet hacked DNC emails containing private facts about Mr. Cockrum and others,

including information regarding his social security number, date of birth, address, and phone number. These emails were published widely, including in Tennessee, where Mr. Cockrum was domiciled, injuring Mr. Cockrum in that state.

277.    As a direct and proximate result of the conduct of Defendant and its co-conspirators, Mr. Cockrum has sustained significant harm, entitling him to damages in an amount to be proven at trial.

278.    The outrageous, malicious, and willful misconduct of Defendant—conspiring with a hostile foreign government to publish Mr. Cockrum's stolen and private information to the world as part of a conspiracy to influence a presidential election—also entitles Mr. Cockrum to punitive damages so that Defendant and others in its position are deterred from repeating such outrageous actions in the future.

## COUNT III
**Public Disclosure of Private Facts as to Mr. Comer in Violation of Maryland Law
(Civil Conspiracy and Aiding and Abetting Liability)**

279.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

280.    Defendant agreed with other parties, including Russian government officials and WikiLeaks, to participate in the public disclosure on the Internet of private email communications that were stolen, or hacked, from the DNC for the purpose of influencing the 2016 presidential election.

281.    Defendant also aided and abetted the above-described public disclosure.

282.    Defendant and its co-conspirators knew that the hacked DNC emails were private and intended to publicly disclose the private emails.

283.    Defendant and its co-conspirators knew, were plainly indifferent to the fact, or consciously disregarded the foreseeable risk that the hacked DNC emails contained private facts, in which the public had no legitimate concern, about Mr. Comer and other individuals similarly situated, and that publication of such information would cause suffering, shame, or humiliation to a person of ordinary sensibilities.

284.    In furtherance of the conspiracy, one or more conspirators caused to be published on the Internet hacked DNC emails containing private facts about Mr. Comer and others, including information regarding personal health matters, and personal and professional relationships.  These emails were published widely, including in the state of Maryland, where Mr. Comer was domiciled, injuring Mr. Comer in that state.

285.    As a direct and proximate result of the conduct of Defendant and its co-conspirators, Mr. Comer has sustained significant harm, entitling him to damages in an amount to be proven at trial.

286.    The outrageous, malicious, and willful misconduct of Defendant—conspiring with a hostile foreign government to publish Mr. Comer's stolen and private information to the world as part of a conspiracy to influence a presidential election—also entitles Mr. Comer to punitive damages so that Defendant and others in its position are deterred from repeating such outrageous actions in the future.

## COUNT IV
### Public Disclosure of Private Facts as to Mr. Schoenberg in Violation of New Jersey Law
### (Civil Conspiracy and Aiding and Abetting Liability)

287.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

288.     Defendant agreed with other parties, including Russian government officials and WikiLeaks, to participate in the public disclosure on the Internet of private email communications that were stolen, or hacked, from the DNC for the purpose of influencing the 2016 presidential election.

289.     Defendant also aided and abetted the above-described public disclosure.

290.     Defendant and its co-conspirators knew that the hacked DNC emails were private and intended to publicly disclose the private emails.

291.     Defendant and its co-conspirators knew, were plainly indifferent to the fact, or consciously disregarded the foreseeable risk that the hacked DNC emails contained private facts, in which the public had no legitimate concern, about Mr. Schoenberg and other individuals similarly situated, and that publication of such information would cause suffering, shame, or humiliation to a person of ordinary sensibilities.

292.     In furtherance of the conspiracy, one or more conspirators caused to be published on the Internet hacked DNC emails containing private facts about Mr. Schoenberg and others, including information regarding his social security number, date of birth, address, phone number, and banking relationships.  These emails were published widely, including in New Jersey, where Mr. Schoenberg was domiciled, injuring Mr. Schoenberg in that state.

293.     As a direct and proximate result of the conduct of Defendant and its co-conspirators, Mr. Schoenberg has sustained significant harm, entitling him to damages in an amount to be proven at trial.

294.     The outrageous, malicious, and willful misconduct of Defendant—conspiring with a hostile foreign government to publish Mr. Schoenberg's stolen and private information to the world as part of a conspiracy to influence a presidential election—also entitles Mr.

Schoenberg to punitive damages so that Defendant and others in its position are deterred from repeating such outrageous actions in the future.

## COUNT V
### Intentional Infliction of Emotional Distress as to Mr. Comer in Violation of Maryland Law
### (Civil Conspiracy and Aiding and Abetting Liability)

295.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

296.     Defendant agreed with other parties, including Russian government officials and WikiLeaks, to publicly disclose on the Internet private email communications that were stolen, or hacked, from the DNC for the purpose of influencing the 2016 presidential election.

297.     Defendant also aided and abetted the above-described public disclosure.

298.     Defendant and its co-conspirators knew that the hacked DNC emails were private and intended to publicly disclose the private emails.

299.     Defendant and its co-conspirators knew, were plainly indifferent to the fact, or consciously disregarded the foreseeable risk that the publication of the hacked DNC emails would cause Mr. Comer severe or extreme emotional distress.

300.     In furtherance of the conspiracy, one or more conspirators caused to be published on the Internet hacked DNC emails containing private facts about Mr. Comer, including information regarding personal health matters, and personal and professional relationships.

