# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

ROY COCKRUM, ET AL.,

        *Plaintiffs*,

v.

DONALD J. TRUMP FOR PRESIDENT, INC.,

        *Defendant*.

Case No. 3:18-cv-484-HEH

---

## OPENING BRIEF IN SUPPORT OF
## DEFENDANT DONALD J. TRUMP FOR PRESIDENT, INC.'S
## MOTION TO DISMISS

---

Jeffrey Baltruzak
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
(412) 391-3939
jbaltruzak@jonesday.com

Michael A. Carvin
Nikki L. McArthur
Vivek Suri
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
(202) 879-3939
macarvin@jonesday.com
nmcarthur@jonesday.com
vsuri@jonesday.com

*Counsel for Donald J. Trump for President, Inc.*

# TABLE OF CONTENTS

Page

Introduction ................................................................................................................... 1

Facts ............................................................................................................................... 2

Argument ....................................................................................................................... 4

I.  Plaintiffs' claims share common flaws that require their dismissal .................................... 4

    A.  The Court should dismiss all claims because the First Amendment protects the
        disclosure of the DNC emails ......................................................................................... 4

    B.  The Court should dismiss all claims because Plaintiffs do not plausibly allege
        unlawful conspiracy or collusion .................................................................................... 9

    C.  The Court should dismiss the public-disclosure, intentional-infliction, and
        civil-conspiracy claims in accordance with applicable choice-of-law rules .............. 11

    D.  The Court should dismiss the public-disclosure and intentional-infliction
        claims because these theories of liability violate the First Amendment ..................... 14

    E.  The Court should dismiss the public-disclosure and intentional-infliction
        claims because these theories of liability are impermissibly vague ........................... 15

    F.  The Court should dismiss the claims of conspiracy with WikiLeaks because
        they violate the Communications Decency Act ........................................................... 16

II.  Plaintiffs' claims should be dismissed for additional reasons ........................................... 17

    A.  Plaintiffs fail to state a claim under section 1985(3) .................................................. 17

    B.  Even if New York law does not apply, Plaintiffs fail to state claims for public
        disclosure of private facts under Maryland, New Jersey, and Tennessee law............ 24

    C.  Even if New York law does not apply, Mr. Comer fails to state a claim for
        intentional infliction under Maryland law ................................................................... 26

    D.  Even if New York law does not apply, Plaintiffs fail to state a claim for civil
        conspiracy .................................................................................................................... 28

Conclusion .................................................................................................................... 30

Certificate of Service

# TABLE OF EXHIBITS

**Exhibit**

Email dated May 5, 2016 (regarding Sen. Sanders' religious beliefs) ...........................................1

Email dated May 21, 2016 (regarding Sen. Sanders' campaign) ....................................................2

Aaron Blake, *Latest, Most Damaging Things in the DNC's Leaked Emails*, The Washington Post (July 25, 2016) ....................................................................................................3

Email dated April 24, 2016 (regarding fairness to Sen. Sanders)....................................................4

Nicholas Confessore and Steve Eder, *In Hacked D.N.C. Emails, a Glimpse of How Big Money Works*, The New York Times (July 25, 2016) ......................................................................5

Michael Calderone, *Politico Admits "Mistake" In Sending DNC An Article In Advance*, Huffington Post (July 24, 2016) ....................................................................................................6

Email dated April 28, 2016 (regarding questions for Jake Tapper)..................................................7

Email dated May 22, 2016 (regarding outreach to Hispanic voters) ...............................................8

Email dated May 6, 2016 (regarding "taco bowl engagement") .....................................................9

WikiLeaks' accuracy policy ..........................................................................................................10

## INTRODUCTION

This is a meritless case. Plaintiffs—two donors and one ex-employee of the Democratic Party—allege, without factual grounds, that Donald J. Trump for President, Inc. (Campaign) conspired with Russian agents to publish emails that the Russians had previously stolen from the computers of the Democratic National Committee. Plaintiffs originally sued the Campaign in the District of Columbia, but the district court there dismissed their lawsuit for lack of personal jurisdiction and improper venue. *See Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp. 3d 158 (D.D.C. 2018). Plaintiffs have now refiled the case in this Court.

The object of this lawsuit is to launch a private investigation into the President of the United States. The Amended Complaint already foreshadows discovery into the President's "tax returns" (Am. Compl. ¶ 238), his "business relationships" (*id.*), his conversations with "Director Comey" (*id.* ¶ 251), and on and on. This lawsuit, meanwhile, threatens to interfere with pending criminal and congressional investigations. Special Counsel Robert Mueller and multiple congressional committees are already investigating alleged collusion with Russia during the 2016 presidential election. A parallel civil case, with parallel discovery proceedings, handled by a group of self-appointed private investigators, will surely complicate those efforts.

The Court should dismiss this disruptive, politically motivated lawsuit. Plaintiffs allege that the Campaign conspired to publish the DNC's emails after Russian hackers stole them—not that the Campaign participated in the hack itself. As a threshold matter, under dispositive First Amendment and tort-law principles, a person does not commit a legal wrong simply by publishing information of public concern that someone else had previously stolen. Even crediting Plaintiffs' far-fetched accusations, therefore, Plaintiffs have failed to state a claim against the Campaign. Further, the applicable state law—from New York—rejects Plaintiffs' torts. The case should be dismissed with prejudice on these grounds and, if necessary, for other reasons as well.

**FACTS**

On July 22, 2016, days before the Democratic Convention met to nominate Hillary Clinton for President, WikiLeaks published thousands of work emails sent and received by officials at the Democratic National Committee. (Am. Compl. ¶ 43.) These emails revealed important information about the Clinton Campaign and Democratic Party. For example:

- The emails revealed DNC officials' hostility toward Senator Sanders. DNC figures discussed portraying Senator Sanders as an atheist, because "my Southern Baptist peeps would draw a big difference between a Jew and an atheist." (Ex. 1.) They suggested pushing a media narrative that Senator Sanders "never ever had his act together, that his campaign was a mess." (Ex. 2.) They opposed his push for additional debates. (Ex. 3.) They complained that he "has no understanding" of the Democratic Party. (Ex. 4.)

- According to *The New York Times*, "thousands of emails" between donors and fundraisers revealed "in rarely seen detail the elaborate, ingratiating and often bluntly transactional exchanges necessary to harvest hundreds of millions of dollars from the party's wealthy donor class." These emails "capture[d] a world where seating charts are arranged with dollar totals in mind, where a White House celebration of gay pride is a thinly disguised occasion for rewarding wealthy donors and where physical proximity to the president is the most precious of currencies." (Ex. 5.)

- The emails revealed the coziness of the relationship between the DNC and the media. For example, they showed that reporters would ask DNC to pre-approve articles before publication. (Ex. 6.) They also showed DNC staffers talking about giving a CNN reporter "questions to ask us." (Ex. 7.)

- The emails revealed the DNC's attitudes toward Hispanic voters. One memo discussed ways to "acquire the Hispanic consumer," claiming that "Hispanics are the most brand loyal consumers in the World" and that "Hispanics are the most responsive to 'story telling.'" (Ex. 8.) Another email pitched "a new video we'd like to use to mop up some more taco bowl engagement." (Ex. 9.)

WikiLeaks, however, did not redact the emails, so the publication also included details that Plaintiffs describe as private. (Am. Compl. ¶¶ 43–53.) Roy Cockrum and Eric Schoenberg, both Democratic Party donors, allege that the emails revealed identifying information (including social security numbers) that they sent to the DNC to get security clearances for a political event.