301.     The conduct of Defendant and its co-conspirators was extreme, outrageous, and beyond the bounds of decency.

302.     As a direct and proximate result of the conduct of Defendant and its co-conspirators, Mr. Comer has suffered emotional distress so severe and extreme that it required him to seek medical treatment, entitling him to damages in an amount to be proven at trial.

303.     The outrageous, malicious, and willful misconduct of Defendant—conspiring

with a hostile foreign government to publish Plaintiffs' stolen and private information to the

world as part of a conspiracy to influence a presidential election—also entitles Mr. Comer to

receive punitive damages so that Defendant and others in its position are deterred from repeating

such outrageous actions in the future.

**COUNT VI**
**Civil Conspiracy in Violation of the Common Law**

304.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth

herein.

305.     Defendant agreed with other parties, including Russian agents and WikiLeaks, to

act in concert for an unlawful purpose, or to accomplish a lawful purpose by unlawful means.  In

particular, Defendant and its co-conspirators agreed to publicly disclose on the Internet private

email communications that were stolen, or hacked, from the DNC.  As set forth above, this

conduct was unlawful in violation of federal civil rights law and state tort law.

306.     Defendant and its co-conspirators' conduct not only violated federal civil rights

law and state tort law, but also federal campaign finance law, federal law prohibiting

conspiracies to interfere with or obstruct a lawful government function, and federal law

prohibiting the acceptance of information known to be obtained through unauthorized access to a

computer network.

307.     Defendant and its co-conspirators committed overt acts in furtherance of the

agreement, as set forth above.

308.     As a direct and proximate result of the conduct of Defendant and its co-

conspirators, Plaintiffs have sustained significant harm, entitling them to damages in an amount

to be proven at trial.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully pray that this Court:

a) Issue judgment in favor of Plaintiffs.

b) Award compensatory and consequential damages as proven at trial, and in an amount over $75,000 for each Plaintiff (exclusive of interest and costs), to compensate Plaintiffs for the injuries they suffered.

c) Award punitive damages as just and proper in light of Defendant's outrageous and malicious conduct and to deter such egregious conduct from being committed in the future.

d) Require Defendant to disgorge any profits it obtained through its involvement in the conspiracy, including gains from its financial relationships with Russian agents and financial benefits accruing from Russia's intervention in the election.

e) Award Plaintiffs costs and reasonable attorneys' fees.

f) Provide such other relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a jury trial of all issues so triable.


Date: August 23, 2018          */s/ April H. Pullium* _____
APRIL H. PULLIUM
Virginia Bar No. 90994
Bredhoff & Kaiser, P.L.L.C.
805 15th St. N.W.
Washington, DC 20005
Tel: (202) 842-2600
Fax: (202) 824-1888
Email: apullium@bredhoff.com

*Counsel for Plaintiffs*

BENJAMIN L. BERWICK (MA Bar No. 679207)
(*pro hac vice* application forthcoming)
United to Protect Democracy
10 Ware St.
Cambridge, MA 02138
(909) 326-2911
Ben.Berwick@protectdemocracy.org

IAN BASSIN (NY Attorney Registration No.
4683439) (*pro hac vice* application forthcoming)
United to Protect Democracy
222 Broadway, 19th Floor
New York, NY 10038
Ian.Bassin@protectdemocracy.org

JUSTIN FLORENCE (D.C. Bar No. 988953) (*pro hac vice* application forthcoming)
Justin.Florence@protectdemocracy.org
ANNE TINDALL (D.C. Bar No. 494607) (*pro hac vice* application forthcoming)
Anne.Tindall@protectdemocracy.org
CAMERON KISTLER (D.C. Bar No. 1008922) (*pro hac vice* application forthcoming)
Cameron.Kistler@protectdemocracy.org
United to Protect Democracy
2020 Pennsylvania Ave. NW, #163
Washington, DC 20006
(202) 856-9191

NANCY GERTNER (MA Bar No. 190140) (*pro hac vice* application forthcoming)
Fick & Marx
100 Franklin Street, 7th floor
Boston, MA 02110
(857) 321-8360
ngertner@fickmarx.com

RICHARD PRIMUS (MI Bar No. P70419) (*pro hac vice* application forthcoming)
The University of Michigan Law School*
625 S. State Street
Ann Arbor, MI 48109
(734) 647-5543
PrimusLaw1859@gmail.com

STEVEN A. HIRSCH (CA State Bar No. 171825) (*pro hac vice* application forthcoming)
shirsch@keker.com
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
(415) 391-5400

STEPHEN P. BERZON (CA State Bar No. 46540) (*pro hac vice* application forthcoming)
sberzon@altber.com
BARBARA J. CHISHOLM (CA State Bar No. 224656) (*pro hac vice* application forthcoming)
bchisholm@altber.com
DANIELLE E. LEONARD (CA State Bar No. 218201) (*pro hac vice* application forthcoming)
dleonard@altber.com
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
(415) 421-7151

\* For identification purposes.


*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 23rd day of August 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all registered parties.

Date: August 23, 2018          /s/ *April H. Pullium*                
APRIL H. PULLIUM
Virginia Bar No. 90994
Bredhoff & Kaiser, P.L.L.C.
805 15th St. N.W.
Washington, DC 20005
Tel: (202) 842-2600
Fax: (202) 824-1888
Email: apullium@bredhoff.com

*Counsel for Plaintiffs*