(*Id.* ¶¶ 50–51.) Scott Comer, formerly the DNC's Finance Chief of Staff and LGBT Finance Director, originally alleged that the emails also revealed "details from which [others] deduced his sexual orientation." (Compl. ¶ 19). The Amended Complaint drops that allegation; Mr. Comer now rests his claims only on emails that included "gossip" about his colleagues and his note to "his boss" describing his symptoms "during a virus." (Am. Compl. ¶¶ 52–53.)

Plaintiffs claim that Russia had stolen these emails, and that Russia and the Campaign later conspired to publish them. Specifically, they allege that "elements of Russian intelligence" hacked into the DNC's email systems "in July 2015" and "maintained that access" over the course of the next year. (*Id.* ¶ 86.) Then, in "a series of secret meetings in the spring and summer of 2016," the Campaign and Stone allegedly conspired with "Russian actors" to publish those emails on WikiLeaks in order to harm the Clinton Campaign. (*Id.* at 25.) This conspiracy allegedly covered only the "release" of the emails, not their initial acquisition. (*Id.* ¶ 2.)

In July 2017, Plaintiffs sued the Campaign in the United States District Court for the District of Columbia. The district court dismissed the case for lack of personal jurisdiction and improper venue. *Cockrum*, 319 F. Supp. 3d at 165.

Plaintiffs have now refiled their lawsuit in Virginia, where the Campaign is incorporated. The Amended Complaint—the second complaint in this venue, and the fourth overall—raises four sets of claims. First, all Plaintiffs raise claims under 42 U.S.C. § 1985(3) for conspiracy to intimidate voters. Second, all Plaintiffs raise claims for public disclosure of private facts under the laws of New Jersey, Maryland, and Tennessee (their home states). Third, Mr. Comer alone raises a claim for intentional infliction of emotional distress under the law of Maryland (Mr. Comer's home state). Finally, all Plaintiffs raise a claim for civil conspiracy under "the common law" of an unspecified state (presumably Virginia, the forum state). (Am. Compl. ¶¶ 257–308.)

**ARGUMENT**

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court should consider the factual allegations in the complaint, documents to which the complaint refers or on which the complaint relies, and matters of public record subject to judicial notice. *See United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014). Here, the Court may consider the contents of the WikiLeaks emails: Plaintiffs have attached some to their Complaint; the Complaint refers to and relies on them; and the Court may take judicial notice of their contents because they are publicly available on the internet.

I.  **Plaintiffs' Claims Share Common Flaws That Require Their Dismissal**

    A.  **The Court should dismiss all claims because the First Amendment protects the disclosure of the DNC emails**

In each claim, Plaintiffs seek to hold the Campaign legally responsible for the publication of the DNC emails on WikiLeaks. The First Amendment, however, protects a speaker's right to disclose information—even stolen information—so long as (1) the speaker did not participate in the theft and (2) the information deals with matters of public concern. The DNC emails clearly deal with matters of significant public concern, and Plaintiffs do not and cannot allege that the Campaign participated in the hacking of those emails. Each claim must therefore be dismissed.

**1.** In *Bartnicki v. Vopper*, 532 U.S. 514 (2001), the Supreme Court held that the First Amendment protects a speaker's right to disclose stolen information if (1) the speaker was "not involved" in the acquisition and (2) the disclosure deals with "a matter of public concern." *Id.* at 529, 535. There, union leaders spoke on the phone about using violence against school-board members to influence salary negotiations. *Id.* at 518–19. An unknown person secretly intercepted the call and shared the illegal recording with a local radio host, who played it on his show. *Id.* at 519. The Court ruled that the First Amendment protected the radio broadcast, because the host

4

"played no part in the illegal interception" and "the subject matter of the conversation was a matter of public concern." *Id.* at 525. The Court reasoned that "state action to punish the publication of truthful information seldom can satisfy constitutional standards." *Id.* at 527. The state has an interest in deterring theft of information, but it must pursue that goal by imposing "an appropriate punishment" on "the interceptor"—not by punishing a speaker who was "not involved in the initial illegality." *Id.* at 529. The state also has an interest in protecting "privacy of communication," but "privacy concerns give way when balanced against the interest in publishing matters of public importance." *Id.* at 533–34. In short, "a stranger's illegal conduct does not suffice to remove the First Amendment shield from speech about a matter of public concern." *Id.* at 535.

"An opposite rule"—under which a speaker may be punished for truthful disclosures on account of a "defect in the chain of title"—"would be fraught with danger." *Boehner v. McDermott*, 484 F.3d 573, 586 (D.C. Cir. 2007) (opinion of Sentelle, J., joined by a majority of the *en banc* court). "U.S. newspapers publish information stolen via digital means all the time." Jack L. Goldsmith, *Uncomfortable Questions in the Wake of Russia Indictment 2.0* (July 16, 2018).[1] Indeed, they "openly solicit such information." *Id.* Punishing "conspiracy to publish stolen information" "would certainly narrow protections for 'mainstream' journalists." *Id.*

**2.** The Campaign satisfies the first part of *Bartnicki*'s test: It "played no part in the illegal interception." *Bartnicki*, 532 U.S. at 525. That is clear from Plaintiffs' factual theory: "Defendants entered into an agreement with other parties, including agents of Russia and WikiLeaks, to have information stolen from the DNC publicly *disseminated* in a strategic way." (Am. Compl. ¶ 16) (emphasis added). The complaint reinforces that theory on every page: "the *publication* of hacked information pursuant to the conspiracy" (*id.* ¶ 20); "conspiracy … *to disseminate* infor-

---

[1] https://www.lawfareblog.com/uncomfortable-questions-wake-russia-indictment-20-and-trumps-press-conference-putin

mation" (*id.* ¶ 78); "extracting concessions … in exchange for *the dissemination* of the information" (*id.* ¶ 149); "an agreement *to disseminate* the hacked DNC emails") (*id.* at 42); "motive to coordinate regarding such *dissemination*" (*id.* ¶ 153); "an agreement regarding the *publication*" (*id.* ¶ 154); "agreed … to *publicly disclose*" (*id.* ¶ 296) (all emphases added).

That is no surprise. Given Rule 11, Plaintiffs *could not* have alleged the Campaign's involvement in the initial hack. According to Plaintiffs' own account, Russian intelligence hacked the DNC's networks "in July 2015," and gained access to email accounts "by March 2016." (*Id.* ¶ 86.) But the Campaign supposedly became motivated to work with Russia only in "the spring and summer of 2016" (*id.* at 25), and supposedly entered into the agreement in "secret meetings" in "April," "May," "June," and "July" 2016 (*id.* ¶¶ 89–104). In other words, Plaintiffs themselves say that the alleged conspiracy was formed *after* the hack and *after* the acquisition of the emails—so that the Campaign could not have participated in the initial theft.

**3.** The Campaign also satisfies the second part of *Bartnicki*'s test: the disclosure deals with "a matter of public concern." *Bartnicki*, 532 U.S. at 525. Whether speech deals with issues of public concern is "a matter of law." *Snyder v. Phelps*, 580 F.3d 206, 220 (4th Cir. 2009). "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (citations and quotation marks omitted). A court applying this test must examine the "content, form, and context" of the speech. *Id.*

Courts judge the public character of a disclosure in the aggregate, not line by line. Regardless of whether the particular sentence complained about is itself of public concern, the disclosure is constitutionally protected if the disclosure as a whole deals with a matter of public concern. For example, in *Bartnicki*, leaders of a teachers' union spoke on the phone about

6

"blow[ing] off [school-board members'] front porches" to influence salary negotiations. 532 U.S. at 519. Even though the threat to "blow off" porches was not itself speech about public issues, the First Amendment protected the disclosure because the host made it while "engaged in debate about" teacher pay—"a matter of public concern." *Id.* at 535. The "public concern" test thus turns on the broader context of the disclosure, not the nature of the specific fact disclosed.

The Supreme Court followed the same holistic approach in in *Florida Star v. B.J.F.*, 491 U.S. 524 (1989). In that case, a newspaper published an article that revealed the name of a rape victim, violating a state statute that forbade the disclosure of this private fact. The Court ruled that the First Amendment barred civil liability, because "the *news article* concerned a matter of public significance," even though the victim's name itself did not. *Id.* at 536 (emphasis added). The Court emphasized that "the article generally, *as opposed to the specific identity contained within it*, involved a matter of paramount public import." *Id.* at 536–37 (emphasis added).

The Supreme Court and Fourth Circuit again followed the same approach in *Snyder v. Phelps*. There, protesters held up hateful signs at a soldier's funeral—some addressing public issues ("God Hates the USA"), some specifically condemning the fallen soldier ("You're Going to Hell"). 562 U.S. at 454. Yet the Supreme Court held that the First Amendment protected the entire funeral protest—including the private taunts that were "related to [the fallen soldier and his family] specifically"—because "the overall thrust and dominant theme of [the] demonstration spoke to broader public issues." *Id*. The Fourth Circuit, too, ruled that the whole protest was protected, "even when [the soldier's parents] are mentioned," because the "general message" "primarily concerned" matters of public concern. 580 F.3d at 225–26.

*Bartnicki*, *Florida Star*, and *Snyder* thus show that courts apply the public-concern test to the disclosure as a whole, not to individual snippets taken in isolation. This approach accords

with the "essential First Amendment rule" that courts must always judge speech "as a whole." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 248 (2002); *cf. Miller v. California*, 413 U.S. 15, 24 (1973) (speech is obscene only if "the work, *taken as a whole*, appeals to the prurient interest" and "*taken as a whole*, lacks serious … value" (emphasis added)).

Here, the content, form, and context of the disclosure establishes that the disclosure, in the aggregate, dealt with public issues. To begin with the content: Every disclosed email was (1) a work email (2) sent or received by a political operative (3) during a presidential campaign. Every disclosed email thus inherently addressed politics, elections, and campaigns—all paradigmatic public issues. Indeed, the disclosed emails dealt pervasively with *important* public issues. They revealed the Democratic Party's conduct during its presidential primaries—which are public processes "structur[ed] and monitor[ed]" by the state. *Cal. Democratic Party v. Jones*, 530 U.S. 567, 572 (2000). They revealed the DNC's interactions with rich donors—educating citizens about the influence of "moneyed interests." *Citizens United v. FEC*, 558 U.S. 310, 370 (2010). And they revealed the closeness of the party's ties to the media—"the great interpreters between the government and the people." *Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936).

Next, form. WikiLeaks published the emails on "the vast democratic forums of the Internet." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017). It communicated the information to the public at large—not, for example, just to Mr. Comer's colleagues.

Finally, context. WikiLeaks published the emails on July 22, 2016, "right before the Democratic National Convention." (Am. Compl. ¶ 185.) That timing shows that the "overall thrust" of the disclosure was to reveal important facts to the electorate—not to release social security numbers and office gossip buried in a few out of thousands of emails.

In sum, the Campaign did not participate in the theft of the emails, and the emails taken as a whole concerned public issues. Under *Bartnicki*, the First Amendment bars civil liability.

### B.    The Court should dismiss all claims because Plaintiffs do not plausibly allege unlawful conspiracy or collusion

Rule 8 requires a complaint to state a "plausible" claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint satisfies this standard if its "factual content" raises a "reasonable inference" that the defendant engaged in the misconduct alleged. *Id.* at 678. This requirement protects defendants against "costly and protracted discovery" on a "largely groundless claim." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558 (2007). This protection is essential here, where Plaintiffs' explicit goal is to burden the President with discovery. The President's "unique position in the constitutional scheme" requires him to "devote his undivided time and attention to his public duties." *Clinton v. Jones*, 520 U.S. 681, 697–98 (1997). Courts must thus ensure that plaintiffs do not use "civil discovery" on "meritless claims" to interfere with his responsibilities. *Cheney v. U.S. District Court*, 542 U.S. 367, 386 (2004).

The Amended Complaint falls short of the standard set by Rule 8 in two ways: It fails to plausibly allege that the Campaign engaged in conspiracy or aiding and abetting, and it also fails to plausibly allege that the Campaign acted with the necessary state of mind.

**1.** Because Plaintiffs do not claim that the Campaign itself published the emails, Plaintiffs must show that the Campaign conspired with or aided and abetted Russian agents to establish each of their four claims. Conspiracy is an element of the § 1985(3) claim (conspiracy to intimidate voters) and the civil-conspiracy claim. Similarly, the public-disclosure and intentional-infliction claims require a showing that the Campaign conspired with or aided and abetted *other* wrongdoers. (Am. Compl. ¶¶ 271–303.)

Yet the Amended Complaint fails to plausibly allege that the Campaign conspired with or aided and abetted the publishers of the DNC emails. Plaintiffs allege a series of meetings between the Campaign and Russian agents in 2016. (*Id.* ¶ 15.) But Plaintiffs do not allege that any of the meetings in any way concerned the DNC emails, much less the information about Plaintiffs contained in those emails. The allegation that people met to discuss *something* does not raise a plausible inference that they met to discuss collaborative efforts to release specific emails hacked from the DNC to influence an election, much less to intimidate or embarrass Plaintiffs. *Cf. Twombly*, 550 U.S. at 567 n.12 (regular meetings do not suggest conspiracy).

**2.** In order to establish their claims, Plaintiffs must also show that the Campaign acted with the necessary state of mind. First, the Campaign can be held liable under § 1985(3) only if it acted with the purpose of intimidating or injuring Plaintiffs. Section 1985(3) prohibits conspiracies to "prevent by force, intimidation, or threat" voters from giving support or advocacy to federal candidates, or to "injure" voters on account of such support or advocacy. As a matter of ordinary English, two people have conspired "to prevent" or "to injure" only if prevention or injury is the *purpose* (not merely the *effect*) of their agreement. Second, the Campaign can be held liable for public disclosure and intentional infliction under a theory of conspiracy liability only if the Campaign acted with the "specific intent" to accomplish these particular torts. *Whitfield v. John Bourne Co.*, 16 Fed. App'x 116, 124 (4th Cir. 2001). Finally, the Campaign can be held liable for public disclosure and intentional infliction under a theory of aiding-and-abetting liability only if the Campaign "knowingly and substantially assist[ed]" these particular torts. *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983).

Plaintiffs do not plausibly allege these states of mind. For one thing, Plaintiffs allege that the object of the purported conspiracy was to promote the Trump Campaign and to embarrass the

*DNC* and the *Clinton Campaign.* (Am. Compl. ¶ 190.) They do not allege facts showing that the Campaign even *knew* of Mr. Comer, Mr. Cockrum, or Mr. Schoenberg, much less that Campaign officials met with Russian agents for the purpose of disclosing these individuals' social security numbers, gossip, and stomach-flu symptoms. For another thing, Plaintiffs fail to address (let alone refute) the "obvious alternative explanation" for the disclosure of their emails (*Iqbal*, 556 U.S. at 682): WikiLeaks' "accuracy policy," under which WikiLeaks does not redact or "tamper with" the documents it discloses. (Ex. 10.) The upshot is that Plaintiffs do not plausibly allege that the Campaign acted with the purpose of intimidating Plaintiffs; do not plausibly allege that the Campaign acted with the specific intent to disclose Plaintiffs' allegedly private emails; and do not plausibly allege that the Campaign acted with knowledge that the WikiLeaks email collection included Plaintiffs' allegedly private emails.

### C.   The Court should dismiss the public-disclosure, intentional-infliction, and civil-conspiracy claims in accordance with applicable choice-of-law rules

Under the choice-of-law principles that apply to this case, Plaintiffs' state-law tort claims—public disclosure of private facts, intentional infliction of emotional distress, and civil conspiracy—are governed by the law of New York. New York rejects each of these theories of tort liability, and, as a result, each of these claims must be dismissed.

**1.** A federal court sitting in diversity "must apply the choice of law principles of the state in which the case was filed"—here, Virginia. *Elderberry of Weber City, LLC v. Living Ctrs.-Se., Inc.*, 794 F.3d 406, 415 n.6 (4th Cir. 2015). In "tort actions," "Virginia applies … the law of the place of the wrong." *Milton v. IIT Research Inst.*, 138 F.3d 519, 521 (4th Cir. 1998). The "place of the wrong" is "the state in which the wrongful act took place"—"the place where the tortious conduct … occurred." *Id.* at 522. In cases involving tortious internet speech, the place in which the wrongful act took place is usually the place from which the defendant published the speech.

For example, in *Wiest v. E-Fense, Inc.*, 356 F. Supp. 2d 604, 608 (E.D. Va. 2005), this Court applied Virginia law to a claim that the defendant had defamed the plaintiff on its corporate website, because "the website in question [was] controlled from [the defendant's] corporate headquarters located in Virginia." Similarly, in *Cretella v. Kuzminski*, 2008 WL 2227605, at *3 (E.D. Va. May 29, 2008), this Court applied Virginia law to a claim that the defendant had defamed the plaintiff on a website, because the defamatory statements "were probably posted in Virginia, given that [the defendant] resides in … Virginia."

Here, New York is the place of the alleged wrong—the place where the alleged wrongful act took place. In the first place, the Campaign has "its permanent headquarters in New York." (Am. Compl. ¶ 35.) Plaintiffs also allege that the purported conspiracy included a number of participants who reside in New York: Mr. Trump, Donald Trump, Jr., and Jared Kushner. (*Id.* ¶ 38.) The Campaign's alleged role in publication of materials on WikiLeaks was thus "controlled from [the Campaign's] corporate headquarters"—and the alleged conspirators' residences—in New York. *Wiest*, 356 F. Supp. 2d at 608. In the second place, according to Plaintiffs' allegations, the supposed conspiracy between the Campaign and Russian agents was formed principally in meetings in New York. For example, Plaintiffs rely on a meeting between "senior Trump Campaign officials" and "a Kremlin-connected lawyer" in Trump Tower in New York, and on a meeting "in New York" between "Mr. Kushner" and "Sergey Gorkov, the chairman of … a Russian state-owned bank." (Am. Compl.¶¶ 15, 228.) As a result, New York law governs Plaintiffs' claims.

New York rejects each of the three tort theories that Plaintiffs invoke. First, there is "no cause of action in [New York] for publication of truthful but embarrassing facts." *Howell v. New York Post Co.*, 612 N.E.2d 699, 704 (N.Y. 1993). Second, a plaintiff may not "circumvent" the unavailability of a tort claim "simply [by] relabeling it as a claim for intentional infliction of

emotional distress." *Chaiken v. VV Publishing Corp.*, 119 F.3d 1018, 1034 (2d Cir. 1997). Finally, "New York does not recognize an independent tort of conspiracy." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006). As a result, Plaintiffs' public-disclosure, intentional-infliction, and conspiracy claims should all be dismissed.

**2.** Plaintiffs lack a consistent and principled theory about which state's law governs their claims. In their previous lawsuit against the Campaign in the District of Columbia, they asserted that District of Columbia law governed all of their claims. *Cockrum*, 319 F. Supp. 3d at 165. Now, they ask the Court to apply Maryland, New Jersey, and Tennessee law to the public-disclosure claims, Maryland law to Mr. Comer's intentional-infliction claim, and (seemingly) Virginia law to the conspiracy claim.

There is no basis for Plaintiffs' invocation of Maryland, New Jersey, and Tennessee law. Plaintiffs allege that they were domiciled in these three states, but, as the Fourth Circuit has explained, "the Virginia Supreme Court has declined the invitation to … focu[s] on the parties' domicile, choosing instead to reaffirm the place of the wrong rule." *Milton*, 138 F.3d at 522 (citing *McMillan v. McMillan*, 253 S.E.2d 662, 664 (Va. 1979)). Plaintiffs also allege that they experienced their injuries in these three states, but, as the Fourth Circuit and this Court have both explained, "Virginia clearly selects the law of the place where the wrongful act occurred, even when that place differs from the place where the effects of injury are felt." *Milton*, 138 F.3d at 522; *see Gen. Assurance of America, Inc. v. Overby-Seawell Co.*, 893 F. Supp. 2d 761, 778 (E.D. Va. 2012) ("Virginia's choice of law rule selects the law of the state in which the wrongful act took place, wherever the effects of that act are felt … Given this, [the plaintiff] is incorrect in asserting that the place of the injury, rather than the place of the wrong, controls").

There is also no basis for Plaintiffs' apparent invocation of Virginia law. Plaintiffs do not allege that the wrong—or, for that matter, any event related to the wrong—occurred in Virginia. Instead, Plaintiffs allege only that the Campaign is "incorporated in Virginia." (Am. Compl. ¶ 37.) Under Virginia law, however, a tort claim is governed by the law of "the place of the wrong"— not the law of the defendant's "place of incorporation." *McMillan*, 253 S.E.2d at 664.

### D. The Court should dismiss the public-disclosure and intentional-infliction claims because these theories of liability violate the First Amendment

The tort of public disclosure of private facts violates the First Amendment on its face, and the tort of intentional infliction of emotional distress violates the First Amendment as applied to truthful speech. At a minimum, both violate the First Amendment as applied to the kind of speech at issue here—truthful speech in a political campaign.

Under the First Amendment, the government has no power to restrict expression simply because society finds the speech "offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). Plaintiffs' tort theories flatly contradict this elementary principle: Public-disclosure liability applies to disclosures that "would be highly offensive to a reasonable person." Restatement (Second) of Torts § 652D (1977) (Second Restatement). And intentional-infliction liability applies to "outrageous" conduct. *Figueiredo-Torres v. Nickel*, 584 A.2d 69, 74 (Md. 1991). In addition, the First Amendment generally denies the government power to punish truthful speech. "Punish[ing] the publication of truthful information seldom can satisfy constitutional standards." *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 102 (1979). Plaintiffs' tort theories contradict this rudimentary principle as well; they would punish publication of *truthful* information about Plaintiffs' lives.

Privacy cannot justify these violations of core First Amendment norms. "Punishing truthful publication in the name of privacy" is an "extraordinary measure." *Florida Star.*, 491 U.S. at

540. The state may resort to this measure, "if at all," only if it satisfies strict scrutiny—only where liability is "narrowly tailored to a state interest of the highest order." *Id.* at 541. There is no narrow tailoring here. The state has available a "far more limited means of [protecting privacy] than the extreme step of punishing truthful speech" (*id.* at 538): It could just punish the people who hacked the information in the first place.

At a minimum, privacy cannot justify suppressing true speech during a political campaign. The First Amendment "has its fullest and most urgent application to speech uttered during a campaign for political office." *Eu v. San Francisco County Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989). It leaves voters "free to obtain information from diverse sources in order to determine how to cast their votes." *Citizens United*, 558 U.S. at 341. It would eviscerate that guarantee to punish true disclosures made in a political campaign.

### E.   The Court should dismiss the public-disclosure and intentional-infliction claims because these theories of liability are impermissibly vague

The Due Process Clause prohibits "impermissibly vague" laws. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). The Free Speech Clause requires "rigorous adherence" to this principle "when speech is involved." *Id.* The public-disclosure tort is impermissibly vague because it turns on whether the disclosure is "highly offensive"; the intentional-infliction tort is impermissibly vague as applied to speech because it turns on whether the speech is "outrageous."

The terms "highly offensive" and "outrageous" bear all the hallmarks of vague laws. They deny speakers "fair warning" (*Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)): A speaker cannot accurately predict in advance what disclosures a jury will deem "highly offensive." They invite "arbitrary and discriminatory" enforcement (*id.*): "Outrageous" is an "inherent[ly] subjectiv[e]" standard, inviting liability "on the basis of the jurors' tastes or views" (*Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 55 (1988)). They also "inhibit the exercise" of "basic

First Amendment freedoms" (*Grayned*, 408 U.S. at 109): Potential tort liability for vague terms deters speakers from speaking in the first place. Invalidating these terms would break no new ground; the law reports are replete with cases invalidating indefinite terms such as "annoying" (*Coates v. Cincinnati*, 402 U.S. 611, 616 (1971)), "vile", (*Godfrey v. Georgia*, 446 U.S. 420, 428 (1980)) and "offensive" (*Reno v. ACLU*, 521 U.S. 844, 873 (1997)).

*Miller v. California* is dispositive. It held that an obscenity statute that simply bans "patently offensive" portrayal of sex violates the First Amendment. 413 U.S. at 24. An obscenity statute must instead "specifically defin[e]" the acts whose portrayal is prohibited (for instance, "lewd exhibition of the genitals"). *Id.* This specific listing is necessary to "reduc[e] the vagueness inherent in the open-ended term 'patently offensive.'" *Reno*, 521 U.S. at 873. But Maryland, New Jersey, and Tennessee have not specifically listed the kinds of disclosures that would be tortious; they have relied on the phrases "highly offensive" and "outrageous" standing alone. The torts are accordingly void for vagueness.

F.     **The Court should dismiss the claims of conspiracy with WikiLeaks because they violate the Communications Decency Act**

Under section 230 of the Communications Decency Act (47 U.S.C. § 230), a state may impose liability on "the original culpable party who posts [tortious] messages," but not on "companies that serve as intermediaries for other parties' potentially injurious messages." *Zeran v. America Online*, 129 F.3d 327, 330–31 (4th Cir. 1997). As a result, a website that provides a forum where "third parties can post information" is not liable for the third party's posted information. *Klayman v. Zuckerberg*, 753 F.3d 1354, 1358 (D.C. Cir. 2014). Since WikiLeaks provided a forum for a third party (the unnamed "Russian actors") to publish content developed by that third party (the hacked emails), it cannot be held liable for the publication.

Section 230 defeats any claim that rests on allegations of conspiracy. A conspiracy is an agreement to commit "an unlawful act." *Marshall v. James B. Nutter & Co.*, 758 F.3d 537, 541 (4th Cir. 2014). Since WikiLeaks' posting of emails was not an unlawful act, an alleged agreement that it should publish those emails could not have been a conspiracy.

## II.     Plaintiffs' Claims Should Be Dismissed For Additional Reasons

Each of Plaintiffs' claims also fails for reasons specific to that claim.

### A.      Plaintiffs fail to state a claim under section 1985(3)

Section 1985(3), a provision of the Ku Klux Klan Act of 1871, provides in full:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or *if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy*; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

Plaintiffs rely on the support-or-advocacy clause (italicized above). Plaintiffs fail to state a claim under this provision.

### 1.      The alleged conspiracy did not involve physical violence or its threat

The support-or-advocacy clause covers only conspiracies to cause or threaten physical violence—not agreements to disclose information in the course of a political campaign.

*First*, the plain language of the support-or-advocacy clause covers only conspiracies regarding physical harm. The support-or-advocacy clause applies where "two or more persons conspire to [use] *force, intimidation, or threat*" to prevent a voter from giving his support or advocacy. "Force" requires a physical act—at a bare minimum, an "offensive touching" of the victim's body. *United States v. Castleman*, 572 U.S. 157, 163 (2014). "Intimidation" requires conduct that would lead a reasonable person in the victim's position to "infer a threat of bodily harm." *United States v. McNeal*, 818 F.3d 141, 154 (4th Cir. 2016). And in the context of a phrase such as "force, intimidation, or threat," a "threat" is an "expression of an intention to do bodily harm." *Anderson v. Clarke*, 2014 WL 6712639, at *5 (E.D. Va. Nov. 26, 2014). The phrase "force, intimidation, or threat" thus requires physical harm or the threat of physical harm.

The support-or-advocacy clause also applies where "two or more persons conspire to … injure any citizen *in person or property* on account of such support or advocacy." The ordinary meaning of "injury to person or property" "require[s] some *physical* injury." *Bryant Elec. Co. v. City of Fredericksburg*, 762 F.2d 1192, 1195 (4th Cir. 1985). Injury to one's "person" means physical harm to one's body; injury to one's "property" means physical damage to one's belongings. *See Redman v. John D. Brush & Co.*, 111 F.3d 1174, 1182 (4th Cir. 1997) ("distinction between … injuries to persons or property on one hand and economic losses on the other"); *Rentzell v. Dollar Tree Stores, Inc.*, 2011 WL 4528367, at *2 (E.D. Pa. Sep. 29, 2011) ("damage to professional reputation does not constitute injury to person or property").

*Second*, history confirms that the support-or-advocacy clause covers only conspiracies regarding physical harm—indeed, *serious* physical harm. Congress enacted the clause during Reconstruction as part of the Ku Klux Klan Act. Given this provision's starting words—"If two or more persons … conspire or go in disguise on the highway or on the premises of anoth-

er …"—"the source of this section in the doings of the Ku Klux Klan and the like is obvious, and acts of violence obviously were in the mind of Congress." *United States v. Mosley*, 238 U.S. 383, 387 (1915) (Holmes, J.). These "acts of violence" included "murders, whippings and beatings." *Gill v. Farm Bur. Life Ins. Co.*, 906 F.2d 1265, 1269 (8th Cir. 1990). Given this historical context, the statute must be read to prohibit only conspiracies to use or threaten physical violence.

*Third*, principles of federalism reinforce this reading of the support-or-advocacy clause. Under the Constitution, the regulation of elections is "primarily the duty and responsibility of the State." *Shelby County v. Holder*, 570 U.S. 529, 542 (2013). Against the backdrop of that constitutional allocation of responsibility, the Supreme Court has interpreted § 1985(3) narrowly, rejecting any interpretation that would "mak[e] the federal courts, by virtue of § 1985(3), the monitors of campaign tactics in both state and federal elections." *Carpenters v. Scott*, 463 U.S. 825, 836 (1983). By interpreting the support-or-advocacy clause to address matters beyond physical violence, however, this Court *would* become a monitor of campaign tactics. If such an interpretation were accepted, "§ 1985(3) would arguably reach the claim that a political party has interfered with the freedom of speech of another political party by encouraging the heckling of its rival's speakers and the disruption of the rival's meetings"—an absurd result. *Id.* In fact, under Plaintiffs' boundless interpretation, §1985(3) would reach a journalist who criticizes a wealthy donor, a protester who pickets a celebrity over an endorsement, or a political party that fires an operative for supporting a rival candidate—since all of these acts would "intimidate" a voter from giving support or advocacy. These absurd consequences show precisely why §1985(3) is limited to the Klan-like activities it was intended to penalize—physical harm or threats thereof.

*Fourth*, the doctrine of constitutional avoidance precludes interpreting §1985(3) to reach the disclosure of truthful speech about matters of public concern. As established above, the First

Amendment prohibits punishing a non-interceptor for such a disclosure. As a result, the statute must be read, if possible, not to reach such speech. Since the Court *can* reasonably read § 1985(3) not to reach such disclosures, the Court *must* read § 1985(3) not to reach such disclosures.

*Finally*, the Eighth Circuit's decision in *Gill* confirms that § 1985(3) reaches only conspiracies to use or threaten physical violence. In that case, the Eighth Circuit held that an insurance company did not violate the support-or-advocacy clause by firing an agent on account of the agent's support for a congressional candidate. The Court explained that, "viewed in the light of its origin as a reaction against … Klan terrorism and atrocities," "the Ku Klux Klan Act obviously meant to its framers, when it spoke of 'force, intimidation, or threat' something much more serious and terrifying than a written notice of cancellation of a contract." 906 F.2d at 1269 & n.22. Further, "the victim 'injured in his person or property' was surely contemplated by Congressmen in 1871 as suffering something more severe than loss of commissions as an insurance agent." *Id.* at 1269.

These principles defeat Plaintiffs' § 1985(3) claim. Plaintiffs do not allege that the Campaign conspired to use physical violence or threats of physical violence to deter people from supporting the Clinton Campaign. Rather, Plaintiffs allege only that the Campaign conspired to release political information about the Clinton Campaign, and that this disclosure in turn resulted in emotional and reputational harm to Plaintiffs. But § 1985(3) does not reach such allegations.

### 2. The alleged conspiracy does not involve state action

Section 1985(3) provides a remedy for conspiracy to violate predicate rights defined by other laws; it does not create any freestanding private rights of its own. As a result, § 1985(3) covers a purely private conspiracy if—but only if—federal law protects the predicate right against private action. In this case, the predicate right—the First Amendment right to support a

candidate in a federal election—is protected only against state action, not private action. Plaintiffs, however, allege no such state action.

**a.** If the predicate right on which a § 1985(3) claim rests requires state action, the § 1985(3) claim also requires state action. For example, the Supreme Court has explained that § 1985(3) "provides no substantive rights itself; it merely provides a remedy for violation of the rights it designates." *Great American v. Novotny*, 442 U.S. 366, 372 (1979). As a result, § 1985(3) provides a remedy for "purely private conspiracies" only where the conspiracy targets a right that is protected "against private, as well as official, encroachment." *Carpenters*, 463 U.S. at 832–33 (1983). Applying this principle, the Fourth Circuit ruled in *Bellamy v. Mason's Stores, Inc.*, 508 F.2d 504, 507 (4th Cir. 1974), that § 1985(3) "cannot be interpreted to [cover] persons who conspire without involvement of government to deny another person the right of free association," "because the right of association derives from the first amendment—itself framed as a prohibition against the federal government and not against private persons." Other courts agree. For example: "The rights protected by section 1985(3) exist independently of the section and only to the extent that the Constitution creates them." *Hobson v. Wilson*, 737 F.2d 1, 15 (D.C. Cir. 1984). Again: "When the asserted constitutional deprivation is based upon a right guaranteed against government interference … plaintiffs must demonstrate some 'state involvement.'" *N.Y. Nat'l Org. for Women v. Terry*, 886 F.2 1339, 1359 (2d Cir. 1989).

A contrary interpretation of § 1985(3) would, again, raise serious constitutional doubts. Section 1985(3) rests on Congress' power to enforce "the Thirteenth, Fourteenth, and Fifteenth Amendments." *Carpenters*, 463 U.S. at 837; *see Griffin v. Breckenridge*, 403 U.S. 88, 105 (1971) ("powers under § 2 of the Thirteenth Amendment"). Section 1985(3) is thus designed to *enforce* preexisting constitutional rights against state action, not to *create* new rights against private ac-

21

tion. Indeed, the enforcement clauses empower Congress only to enact "remedial" laws enforcing preexisting rights; they do not empower it to enact "substantive" laws *expanding* those rights. *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997). Thus, where a guarantee "prohibits only state action," the power to enforce it does not reach "purely private conduct." *United States v. Morrison*, 529 U.S. 598, 621 (2000). Reading § 1985(3) to create independent rights against private parties would make the statute unconstitutional—or, at least, raise grave constitutional doubts.

**b.** These principles doom Plaintiffs' claim under the support-or-advocacy clause of § 1985(3). The First Amendment—the source of the right to give "support or advocacy"— "restrains only official conduct." *Carpenters*, 463 U.S. at 833. As a result, § 1985(3) does not cover "wholly private conspiracies" to violate it. For example, in *Federer v. Gephardt*, 363 F.3d 754, 760 (8th Cir. 2004), the Eighth Circuit ruled that "the support or advocacy clause" does not cover a private conspiracy to break in to a candidate's campaign headquarters because "a First Amendment claim cannot be actionable … without showing state or government action." Similarly, in *Gill*, the Eighth Circuit ruled that the clause does not cover a conspiracy to deter someone from making campaign contributions, because "there is no recognized constitutional right to [contribute money] free from … private pressure." 906 F.2d at 1270. In this case, Plaintiffs allege only private action, not state action. Their claim therefore fails.

To be sure, some courts have held that § 1985(3) prohibits private conspiracies to interfere with the right to vote (as opposed to the right to support or advocate). *E.g.*, *Az. Democratic Party v. Az. Republican Party*, 2016 WL 8669978, at *1 (D. Ariz. Nov. 4, 2016). They have done so, however, only because "the right of citizens to vote" is protected "from individual as well as from State interference." *United States v. Williams*, 341 U.S. 70, 77 (1951) (plurality). Since Plaintiffs do not allege a conspiracy to prevent anyone from voting, these cases cannot help them.

### 3.      The alleged conspiracy does not target Plaintiffs

The support-or-advocacy clause of 1985(3) prohibits targeted conspiracies to intimidate particular persons, not generalized conspiracies that allegedly "intimidate" broad groups. This clause prohibits conspiracies to prevent "*any citizen … from giving his support or advocacy*," and it creates a civil remedy for "*the party so injured*." § 1985(3) (emphasis added). It stands in stark contrast to the equal-protection component of § 1985(3), which prohibits conspiracies to deprive "any person *or class of persons* of the equal protection of the laws." § 1985(3) (emphasis added). Put simply, the equal-protection provision prohibits conspiracies against groups as well as conspiracies against individuals, but the support-or-advocacy provision prohibits only conspiracies against individuals.

The Amended Complaint, however, fails to allege a conspiracy against any of these Plaintiffs. Plaintiffs have not alleged that the Campaign entered into this far-reaching conspiracy for the purpose of deterring Mr. Comer, Mr. Cockrum, and Mr. Schoenberg from giving their support or advocacy. In fact, they have not even alleged that the Campaign had ever heard of these three individuals. Even worse, they have not alleged that the Campaign ever possessed or reviewed the emails in which these individuals' names were mentioned. There is thus no plausible basis for inferring that the Campaign entered into the kind of conspiracy prohibited by § 1985(3).

### 4.      Plaintiffs improperly seek *respondeat superior* liability

A defendant cannot be held liable under federal civil-rights laws under a theory of *respondeat superior*. *See Monnell v. Dept. of Social Servs.*, 436 U.S. 658, 693 (1978). In particular, a defendant in a § 1985 case is liable only for his own acts or policies, not for the acts of employees or agents. *Steelworkers v. Dalton*, 544 F. Supp. 291, 293 n.1 (E.D. Va. 1982); *see Owens v. Haas*, 601 F.2d 1242, 1247 (2d Cir. 1979); *Suber v. Guinta*, 902 F. Supp. 2d 591, 609 (E.D. Pa.

23

2012); *Moore v. New Hanover County Gov't*, 2004 WL 3266045, at \*9 (E.D.N.C. Aug. 13, 2004); *Morgan v. District of Columbia*, 550 F. Supp. 465, 470 (D.D.C. 1982).

Plaintiffs do not allege that the Campaign itself entered into a conspiracy. Rather, they allege that "agents of the Trump Campaign" did so. (Am. Compl. ¶ 87.) Plaintiffs thus improperly seek vicarious rather than personal liability—yet another reason to dismiss this § 1985(3) claim.

**B.     Even if New York law does not apply, Plaintiffs fail to state claims for public disclosure of private facts under Maryland, New Jersey, and Tennessee law**

To plead a claim for public disclosure of private facts under Maryland, New Jersey, and Tennessee law, a plaintiff must plead that (1) the defendant "publicized" (2) "a matter concerning … private life," (3) that is "not of legitimate concern to the public," and (4) whose disclosure "would be highly offensive to a reasonable person." Second Restatement § 652D; *see Klipa v. Board of Education*, 460 A.2d 601, 654–55 (Md. App. 1983); *Cawood v. Booth*, 2008 WL 4998408, at \*4 (Tenn. App. Nov. 25, 2008); *Romaine v. Kallinger*, 537 A.2d 284, 292 (N.J. 1988). "This privacy tort permits recovery for *truthful* disclosures. For this reason the recognition of such a tort creates significant potential for conflict with the guarantees contained in the first amendment of the Constitution. This constitutional dimension explains the stringency of the requirements that must be met in order successfully to establish this privacy-invasion cause of action." *Romaine*, 537 A.2d at 292 (citations omitted). Plaintiffs fail to state a claim for this tort.

**1.     The disclosure dealt with matters of public concern**

To establish public-disclosure liability, a plaintiff must show that the facts at issue are not "of legitimate concern to the public"—in other words, that the facts are not "of the kind customarily regarded as 'news.'" Second Restatement § 652D & comment g. Like the First Amendment test, the tort-law test requires courts to analyze speech "on an aggregate basis." *Alvarado v. KOB-TV, LLC*, 493 F.3d 1210, 1221 (10th Cir. 2007). A publisher does not have to "parse out

concededly public interest information" "from allegedly private facts." *Id.* That is because redactions would undermine the "credibility" of a disclosure, causing the public to doubt its accuracy. *Ross v. Midwest Commc'ns, Inc.*, 870 F.2d 271, 275 (5th Cir. 1989). Further, requiring publishers to redact—"to sort through an inventory of facts, to deliberate, and to catalogue"—"could cause critical information of legitimate public interest to be withheld until it becomes untimely and worthless to an informed public." *Star-Telegram, Inc. v. Doe*, 915 S.W.2d 471, 475 (Tex. 1995).

For the same reasons that the disclosed emails deal with matters of public concern under the First Amendment (*supra* 6–9), they are of legitimate concern to the public under tort law. The public-disclosure claim therefore fails.

### 2. The disclosed facts do not qualify for protection under tort law

Public-disclosure liability covers only "embarrassing" facts. *Brown v. Am. Broad. Co.*, 704 F.2d 1296, 1302 n.2. (4th Cir. 1983) (emphasis added); *see* Second Restatement § 652D. "Embarrassment" is a "key elemen[t]." *Brown*, 704 F.2d at 1302. In addition, this theory of tort liability protects only "the private life of [the plaintiff]." Second Restatement § 652D. A fact is an element of the plaintiff's "private life" if the plaintiff "keeps [it] entirely to himself or at most reveals [it] only to his family or to close friends." *Id.* comment b. A fact, no matter how "intimate," loses protection the moment the plaintiff "disclose[s]" it to professional colleagues. *Weiss v. Lehman*, 713 F. Supp. 489, 504 (D.D.C. 1989). The facts here fail to satisfy these standards.

Mr. Cockrum and Mr. Schoenberg's claims concern the disclosure of "social security numbers," "dates of birth," "address[es]," "banking relationships," and "phone number[s]." (Am. Compl. ¶ 11.) These facts are not "embarrassing. No reasonable person would feel *embarrassed* about his social security number. Further, nobody keeps his social security number entirely to himself, his family, and his close friends; quite the contrary, people routinely reveal such information to employers, banks, government officials, and others. Courts therefore generally hold

that the public-disclosure tort does not cover these facts. *See In re Barnes & Noble Pin Pad Litigation*, 2016 WL 5720370, at *7 (N.D. Ill. Oct. 3, 2016) (social security number); *In re Zappos.com, Inc.*, 2013 WL 4830497, at *3 (D. Nev. Sep. 9, 2013) (same); *In re Carter*, 411 B.R. 730, 741 (Bankr. M.D. Fla. 2009) (same).

Mr. Comer's claims concern the disclosure of office "gossip"—"frank, sensitive, and private discussions about other individuals." (Am. Compl. ¶ 52.) Mr. Comer also claims that he discussed "private medical information"—his symptoms during a bout of stomach flu—in an email to "his boss." (Am. Compl. ¶ 53.) But these facts are not "private." Mr. Comer did not keep these facts entirely to himself or reveal them only to family and friends. Quite the opposite, he broadcast them on work computers in emails to work colleagues. Moreover, Mr. Comer's office gossip does not constitute an element of his "private life." Quite the opposite, it constitutes an element of his professional life. The public-disclosure theory of liability, however, exists to protect one's private life—"family quarrels," "intimate personal letters," and "details of a man's life in his home"—not to protect one's dealings with work colleagues. Second Restatement § 652D. In fact, we are aware of no case that suggests that this theory of liability covers office gossip.

### C.   Even if New York law does not apply, Mr. Comer fails to state a claim for intentional infliction under Maryland law

To show intentional infliction of emotional distress under Maryland law, a plaintiff must satisfy four elements: "(1) The conduct must be intentional or reckless; (2) The conduct must be extreme and outrageous; (3) There must be a causal connection between the wrongful conduct and the emotional distress; (4) The emotional distress must be severe." *Figueiredo-Torres*, 584 A.2d at 74–75. Because of the "problems which are inherent in recognizing a tort of this character," "recovery [is] meted out sparingly." *Id.* at 75. Mr. Comer—the only plaintiff who asserts an intentional-infliction claim—cannot satisfy its requirements here.

### 1.  The disclosure dealt with matters of public concern

As a matter of tort law, a plaintiff may not use a claim for intentional infliction "to circumvent the limitations" on other torts. *Creditwatch, Inc. v. Jackson*, 157 S.W. 3d 814, 818 (Tex. 2005). In particular, if a disclosure addresses a matter of public concern, a plaintiff may not get around the public-concern element of the public-disclosure tort by raising an intentional infliction claim instead. *Howell*, 612 N.E. 2d at 705. Indeed, the Supreme Court and Fourth Circuit have both ruled that the First Amendment prohibits the imposition of intentional-infliction liability for speech on matters of public concern. *Snyder*, 562 U.S. at 448; *Snyder*, 580 F.3d at 280. For the reasons already explained, the disclosure here addressed matters of public concern.

### 2.  The disclosure was not directed at Mr. Comer

A plaintiff normally may not recover for intentional infliction of emotional distress for "conduct … directed at a third person." *Jones v. Harris*, 371 A.2d 1104, 1106 (Md. App. 1977) (quoting Second Restatement § 46). In other words, "outrageous conduct directed at *A* does not necessarily give *B* a cause of action." *Homer v. Long*, 599 A.2d 1193, 1198 (Md. App. 1992). For example, if Smith murders Jones in the street, a bystander who has just watched Jones die may experience intense emotional distress. Yet he does not have a tort claim, since Smith's actions were "directed at" Jones, not at the bystander. Second Restatement § 46, comment *l*.

The disclosure here was "directed at" the Clinton Campaign, not at Mr. Comer. Plaintiffs allege that the purpose of the conspiracy and the disclosure was "to defeat Hillary Clinton and help elect Mr. Trump." (Am. Compl. ¶ 86.) They do not allege that the Campaign even knew of Mr. Comer's existence, let alone that it "directed" its conduct toward him.

### 3.  The disclosure was not outrageous

A defendant is liable for intentional infliction only if his conduct was so "atrocious" and "utterly intolerable" that it went "beyond all possible bounds of decency." *KFC Nat'l Mgmt. Co.*

*v. Weathersby*, 607 A.2d 8, 11 (Md. 1992). As a matter of law, it does not exceed all possible bounds of decency to print stolen emails. As discussed above, newspapers print stolen documents all the time, and there is a First Amendment right to do so. *Supra* 6–9.

> **D.     Even if New York law does not apply, Plaintiffs fail to state a claim for civil conspiracy**

Plaintiffs assert a claim for civil conspiracy under "the common law." (Am. Compl. Count VI.) But there is no such thing as "the common law." *See Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 79 (1938). Plaintiffs therefore have an obligation to specify the state under whose law they bring their claim. Their civil-conspiracy count includes no such specification.

Since Plaintiffs have sued in Virginia, we presume they invoke the common law of Virginia. In Virginia, "conspiracy is not independently actionable; rather, it is a means for establishing vicarious liability for the underlying tort." *Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 317 (Va. 2014). Plaintiffs seek to use this theory of liability to hold the Campaign liable for alleged violations of "federal campaign finance law"—specifically, for allegedly receiving illegal contributions from foreign nationals. (Am. Compl. ¶ 306.) This effort fails.

*First*, Virginia law does not allow a claim for conspiracy to violate federal campaign-finance law. In Virginia, "if the underlying tort is dismissed for any reason, so, too, must the corresponding conspiracy claim be dismissed." *Tire Eng'g & Dist., LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 311 (4th Cir. 2012). "Where there is no actionable claim for the underlying alleged wrong, there can be no action for civil conspiracy based on that wrong." *Firestone v. Wiley*, 485 F. Supp. 2d 694, 703 (E.D. Va. 2007). Plaintiffs have no actionable claim for the underlying alleged wrong of violating federal campaign-finance laws. To start, Plaintiffs have no standing to enforce them. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (standing requires particularized injury). Further, Plaintiffs lack a private right of action to enforce federal

campaign-finance laws, since Congress granted the FEC "exclusive jurisdiction with respect to the civil enforcement" of those laws. 52 U.S.C. § 30106(b)(1); *see Janvey v. Democratic Senatorial Campaign Comm.*, 793 F. Supp. 2d 825, 852 (N.D. Tex. 2011) ("[The Federal Election Campaign Act] provides no private right of action"). Because any claim for the underlying wrong would be dismissed, the civil-conspiracy claim must be dismissed too.

*Second*, federal law would preempt any effort by Virginia to rest civil-conspiracy liability on a violation of federal campaign-finance law. A state invades the FEC's "exclusive jurisdiction with respect to the civil enforcement" of federal campaign laws (52 U.S.C. § 30106(b)(1)) when it attaches its own civil-conspiracy penalties to federal campaign-finance violations. Moreover, federal law expressly provides that "the provisions of [the Federal Election Campaign Act], and of rules prescribed under [the] Act, supersede and preempt any provision of State law with respect to election to Federal office." § 30143(a). The FEC interprets this preemption clause to mean that "Federal law supersedes State law concerning the … [l]imitation on contributions and expenditures regarding Federal candidates and political committees." 11 C.F.R. § 108.7(b); *see Teper v. Miller*, 82 F.3d 989 (11th Cir. 1996). A state violates this preemption provision by imposing civil-conspiracy liability for campaign-finance violations in federal elections.

*Third*, Plaintiffs in all events fail to establish a conspiracy to violate any federal campaign-finance law. Plaintiffs assert that federal law prohibits foreign nationals from making "a contribution or donation of money or other thing of value" in connection with an election, 52 U.S.C. § 30121(a), and that "Defendant's co-conspirators … contributed a 'thing of value' … in the form of the dissemination of hacked private emails" (Am. Compl. ¶ 215). This assertion is incorrect. For one, there is a fundamental difference between contributing a thing of value and engaging in pure political speech. Pure political speech constitutes "direct political expression";

in contrast, "while contributions may result in political expression if spent by a candidate or as-sociation to present views to the voters, the transformation of contributions into political debate involves speech by someone other than the contributor." *Buckley v. Valeo*, 424 U.S. 1, 21–22 (1976). The disclosure of information about a political party is pure political speech, not a politi-cal contribution. The disclosure itself directly expresses political messages; unlike money, it does not need to be transformed into a political message by somebody else.

For another, treating a disclosure of information as a "contribution" would violate the First Amendment. The Supreme Court has held that the First Amendment guarantees Americans the right to receive political speech from foreigners. *Lamont v. Postmaster General*, 381 U.S. 301, 306 (1965). Yet under Plaintiffs' theory, it would be illegal to solicit political information from a foreign national, because the provision of such information would amount to a "contribu-tion." For example, "if the Clinton campaign heard that Mar-a-Lago was employing illegal im-migrants in Florida and staffers went down to interview the workers, that would be a crime." Eu-gene Volokh, *Can it be a crime to do opposition research by asking foreigners for information?* (July 27, 2017).[2] "Or say that Bernie Sanders's campaign heard rumors of some misconduct by Clinton on her trips abroad—it wouldn't be allowed to ask any foreigners about that." *Id.* The First Amendment does not tolerate such results.

## CONCLUSION

The Court should dismiss Plaintiffs' claims with prejudice.

---

[2]    https://www.washingtonpost.com/news/volokh-conspiracy/wp/2017/07/12/can-it-be-a-crime-to-do-opposition-research-by-asking-foreigners-for-information/

Dated:    October 8, 2018

Respectfully submitted,

/s/ Nikki L. McArthur

Jeffrey Baltruzak*
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
(412) 391-3939
jbaltruzak@jonesday.com

Michael A. Carvin*
Nikki L. McArthur (Virginia Bar No. 84174)
Vivek Suri*
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
(202) 879-3939
macarvin@jonesday.com
nmcarthur@jonesday.com
vsuri@jonesday.com

*  *Pro hac vice*

*Counsel for Donald J. Trump for President, Inc.*

## CERTIFICATE OF SERVICE

I certify that on October 8, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered parties.

Dated:    October 8, 2018                    /s/ Nikki L. McArthur
                                             Nikki L. McArthur
                                             *Counsel for Donald J. Trump for President, Inc.*