**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| ROY COCKRUM; SCOTT COMER; and ERIC SCHOENBERG,    ) <br> ) <br> ) <br> Plaintiffs,    ) <br> ) <br> v.    ) <br> ) <br> DONALD J. TRUMP FOR PRESIDENT, INC.,    ) <br> ) <br> Defendant.    ) <br> ) | Civil Action No. 3:18-cv-484-HEH |

## <u>PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS</u>

## <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND .............................................................................................. 3

STANDARD OF REVIEW ................................................................................................. 5

ARGUMENT ...................................................................................................................... 5

I.     The First Amendment offers no protection for conspiring with a hostile foreign power to intimidate and injure the supporters of a rival political candidate. ..................................... 5

II.    The Complaint states constitutionally valid tort claims. ...................................................... 9

    A.    Maryland, New Jersey, and Tennessee law govern the tort claims. ....................... 9

    B.    The Complaint adequately pleads all elements of the private-facts tort. .............. 10

        1.    Three types of publicized facts were private. ........................................... 11

        2.    The publication is highly offensive to a reasonable person of ordinary sensibilities. ............................................................................................. 13

        3.    The private facts were not "newsworthy." ............................................... 13

    C.    The Complaint adequately alleges that the Campaign's misconduct caused Mr. Comer to suffer emotional distress. ..................................................................... 15

    D.    The Campaign is vicariously liable for the torts as a co-conspirator and as an aider and abettor. ........................................................................................................... 16

        1.    Civil conspiracy. ...................................................................................... 16

        2.    Aiding and abetting. ................................................................................. 20

    E.    The First Amendment does not bar the long-established private-facts and emotional-distress torts. ....................................................................................... 21

III.   The Campaign conspired to violate federal rights protected by § 1985(3) ...................... 22

    A.    The plain language of the statute gives Plaintiffs a cause of action. .................... 23

    B.    The Complaint alleges conspiratorial intent. ....................................................... 25

    C.    The support-or-advocacy clauses reach conspiracies by private parties. ............. 27

    D.    The Campaign is liable under § 1985 for the actions of its agents. ...................... 28

    E.    *Bartnicki* does not govern the constitutionality of § 1985(3). ............................. 29

CONCLUSION .................................................................................................................. 30

# TABLE OF AUTHORITIES

## Cases

*Am. Life League, Inc. v. Reno*,
   47 F.3d 642 (4th Cir. 1995).................................................................. 30

*Anderson v. United States*,
   417 U.S. 211 (1974) ........................................................................... 25

*Arroyo v. Rosen*,
   648 A.2d 1074 (Md. Ct. Spec. App. 1994) ......................................... 10

*Banco Popular N. Am. v. Gandi*,
   876 A.2d 253 (N.J. 2005).................................................................... 16

*Bartnicki v. Vopper*,
   532 U.S. 514 (2001) ..................................................................... passim

*Batson v. Shiflett*,
   602 A.2d 1191 (Md. 1992)............................................................ 15, 16

*Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*,
   520 U.S. 397 (1997) ........................................................................... 29

*Bluman v. FEC*,
   800 F. Supp. 2d 281 (D.D.C. 2011) ..................................................... 9

*Bodah v. Lakeville Motor Express, Inc.*,
   649 N.W.2d 859 (Minn. Ct. App. 2002) ............................................ 11

*Bray v. Alexandria Women's Health Clinic*,
   506 U.S. 263 (1993) ........................................................................... 26

*Brown v. American Broadcasting Co.*,
   704 F.2d 1296 (4th Cir. 1983)............................................................ 11

*Burson v. Freeman*,
   504 U.S. 191 (1992) ........................................................................... 30

*Carpenters v. Scott*,
   463 U.S. 825 (1983) ..................................................................... 24, 28

*Catholic Leadership Coal. of Tex. v. Reisman*,
   764 F.3d 409 (5th Cir. 2014)................................................................ 9

*Cawood v. Booth*,
   2008 WL 4998408 (Tenn. Ct. App. 2008) ................................................................. 11

*Cecil v. Hardin*,
   575 S.W.2d 268 (Tenn. 1978) .................................................................................. 20

*City of Canton v. Harris*,
   489 U.S. 378 (1989) ................................................................................................ 29

*City of Kirkland v. Sheehan*,
   2011 WL 1751590 (Wash. Super. Ct. 2001) ............................................................ 15

*Dahlstrom v. Sun-Times Media, LLC*,
   777 F.3d 937 (7th Cir. 2015) ..................................................................................... 9

*Daniel v. DTE Energy*,
   2012 WL 12925071 (E.D. Mich. 2012) ................................................................... 12

*Dennis v. Sparks*,
   449 U.S. 24 (1980) ................................................................................................. 20

*Doe v. Gangland Prods., Inc.*,
   730 F.3d 946 (9th Cir. 2013) ................................................................................... 14

*Doe v. HarperCollins Publishers, LLC*,
   2018 WL 1174394 (N.D. Ill. 2018) ......................................................................... 14

*Estes Forwarding Worldwide LLC v. Cuellar*,
   239 F. Supp. 3d 918 (E.D. Va. 2017) ........................................................................ 5

*Eu v. S.F. Cty. Democratic Cent. Comm.*,
   489 U.S. 214 (1989) ................................................................................................ 22

*Evergreen Partnering Grp. v. Pactive Grp.*,
   720 F.3d 33 (1st Cir. 2013) ..................................................................................... 17

*Ex parte Yarbrough*,
   110 U.S. 651 (1884) ...................................................................................... 27, 28, 30

*Failla v. City of Passaic*,
   146 F.3d 149 (3d Cir. 1998) .................................................................................... 20

*Federer v. Gephardt*,
   363 F.3d 754 (8th Cir. 2004) ................................................................................... 28

*Florida Star v. B.J.F.*,
   491 U.S. 524 (1989) ..................................................................................... 7, 21, 29

*G.D. v. Kenny*,
   15 A.3d 300 (2011) ......................................................................................... 10, 13

*Gelboim v. Bank of Am. Corp.*,
   823 F.3d 759 (2d Cir. 2016) ...................................................................................... 18

*Gilbert v. Med. Econ. Co.*,
   665 F.2d 305 (10th Cir. 1981) .......................................................................... 6, 7, 8, 14

*Gill v. Farm Bureau Life Ins.*,
   906 F.2d 1265 (8th Cir. 1990) ................................................................................... 28

*Great Am. Fed. Sav. & Loan v. Novotny*,
   442 U.S. 366 (1979) .................................................................................................. 27

*Great Am. Ins. Co. v. Nextday Network Hardware Corp.*,
   73 F. Supp. 3d 636 (D. Md. 2014) ............................................................................. 20

*Greidinger v. Davis*
   988 F.2d 1344 (4th Cir. 1993) .................................................................................... 11

*Griffin v. Breckenridge*,
   403 U.S. 88 (1971) ............................................................................................... 26, 27

*Haddle v. Garrison*,
   525 U.S. 121 (1998) .................................................................................................. 24

*Halberstam v. Welch*,
   705 F.2d 472 (D.C. Cir. 1983) ................................................................................... 19

*Harrison v. KVAT Food Mgmt.*,
   766 F.2d 155 (4th Cir. 1985) ..................................................................................... 26

*Hatfill v. Foster*,
   415 F. Supp. 2d 353 (S.D.N.Y. 2006) ........................................................................ 10

*Hishon v. King & Spalding*,
   467 U.S. 69 (1984) .................................................................................................... 29

*Houck v. Substitute Trustee Servs., Inc.*,
   791 F.3d 473 (4th Cir. 2015) ..................................................................................... 18

*Hutton v. Nat'l Bd. of Exam'rs in Optometry*,
   892 F.3d 613 (4th Cir. 2018) ..................................................................................... 25

*In re Norquist*,
   MUR 5409 (FEC 2004) ................................................................................................ 9

*Insteel Indus., Inc. v. Costanza Contracting Co., Inc.*,
    276 F. Supp. 2d 479 (E.D. Va. 2003) ..................................................................... 10

*Jane Doe v. John F. Kennedy Univ.*,
    2013 WL 4565061 (N.D. Cal. 2013) ...................................................................... 13

*John Doe #1 v. Reed*,
    561 U.S. 186 (2010) .............................................................................................. 30

*Kush v. Rutledge*,
    460 U.S. 719 (1983) .............................................................................................. 27

*Kylin Network (Beijing) Movie & Culture Media Co. v. Fidlow*,
    2017 WL 2385343 (E.D. Va. June 1, 2017) ............................................................ 10

*Lawson v. E. Orange Sch. Dist.*,
    2017 WL 751425 (D.N.J. 2017) ............................................................................. 20

*Libertad v. Welch*,
    53 F.3d 428 (1st Cir. 1995) ................................................................................... 25

*Lindenmuth v. McCreer*,
    165 A.3d 544 (Md. Ct. Spec. App. 2017) ............................................................... 11

*LULAC v. Pub. Interest Leg. Found.*,
    2018 WL 3848404 (E.D. Va. 2018) ................................................................. 27, 28

*Mackey v. Compass Mktg., Inc.*,
    892 A.2d 479 (Md. 2006) .............................................................................. 16, 19

*Mandelbaum v. Arseneault*,
    2017 WL 4287837 (N.J. Super. Ct. App. Div. 2017) ......................................... 11, 12

*McAndrew v. Lockheed Martin Corp.*,
    206 F.3d 1031 (11th Cir. 2000) ............................................................................ 24

*Meyerson v. Prime Realty Servs., LLC*,
    796 N.Y.S.2d 848 (N.Y. Sup. Ct. 2005) .................................................................. 12

Miller v. California,
    413 U.S. 16 (1973) ................................................................................................ 22

*Moncier v. Harris*,
    2017 WL 946350 (Tenn. Ct. App. 2017) ................................................................ 12

*Monell v. Dep't of Soc. Servs.*,
    436 U.S. 658 (1978) .............................................................................................. 28

*Morgan v. Union Cty. Bd. of Chosen Freeholders*,
   633 A.2d 985 (N.J. Super. Ct. App. Div. 1993) ...................................................... 19

*Natarajan v. Raju*,
   2017 WL 386540 (D. Md. 2017) ............................................................................. 20

*Nation v. Idaho Dep't of Corr.*,
   158 P.3d 953 (Idaho 2007) ...................................................................................... 12

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
   591 F.3d 250 (4th Cir. 2009) ................................................................................... 20

*Nobles v. Cartwright*,
   659 N.E.2d 1064 (Ind. App. 1995) .......................................................................... 14

*Ostergren v. Cuccinelli*,
   615 F.3d 263 (4th Cir. 2010) ................................................................................... 15

*Painter's Mill Grille v. Brown*,
   716 F.3d 342 (4th Cir. 2013) ................................................................................... 29

*Parr v. Middle Tenn. State Univ.*,
   1999 WL 1086451 (Tenn. Ct. App. 1999) .............................................................. 11

*Paynes v. Lee*,
   377 F.2d 61 (5th Cir. 1967) ..................................................................................... 28

*Pinero v. Jackson Hewitt Tax Servs., Inc.*
   594 F. Supp. 2d 710, (E.D. La. 2009) ..................................................................... 12

*Pippinger v. Rubin*,
   129 F.3d 519 (10th Cir. 1997) ................................................................................. 12

*Pontbriand v. Sundlun*,
   699 A.2d 856 (R.I. 1997) ................................................................................... 12, 13

*Progressive Animal Welfare Soc'y v. Univ. of Wash.*,
   884 P.2d 592 (Wash. 1994) .......................................................................... 12, 13, 15

*Purdy v. BNSF Ry. Co.*,
   2000 WL 34251818 (D. Minn. 2000) ........................................................... 13, 14, 15

*Putnam v. Putnam*
   1996 WL 740807 (Tenn. Ct. App. 1996) ................................................................ 19

*Quillen v. Int'l Playtex, Inc.*,
   789 F.2d 1041 (4th Cir. 1986) ................................................................................... 9

*R.A.V. v. City of St. Paul, Minn.*,
  505 U.S. 377 (1992) ............................................................................................. 29

*Randolph v. ING Life Ins. & Annuity Co.*,
  973 A.2d 702 (D.C. 2009) ............................................................................... 12, 13

*Remsberg v. Docusearch, Inc.*,
  816 A.2d 1001 (N.H. 2003) ............................................................................. 12, 13

*Roberts v. U.S. Jaycees*,
  468 U.S. 609 (1984) ............................................................................................. 29

*Romaine v. Kallinger*,
  537 A.2d 284 (N.J. 1988) ..................................................................................... 14

*Saadeh v. Saadeh, Inc.*,
  819 A.2d 1158 (Md. 2003) ................................................................................... 20

*Satellite Broad. & Commc'n Ass'n v. FCC*,
  275 F.3d 337 (4th Cir. 2001) ............................................................................... 30

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
  801 F.3d 412 (4th Cir. 2015) ........................................................................ 2, 17, 18, 19

*Shqeirat v. U.S. Airways Grp., Inc.*,
  515 F. Supp. 2d 984 (D. Minn. 2007) ................................................................. 12

*Snyder v. Phelps*,
  562 U.S. 443 (2011) .................................................................................... 7, 21, 22

*Stanfill v. Hardney*,
  2007 WL 2827498 (Tenn. App. 2007) ................................................................ 16

*Starr v. Sony BMG Music Entm't*,
  592 F.3d 314 (2d Cir. 2010) ................................................................................ 18

*Star-Telegram, Inc. v. Doe*,
  915 S.W.2d 471, (Tex. 1995) ......................................................................... 7, 14

*Stratton v Krywko*,
  2005 WL 27522 (Mich. Ct. App. 2005) .............................................................. 13

*Tarr v. Ciasulli*,
  853 A.2d 921 (N.J. 2004) ..................................................................................... 20

*Toffoloni v. LFP Pub. Grp., LLC*,
  572 F.3d 1201 (11th Cir. 2009) ..................................................................... 7, 14, 21

*Tomblin v. Trevino*,
    2002 WL 32857194 (W.D. Tex. June 17, 2002) ...................................................... 12

*United States v. Carmichael*,
    685 F.2d 903 (4th Cir. 1982) ............................................................................... 27

*United States v. Netyksho*,
    No. 18-CR-215, ECF No. 1 (D.D.C. 2018) ............................................................ 3

*United States v. O'Brien*,
    391 U.S. 367 (1967) ............................................................................................ 30

*Vassiliades v. Garfinckel's, Brooks Bros.*,
    492 A.2d 580 (D.C. 1985) .............................................................................. 13, 14

*Virgil v Time, Inc.*,
    527 F.2d 1122 (9th Cir. 1975) ....................................................................... 13, 14

*Winstead v. Sweeney*,
    517 N.W.2d 874 (Mich. App. 1994) ................................................................... 14

*Wisconsin v. Mitchell*,
    508 U.S. 476 (1993) ............................................................................................ 29

*Womack v. Eldridge*,
    210 S.E.3d 338 (Va. 1974) ................................................................................. 10

*Zinda v. La. Pac. Corp.*,
    440 N.W.2d 548 (Wis. 1989) .............................................................................. 12

## Statutes

18 U.S.C. § 1030 .......................................................................................................... 8

18 U.S.C. § 1951 .......................................................................................................... 8

18 U.S.C. § 2 ................................................................................................................ 8

18 U.S.C. § 371 ............................................................................................................ 8

18 U.S.C. § 4 ................................................................................................................ 8

18 U.S.C. § 953 ............................................................................................................ 8

42 U.S.C. §1985(3) ..................................................................................... 2, 23, 24, 26

47 U.S.C. § 230 .......................................................................................................... 20

52 U.S.C. § 30121 ........................................................................................................ 8

Tenn. Code Ann. § 10-7-504(a)(29) ........................................................................... 12

**<u>Rules</u>**

11 C.F.R. § 108.7(b) ................................................................................................. 20

**<u>Treatises</u>**

16 Am. Jur. 2d Conspiracy § 56 ............................................................................... 29

Restatement (First) of Conflict of Laws § 377 (1934)................................................ 10

Restatement (First) of Torts § 876(b) ....................................................................... 20

Restatement (Second) of Torts § 652D......................................................... 11, 12, 13

**<u>Memos & Manuals</u>**

U.S. Department of Justice, Criminal Resources Manual ............................................. 8

**<u>Congressional Materials</u>**

Cong. Globe, 42d Cong., 1st Sess. (1871) ................................................................. 24

# **INTRODUCTION**

This case involves three American citizens who have suffered serious injuries. Two have been victims of identity theft. The third lost his career. They suffered these and other injuries because of their support for a political candidate when the opposing campaign—the Defendant in this case—conspired with a hostile foreign government to release thousands of stolen emails containing the private, personal details of their lives onto the Internet.

The claim of conspiracy is well-supported. It is the unanimous view of the U.S. Intelligence Community that Russia interfered in the 2016 election. In April 2016, a Russian operative informed a Trump Campaign[1] advisor that the Russian government had access to "dirt" on Mr. Trump's opponent in the form of thousands of emails. One month later, the Russian government stole the emails at issue here. Days after that theft, the Russian government met with the Campaign to provide damaging material about Mr. Trump's opponent. The Campaign took that meeting and expressed "*love*" for the idea of receiving Russian assistance. The Campaign then intervened to alter the Republican Party platform towards an unprecedented pro-Russia stance.

Days later, stolen emails with Plaintiffs' private information were posted on the Internet by Wikileaks, which functions as a tool of Russian intelligence. And from among all of the email accounts located on the email servers of the Democratic National Committee ("DNC"), seven in particular were chosen for release. Six of those seven were from the DNC finance team and were thus certain to contain private information, like bank account and social security numbers.

That is more than needed to overcome the motion to dismiss. ECF No. 23 ("Mot."). A

---

[1] In this brief, (1) "the Campaign" refers to Defendant Donald J. Trump for President, Inc.; (2) all numbers preceded by a paragraph symbol (¶) refer to paragraphs in the First Amended Complaint (ECF No. 8) ("Complaint"); (3) emphases were added to, and internal punctuation, brackets, quotation marks, and citations were omitted from, quotations (unless otherwise indicated).

plaintiff may allege an unlawful conspiracy on the basis of a pattern of parallel conduct along with circumstantial evidence suggesting a meeting of the minds. *See SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 426 (4th Cir. 2015). In the present case, such evidence is overwhelming.

In the face of undeniable facts, the Campaign argues that the First Amendment permits political campaigns to violate American law in conspiracy with hostile foreign powers. The Campaign's First Amendment argument rests on *Bartnicki v. Vopper*, 532 U.S. 514 (2001). But *Bartnicki* concerned a journalist's publication of a single phone call that was indisputably of public concern, not thousands of personal emails containing large amounts of private information that is of no public interest. And unlike the journalist in *Bartnicki*, who lawfully obtained the recording, the Campaign does not have clean hands: it is a willing participant in an illegal conspiracy. Immunizing such conduct is not what the Framers had in mind when they drafted the First Amendment, and a proper interpretation of the Amendment affords the Campaign no shelter.

The Campaign therefore engages in misdirection to avoid the strength of Plaintiffs' claims, characterizing this lawsuit as a political endeavor—an attempt to hurt a sitting President, and indeed one that might interfere with an ongoing Special Counsel investigation. To be sure, the conspiracy that injured Plaintiffs had political significance. But those politics are for other forums. No political campaign is above the law, and this defendant should answer like anyone else for violating Plaintiffs' rights. The gravamen of the Campaign's motion—that the context excuses the conduct—is fundamentally at odds with the rule of law and with the judiciary's role as protector of the legal rights of individuals. And as explained below, the Campaign's arguments directed at the various elements of the state law torts and 42 U.S.C. § 1985(3) do not comport with applicable law. Thus, Plaintiffs have come to this Court for relief and have shown everything necessary to earn the right to make their case. The motion to dismiss should be denied.

### FACTUAL BACKGROUND

On July 22, 2016, DNC finance team staffer Scott Comer and DNC donors Roy Cockrum and Eric Schoenberg had their lives turned upside down. Their stolen private information—including social security numbers and private correspondence—was placed online for the world to see. ¶ 44. Mr. Cockrum and Mr. Schoenberg had their identities stolen. ¶¶ 20-21. Mr. Comer was harassed and threatened with violence. ¶ 23. All suffered significant emotional distress and will now have to live the rest of their lives with their private information available online. ¶¶ 20-24.

Plaintiffs' private information resided on the DNC's servers. Russian intelligence services infiltrated those servers from July 2015 until at least June 2016. ¶ 86. During that period, the Campaign—which compiled a cast of characters having deep ties to the Putin regime, ¶¶ 127-44—engaged in dozens of secret communications with known agents of the Russian government. ¶¶ 89-124. The Campaign has made every attempt to hide these contacts. ¶¶ 28, 209-53.

Beginning in April 2016, Russian intelligence operatives "began to plan" how to weaponize their access to the DNC servers. ¶ 88. The Russian government informed Campaign advisor George Papadopoulos that Russian intelligence had access to "dirt" on Mr. Trump's opponent in the form of "thousands of emails," which they could disseminate anonymously. ¶ 97. Mr. Papadopoulos passed that information along to the Campaign. ¶ 97. Mr. Papadopoulos has pleaded guilty to lying to law enforcement about these contacts. ¶ 28.

In late May 2016, Russian intelligence used its access to the DNC servers to steal the emails at issue here. ¶ 87; *see also United States v. Netyksho*, No. 18-CR-215, ECF No. 1, ¶ 29 (D.D.C. 2018) ("Between . . . May 25, 2016 and June 1, 2016, the Conspirators . . . stole . . . emails from . . . DNC employees."). Days later, high-ranking Campaign officials met with a Kremlin-connected "Russian government attorney who [was] flying over from Moscow." ¶¶ 102, 106. The

Campaign agreed to join that meeting after being promised damaging material about Mr. Trump's opponent as part of a Russian-government effort to aid the Trump Campaign. ¶ 101. An email to the Campaign stated that the meeting was "part of Russia and its government's support for Mr. Trump." ¶ 101. The Campaign responded: "If it's what you say I love it especially later in the summer." ¶ 101. "Later in the summer" is precisely when Plaintiffs' emails were released. Participants in the meeting have attempted to cover up its true purpose, including by issuing false press releases and giving false testimony. ¶¶ 4, 108, 112, 212.

Communication between the conspirators continued in the time leading up to the release of Plaintiffs' emails. ¶¶ 116, 120, 142. Just days before the release, several agents of the Campaign met with the Russian Ambassador at the Republican National Convention. ¶¶ 121, 162. At that Convention, the Campaign intervened in the drafting of the platform to make changes favorable to the Russian regime. ¶¶ 162-64. The Campaign's foreign-policy advisor initially denied involvement but later admitted that he had been personally involved. ¶¶ 164, 250. The change was one of many concessions that the Campaign has made to Russia. ¶¶ 98, 166-74.

Four days after that convention, and on the eve of the Democratic Convention, emails stolen from the DNC were released on WikiLeaks. The Secretary of State has termed WikiLeaks a "non-state hostile intelligence service often abetted by state actors like Russia." ¶¶ 175-76. The conspirators chose WikiLeaks because of its close ties with Russian intelligence. ¶¶ 175-76.

Russia had stolen a large volume of DNC emails from many email accounts, but the conspirators only released material from a small number of accounts. Six of the seven accounts released belonged to members the DNC finance team, ¶ 18—accounts certain to contain emails with donors' private financial information. ¶¶ 19, 275, 291. By releasing those emails on the eve of the Convention—the key event for organizing fundraising in the election's homestretch—the

conspirators aimed to cause the opposing campaign and its supporters the most possible harm. ¶ 186. They succeeded: by demonstrating that anyone who communicated with—or was on—the finance team was at risk of having their personal information published to the entire world, the release intimidated staff and deterred donors. ¶¶ 19, 25, 208.

The dissemination of the DNC emails injured Plaintiffs. ¶¶ 19-27. Mr. Comer had the entire contents of his email account revealed to anyone with an Internet connection, including information about private relationships with coworkers and collaborators, and embarrassing details about his health. ¶¶ 22, 43, 52-53. As a result, Mr. Comer received constant online and telephone harassment, ¶ 71, developed PTSD, ¶ 24, changed his political advocacy behavior, ¶ 25, and had to abandon his career, ¶ 22, 73-76. Mr. Schoenberg and Mr. Cockrum, who had previously donated to the DNC, had their social security numbers, addresses, and phone numbers revealed to the world. ¶¶ 20-21, 50-51. They have since been victims of multiple attempts at identity theft, some successful. ¶¶ 20-21, 61-68.  Plaintiffs now seek a remedy for these harms.

## STANDARD OF REVIEW

This Court must accept well-pleaded allegations as true and view the Complaint in the light most favorable to Plaintiffs. *See Estes Forwarding Worldwide LLC v. Cuellar*, 239 F. Supp. 3d 918, 922 (E.D. Va. 2017). The Court examines whether the pleadings contain sufficient factual allegations to make a right to relief "plausible on its face." *Id.*

## ARGUMENT

### I.  The First Amendment offers no protection for conspiring with a hostile foreign power to intimidate and injure the supporters of a rival political candidate.

One of the conspirators' common goals was to suppress support for an opposing presidential campaign by demonstrating that its supporters' private information might be made public. ¶¶ 19, 30, 208, 265-66. The Campaign furthered the conspiracy by (1) helping the Russians maximize

the impact of releases of emails that the Campaign knew had been stolen; (2) altering the Republican Party platform and U.S. foreign policy to benefit Russia; and (3) hiding its contacts with the Russian government. ¶¶ 2, 16, 17-19, 142, 154, 177-79, 187-91, 209. As the publicly known evidence of a conspiracy has become overwhelming, the Campaign has pivoted from denying coordination with the Kremlin to claiming that such collusion is not a crime. ¶ 214.

Now the Campaign argues that its conduct is protected by the Constitution. Citing *Bartnicki*, the Campaign argues that imposing liability here would be like imposing liability on ordinary journalistic practices. Mot. 5. The Campaign asserts that under *Bartnicki*, the First Amendment protects the Campaign if (1) the Campaign was not involved in *acquiring* the stolen emails and (2) *any* facts disclosed in the massive WikiLeaks release dealt with "a matter of public concern." *Id.* at 4-5. But *Bartnicki* held no such thing. Its actual holding, which the Court emphasized was "narrow," 532 U.S. at 517, does not help the Campaign—and, in fact, helps Plaintiffs—for two reasons.

**First**, *Bartnicki* involved a single telephone call that was indisputably of public importance. Here, while some of the stolen emails were newsworthy and became the subject of media coverage, that it is not what this case is about. Instead, it is about the *dissemination* of thousands of emails of *no public interest*, without regard for the rights of people whose private information was disclosed, and with the precise purpose of political intimidation. And as *Bartnicki* explained, it was not creating First Amendment protection for the disclosure of information containing "trade secrets or domestic gossip or other information of purely private concern." 532 U.S. at 533; *see also Gilbert v. Med. Econ. Co.*, 665 F.2d 305, 308 (10th Cir. 1981) ("[T]he dissemination of non-newsworthy private facts is not protected by the First Amendment.").

The Campaign responds that "*every* disclosed email" was of public interest because each

was "(1) a work email (2) sent or received by a political operative (3) during a presidential campaign," and each of them thus "inherently addressed politics, elections, and campaigns." Mot. 8. The Campaign asserts that the "aggregate" public importance of the thousands of disseminated emails determines whether the entire disclosure is constitutionally protected. Mot. 6.

That is not the law. *None* of the Campaign's cases support the "aggregate meaning" approach. None involved disclosing—without any effort to remove sensitive private information—thousands of communications that could not (and did not) concern a common subject capable of being analyzed for newsworthiness "in the aggregate." [2] And none involved situations where the defendants intentionally disclosed private information for the purposes of intimidation. *Bartnicki* concerned one phone conversation on one topic of clear public import. 532 U.S. at 525.[3] *Snyder* involved a small group of signs, on topics of clear public import, displayed together at a protest held in full compliance with applicable laws. 562 U.S. 443, 454-57 (2011). *Florida Star* concerned a single newspaper report of a single crime of public import. 491 U.S. 524, 536-37 (1989).

Instead, "to properly balance freedom of the press against the right of privacy, *every private fact disclosed* in an otherwise truthful, newsworthy publication must have *some substantial relevance* to a matter of legitimate public interest." *Gilbert*, 665 F.2d at 308.[4] By way of analogy, if

---

[2] Even the Campaign's cases are clear that publishers "should take precautions to avoid unwarranted public disclosure and embarrassment of innocent individuals who may be involved in otherwise newsworthy events of legitimate public interest." *Star-Telegram, Inc. v. Doe*, 915 S.W.2d 471, 474 (Tex. 1995). It is not hard to search electronic documents for the strings of numbers that comprise social security numbers or bank account numbers.

[3] To further its "aggregate meaning" argument, the Campaign asserts that one *part* of the single intercepted conversation in *Bartnicki*—a proposal to pressure school-board members by blowing up their front porches—would have lacked public interest had it not been made in the "broader context" of "a debate about teacher pay." Mot. 7. It is not tenable to suggest that a discussion of engaging in terrorist acts against public officials is of no public interest.

[4] *See Toffoloni v. LFP Pub. Grp., LLC*, 572 F.3d 1201, 1211 (11th Cir. 2009); *infra*, II.B.3.

the *Bartnicki* journalist also had a tape of a second phone call between the parties on the first call, and on that second call someone had provided a social security number and discussed nothing of concern to the public, the First Amendment would not immunize publication of the second call.

Adopting the Campaign's novel rule would declare open season on the private communications of every political, public interest, media, and corporate organization in existence. Any future privacy violator could be certain to avoid liability for dumping enormous amounts of information onto the Internet because *something* in there will be of public concern. The intimate details of every American's private life would then become fair game "because each member of our society at some time engages in an activity that fairly could be characterized as a matter of legitimate public concern." *Gilbert*, 665 F.2d at 308. Needless to say, "the First Amendment does not require such a result." *Id.*

**Second**, *Bartnicki* does not apply because this case is not about the liability of a publisher who had otherwise acted entirely lawfully. In *Bartnicki*, the journalist's only possible misstep was the publication of information that had a "defect in [the] chain" of title. 532 U.S. at 528. But in this case, the Campaign was engaged in an illegal conspiracy to provide policy favors in exchange for weaponizing stolen private information to intimidate its political opponents, among other things. ¶¶ 2, 16-18, 142, 154, 177-79.[5] Thus, the Campaign is not a diligent journalist who happened upon information as a result of someone else's wrongdoing; it is an active wrongdoer.

---

[5] The Campaign violated several laws by receiving and soliciting a "contribution or donation" from a foreign national, *see* 18 U.S.C. § 371; 52 U.S.C. § 30121(a)(1)-(2); aiding, abetting, and covering up the hacking of a political opponent, *see* 18 U.S.C. § 1030(a)(2), -(c)(2)(B)(ii)-(iii); *see also id.* § 2; *id.* § 4; *id.* § 2315, negotiating with a hostile foreign power to defeat United States sanctions and to defeat the operation of campaign finance law, *see* 18 U.S.C. § 953, and offering a quid-pro-quo of official acts under color of law (sanctions relief) in exchange for stolen property, *see id.* § 1951(a), (b)(2); U.S. Dep't of Justice, Criminal Resources Manual § 2404.

Indeed, *Bartnicki* does not speak to conspiracy liability at all. Thus, it cannot insulate co-conspirators from liability when the publication of the private material is intended to further an otherwise unlawful conspiracy. The government has a constitutionally sufficient interest in preventing such conduct, and imposing liability is an appropriately tailored solution because it is necessary to prevent incentivizing unlawful conduct.[6]

The First Amendment protects the publication of truthful, newsworthy information. That protection is essential to a free press. But that is not what this case is about. The First Amendment is not a license to break federal and state law to publish purely private information of no public relevance. The First Amendment offers no shield for a political campaign to collude with a hostile foreign power to break the law and intimidate American citizens for their political participation.

## II.  The Complaint states constitutionally valid tort claims.

### A.  Maryland, New Jersey, and Tennessee law govern the tort claims.

This Court applies Virginia choice-of-law rules. Virginia courts apply the *lex loci* approach: the place of the wrong determines the substantive law. *Quillen v. Int'l Playtex, Inc.*, 789 F.2d 1041, 1044 (4th Cir. 1986). That is "the place where the last event necessary to make an [actor] liable for an alleged tort takes place." *Id.*

The Supreme Court of Virginia has not addressed how *lex loci* applies when "content is

---

In response, the Campaign argues that information can never be a thing of value under campaign finance law. Mot. 29-30. Not so. Campaign finance law regulates the exchange of information all the time. *See, e.g.*, *Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 443-45 (5th Cir. 2014); *In re Norquist*, MUR 5409 (FEC 2004) (contact list constitutes "thing of value"). Were it otherwise, the distinction between contributions and independent expenditures would become untenable: committees could claim a right to coordinate under the guise of providing information.

[6] *See Dahlstrom v. Sun-Times Media, LLC*, 777 F.3d 937, 951 (7th Cir. 2015) (noting defendant "cannot escape the fact that it acquired that truthful information *unlawfully*"); *cf. Bluman v. FEC*, 800 F. Supp. 2d 281, 288 (D.D.C. 2011) ("[T]he United States has a compelling interest . . . in . . . preventing foreign influence over the U.S. political process."), *aff'd*, 565 U.S. 1104 (2012).

'published' in multiple jurisdictions, such as on . . . a website." *Kylin Network (Beijing) Movie & Culture Media Co. v. Fidlow*, 2017 WL 2385343, at *3 n.2 (E.D. Va. June 1, 2017) (Hudson, J.). Under those circumstances, courts should look to the First Restatement. *See Insteel Indus., Inc. v. Costanza Contracting Co., Inc.*, 276 F. Supp. 2d 479, 486 (E.D. Va. 2003).[7] The Restatement instructs that when injury to reputation occurs in multiple states, the place of the wrong is where the reputational harm occurred. *See* Restatement (First) of Conflict of Laws § 377, note 5 (1934). This is consistent with the practice in the "vast majority" of *lex loci* jurisdictions, which apply the law of the jurisdiction where the plaintiff suffered the greatest injury, usually his domicile. *Hatfill v. Foster*, 415 F. Supp. 2d 353, 364 (S.D.N.Y. 2006) (under Virginia choice-of-law rules, law of plaintiff's domicile governs in multistate libel cases). The laws of Plaintiffs' domiciles therefore govern the privacy torts: Maryland, for Mr. Comer, ¶¶ 40, 284; New Jersey, for Mr. Schoenberg, ¶¶ 39, 292; and Tennessee, for Mr. Cockrum, ¶¶ 38, 276. And New York law certainly cannot govern, Mot. 11-12: the last event necessary to complete each tort occurred in the domicile states.

Similar logic governs the emotional-distress claim. The last event to complete the tort is Mr. Comer's experience of severe emotional distress. *See Womack v. Eldridge*, 210 S.E.3d 338, 148 (Va. 1974). That happened in Maryland. ¶¶ 21, 40. Maryland law therefore applies.

### B.  The Complaint adequately pleads all elements of the private-facts tort.

Maryland, New Jersey, and Tennessee all recognize the public-disclosure-of-private-facts tort.[8] Liability arises where (1) a defendant "gives publicity to a matter concerning the private life

---

[7] The Campaign points to two cases in which federal district courts applied the law of the place of presumed publication to Internet-based defamation claims. Mot. 11-12. Neither of those courts examined the multistate defamation issues, nor did they consider the clear instruction of the First Restatement as the Fourth Circuit has advised. *See Insteel*, 276 F. Supp. 2d at 486-87.

[8] *See, e.g.*, Maryland: *Arroyo v. Rosen*, 648 A.2d 1074, 1081 (Md. Ct. Spec. App. 1994); New Jersey: *G.D. v. Kenny*, 15 A.3d 300, 319-20 (2011); Tennessee: *Cawood v. Booth*, 2008 WL

of another" and (2) "the matter publicized is of a kind which (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." *Lindenmuth v. McCreer*, 165 A.3d 544, 556 (Md. Ct. Spec. App. 2017). To "publicize" a private fact "requires publication to the public at large"—a requirement met here by the publication of the private facts to the world. *Lindenmuth*, 165 A.3d at 557.

### 1. Three types of publicized facts were private.

*Mr. Schoenberg's and Mr. Cockrum's social security numbers*. ¶ 44. The Campaign asserts that this information was not private because it was not "embarrassing." Mot. 25. But the standard is "highly offensive to a reasonable person," not "embarrassing."[9] *See* Restatement (Second) of Torts § 652D. That is why disclosing tax returns "is an invasion of privacy." *Id.* cmt. b.

Disclosing a social security number is no different. *See Mandelbaum v. Arseneault*, 2017 WL 4287837, at *11 (N.J. Super. Ct. App. Div. 2017). Social security numbers are "one of the most serious . . . privacy concerns in the Nation" as their disclosure opens up an American "to the possibility of a profound invasion of privacy" and "egregious[] . . . harm." *Greidinger v. Davis*, 988 F.2d 1344, 1353-54 (4th Cir. 1993). Thus, in "all of the settings where [social security] numbers are available . . . entities. . . are bound by contractual and legal constraints to hold our social security numbers in confidence." *Bodah v. Lakeville Motor Express, Inc.*, 649 N.W.2d 859, 863 (Minn. Ct. App. 2002), *rev'd on other grounds,* 663 N.W.2d 550 (Minn. 2003).

In sum: "the weight of authority favors treating a social security number as private and

---

4998408, at *4 (Tenn. Ct. App. 2008), appeal granted, June 15, 2009; Parr v. Middle Tenn. State Univ., 1999 WL 1086451, at *2-3 (Tenn. Ct. App. 1999).

[9] The Campaign's case to the contrary, *Brown v. American Broadcasting Co.*, 704 F.2d 1296 (4th Cir. 1983), does not consider the Restatement. Both New Jersey and Tennessee look to the Restatement. *See Mandelbaum*, 2017 WL 4287837, at *11; *Cawood*, 2008 WL 4998408, at *8.

confidential information." *Meyerson v. Prime Realty Servs., LLC*, 796 N.Y.S.2d 848, 854 (N.Y. Sup. Ct. 2005).[10] Every state supreme court decision that Plaintiffs have found on this point has either concluded that social security numbers qualify as private facts or that triers of fact could reasonably conclude that they do.[11]

*Mr. Comer's statements regarding personal relationships, including with coworkers.* ¶¶ 22, 69-76. Mr. Comer's private communications about an interoffice quarrel or interoffice gossip fall within the scope of the tort.[12] A provision of the federal Privacy Act provides a useful analogy, as it was "designed to prevent [disclosure of] the office gossip [and] interoffice and interbureau leaks of information . . . or such actions as the publicizing of information of a sensational or salacious nature or . . . detrimental to character or reputation." *Pippinger v. Rubin*, 129 F.3d 519, 529 (10th Cir. 1997). Few would wish to see their least charitable remarks splashed across the Internet, as it can ruin relationships and careers. That happened to Mr. Comer. ¶¶ 69–75.

*Mr. Comer's private medical information.* ¶ 53. Mr. Comer's communications graphically describing his physical condition while suffering from an illness also falls within the scope of the

---

[10] *See Mandelbaum*, 2017 WL 4287837, at *11; *Moncier v. Harris*, 2017 WL 946350, at *5-6 (Tenn. Ct. App. 2017) (Tennessee law bars state agencies from disclosing social security numbers citing Tenn. Code Ann. § 10-7-504(a)(29)); *see also Daniel v. DTE Energy*, 2012 WL 12925071, at *10 (E.D. Mich. 2012) (disclosure of social security number states good private-facts tort claim); *Pinero v. Jackson Hewitt Tax Servs., Inc.*, 594 F. Supp. 2d 710, 721-22 (E.D. La. 2009) (same); *Shqeirat v. U.S. Airways Grp., Inc.*, 515 F. Supp. 2d 984, 998 (D. Minn. 2007) (same); *Tomblin v. Trevino*, 2002 WL 32857194, at *4 (W.D. Tex. June 17, 2002) (same).

[11] *See Randolph v. ING Life Ins. & Annuity Co.*, 973 A.2d 702, 710 (D.C. 2009); *Nation v. Idaho Dep't of Corr.*, 158 P.3d 953, 964 (Idaho 2007) (examining disclosure of workers compensation forms including social security numbers); *Remsberg v. Docusearch, Inc.*, 816 A.2d 1001, 1008-09 (N.H. 2003); *Pontbriand v. Sundlun*, 699 A.2d 856, 864-65 (R.I. 1997) (examining disclosure of banking records and social security number); *Progressive Animal Welfare Soc'y v. Univ. of Wash.*, 884 P.2d 592, 598 (Wash. 1994).

[12] The private-facts tort extends to private information related to one's professional life. *See Zinda v. La. Pac. Corp.*, 440 N.W.2d 548, 555-56 (Wis. 1989). It can also extend to revealing intimate, private correspondence. *See* Restatement (Second) of Torts § 652D, cmt. b.

tort.[13] That Mr. Comer shared information with close confidants, Mot. 26, "does not equate to making the information public." *Stratton v Krywko*, 2005 WL 27522, at *5 (Mich. Ct. App. 2005).

### 2. The publication is highly offensive to a reasonable person of ordinary sensibilities.

When evaluating offensiveness, "[t]he protection afforded . . . must be [judged] relative to the customs of the time and place, to the occupation of the plaintiff and to the habits of his neighbors and fellow citizens." Restatement (Second) of Torts § 652D, cmt. c. Whether the disclosure was "highly offensive to a reasonable person" is "a factual question usually given to the jury." *Vassiliades*, 492 A.2d at 588. A reasonable person would find it highly offensive to learn that the entirety of his inter-office communications and his health information has been disclosed to the world without permission. Likewise, revealing "plaintiff's social security number . . . can constitute an intrusion that is highly offensive to any reasonable person[.]" *Randolph*, 973 A.2d at 710.[14]

### 3. The private facts were not "newsworthy."

Plaintiffs adequately allege the third and final element of the private-facts tort: "there is no legitimate interest of the public in being apprised of the facts publicized." *G.D.*, 15 A.3d at 309. This element protects First Amendment interests by ensuring that publishers have "the breathing space needed . . . for the exercise of effective editorial judgment." *Virgil v. Time, Inc.*, 527 F.2d 1122, 1129 (9th Cir. 1975). So facts may be publicized as long as they concern "matters of the

---

[13] *See Jane Doe v. John F. Kennedy Univ.*, 2013 WL 4565061, at *10-11 (N.D. Cal. 2013) (disclosing ADHD states good claim); *see also Vassiliades v. Garfinckel's, Brooks Bros.*, 492 A.2d 580, 588 (D.C. 1985) (disclosing facelift states good claim); *cf.* Restatement (Second) of Torts § 652D, cmt. b (noting that "many unpleasant or disgraceful or humiliating illnesses" are private facts).

[14] *See, e.g., Purdy v. BNSF Ry. Co.*, 2000 WL 34251818, at *6 (D. Minn. 2000), *aff'd* 21 F. App'x 518, 520 (8th Cir. 2001); *Remsberg*, 816 A.2d at 1008-09; *Pontbriand*, 699 A.2d at 864-65. *Progressive Animal Welfare Soc'y*, 884 P.2d at 598.

kind customarily regarded as news" or provide "information to the public for purposes of educa-tion, amusement or enlightenment, where the public may reasonably be expected to have a legiti-mate interest in what is published." *Id.* None of the private facts issue at issue meet that standard.

Because the wrongfully disclosed facts at issue here were private, the Campaign seeks to rely on a limited exception permitting publication of some otherwise private facts. Under that ex-ception, "once a matter is found to be within the sphere of public interest, otherwise private facts" may be published so long as they "are *related* to the [newsworthy] subject." *Romaine v. Kallinger*, 537 A.2d 284, 294 (N.J. 1988). But that exception "is not unlimited." *Virgil*, 527 F.2d at 1129. To judge whether a publisher has overstepped those bounds, courts examine whether "every private fact disclosed in an otherwise truthful, newsworthy publication" has "some substantial relevance to a matter of legitimate public interest." *Gilbert*, 665 F.2d at 308.[15]

Here, there is no nexus or logical relationship between the private information that the conspirators released to harm and intimidate donors and the DNC finance team and the identified matters of public concern. The matters of public concern, according to the Campaign, consisted of "important information about the Clinton Campaign and [the] Democratic Party"—i.e., (1) "DNC

---

[15] *See, e.g.*, *Doe v. Gangland Prods., Inc.*, 730 F.3d 946, 959 (9th Cir. 2013) (explaining "news-worthiness inquiry focuses on the particular fact at issue . . . not on the general topic"); *Toffoloni*, 572 F.3d at 1212 (private facts bore "no relevance—let alone substantial relevance—to the matter of legitimate public interest"); *Doe v. HarperCollins Publishers, LLC*, 2018 WL 1174394, at *5 (N.D. Ill. 2018) (asking whether "everything" published was "necessarily germane to" the issue of public concern); *Star-Telegram, Inc.*, 915 S.W.2d at 474 (though article may be on topic of public interest "it does not necessarily follow that all information . . . is newsworthy."); *Vassiliades*, 492 A.2d at 589-90; *Nobles v. Cartwright*, 659 N.E.2d 1064, 1076 (Ind. App. 1995) ("[C]ourts gener-ally require an appropriate nexus or some sufficient degree of relatedness between the fact . . . disclosed and a matter . . . of legitimate public interest."); *Winstead v. Sweeney*, 517 N.W.2d 874, 878-79 (Mich. App. 1994) (error to focus "on the newsworthiness of the topic. . . rather than also evaluating the particular facts"); *cf. Purdy*, 2000 WL 34251818, at *4 (granting injunction against publication of social security numbers).

officials' hostility toward Senator [Bernie] Sanders," (2) "bluntly transactional exchanges" between the DNC and the "donor class," (3) the "coziness" of the DNC-media relationship, and (4) the DNC's "attitudes toward Hispanic voters." Mot. 2. But Mr. Comer's illness and private gossip had no "nexus" with any of those "matters." And the other two plaintiffs, Mr. Cockrum and Mr. Schoenberg, were not even DNC staff or media professionals. Their social security numbers say nothing about the Democratic Party's attitudes toward anyone, and there is no legitimate public interest in knowing those social security numbers. *See, e.g.*, *Purdy*, 2000 WL 34251818, at *4; *Progressive Animal Welfare Soc'y*, 884 P.2d at 598.[16]

### C. The Complaint adequately alleges that the Campaign's misconduct caused Mr. Comer to suffer emotional distress.

Intentional infliction of emotional distress under Maryland law has four elements. The conduct must be (1) intentional or reckless; and (2) extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress must be severe. *Batson v. Shiflett*, 602 A.2d 1191, 1216 (Md. 1992). The Complaint alleges each of those elements. ¶¶ 23, 69–77, 295–303.

The Campaign offers three meritless responses. ***First***, the Campaign's assertion that it is shielded from liability because the disclosures "dealt with" matters of public concern, Mot. 27, is

---

[16] *Ostergren v. Cuccinelli*, 615 F.3d 263 (4th Cir. 2010), is not to the contrary. There, a citizen was calling attention to the government's failure to redact social security numbers on publicly available documents. Because the point of her communication was to criticize the publication of the numbers, the publication of social security numbers was "integral to [the publisher's] message" on a matter of public concern. *Id.* at 271. But where the message on a matter of public concern is not itself about unredacted social security numbers, "'[r]estricting the publication of full social security numbers. . . will not materially interfere with valuable speech.'" *Id.* (quoting Eugene Volokh, *Crime-Facilitating Speech*, 57 Stan. L. Rev. 1095, 1146-47 (2005)); *see also City of Kirkland v. Sheehan*, 2011 WL 1751590, at *6 (Wash. Super. Ct. 2001) ("The blanket identification of the Social Security numbers of a group of people, without more, does not . . . facilitate or promote substantive communication.").

refuted both above and in Section II.E below. **Second**, the Campaign claims that Mr. Comer cannot recover because the disclosures were "directed at" the Clinton campaign, not him. Not so. The conspirators meant specifically to intimidate Mr. Comer by releasing his email account. ¶¶ 18-19, 43, 178, 264, 267. Moreover, the tort merely requires proof of *recklessness*, *Shiflett*, 602 A.2d at 1216—a standard easily met by the mass disclosure of his private communications. **Third**, the Campaign contends that the conduct was not outrageous. But releasing the entirety of someone's email account, and particularly when doing so for the purpose of intimidation, is malicious and unusual. It rightfully arouses shock and outrage.

### D. The Campaign is vicariously liable for the torts as a co-conspirator and as an aider and abettor.

#### 1. Civil conspiracy.

Civil conspiracy requires that (1) two or more persons, (2) agree to engage in conduct by unlawful means or for an unlawful purpose, (3) commit an overt act, and (4) cause damage to the plaintiff.[17] The Complaint alleges each of those elements: (1) the Campaign conspired with the Russian Government and WikiLeaks, ¶ 2; (2) to disseminate finance-team emails knowing or being deliberately indifferent to the risk that they contained private facts, ¶¶ 275, 283, 291; (3) overt acts were committed in furtherance of the conspiracy, ¶¶ 276, 284, 294; and (4) Plaintiffs were injured, ¶¶ 277, 285, 295. The Campaign argues that (1) the allegations are not plausible because the Complaint does not specify what was discussed at each meeting, Mot. 10; (2) the Campaign lacked the specific intent to injure Plaintiffs, Mot. 10; and (3) the Communications Decency Act bars liability, Mot. 16. None of these arguments succeeds.

*The Complaint alleges sufficient details*. The Campaign never argues that it is implausible

---

[17] *Mackey v. Compass Mktg., Inc.*, 892 A.2d 479, 485 (Md. 2006); *Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 263 (N.J. 2005); *Stanfill v. Hardney*, 2007 WL 2827498, at *7 (Tenn. App. 2007).

to conclude that the Campaign colluded. Instead, the Campaign argues that it is implausible to conclude that the conspiracy included the DNC emails because the Complaint does not specify which meetings of the conspirators involved those emails. Mot. 10-11. But Plaintiffs *do* allege that stolen emails were a subject of at least some of the contacts between the co-conspirators. ¶¶ 15, 97. In any event, knowing precisely what happened at each meeting of the conspirators is not a requirement for pleading conspiracy. A requirement that a plaintiff describe in detail all interactions between the alleged co-conspirators before discovery would impose a virtually impossible bar on pleading a conspiracy. Thus, a plaintiff alleging a conspiracy need not provide conspiracy meeting details or even "definitively show an [unlawful] agreement" in response to a motion to dismiss. *SD3*, 801 F.3d at 426. Instead, a plaintiff need only allege facts "plausibly suggest[ing] such an agreement," *id.*, and sketch out "the general contours of when an agreement was made." *Evergreen Partnering Grp. v. Pactive Grp.*, 720 F.3d 33, 46 (1st Cir. 2013).

The Complaint goes far beyond that. Plaintiffs identify dozens of contacts between the Campaign and Russian government representatives in 2016—contacts that the Campaign strove to conceal. ¶¶ 209-238, 250. Campaign representatives knew as early as April 2016 that the Russian government was claiming to have "dirt" in the form of "thousands of emails" that the Russians could disseminate anonymously. ¶ 97. Mere days after the DNC theft was completed, Russian operatives reached out again to the Campaign. ¶ 87. The Campaign agreed to a meeting with a "Russian government attorney," ¶ 102, to get "information on an opponent," ¶ 4, as "part of Russia and its government's support for Mr. Trump," ¶ 101. And just days after that meeting, a Russian intelligence agent began posting documents stolen from the DNC. ¶ 111. Shortly thereafter, a Campaign representative took another meeting to discuss the release of Russian dirt, ¶ 120, as well as sanctions relief. ¶ 142. The FBI accordingly formed the view that the advisor was likely trying

to trade sanctions relief for the release of information stolen by the Russians. ¶ 142.

Contact between the Campaign and the Russian regime intensified in mid-July of 2016, just before the stolen emails were released. On July 18 and 20, high-ranking Campaign agents met with the Russian Ambassador. ¶ 121. At the same time, the Campaign intervened to change the Republican platform in ways favorable to Russia. ¶¶ 121, 162-63. That intervention was one of several concessions to Russian interests. ¶¶ 155-174.

All the necessary elements of conspiracy are alleged here. The Complaint establishes a long course of parallel conduct between the Campaign and the Russian government. The declared desire of the Campaign to get "dirt" from the Russian government shows motive and intent.[18] The frequent communications "support an inference of agreement because they provide the means and opportunity to conspire." *SD3*, 801 F.3d at 432. The pro-Russian changes to the RNC platform along with the repeated contacts with Russian agents that trigger a suspicion of criminal behavior (*see above* n.5) show a pattern of behavior against self-interest that buttresses that inference of conspiracy. *See Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781-82 (2d Cir. 2016). So do the cover-up attempts, the false statements, and the parallel federal-law enforcement investigation. *See Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 324 (2d Cir. 2010).

Presumably, the Campaign will attempt to provide alternative explanations for these many meetings and contacts. But to "survive a motion to dismiss, a plaintiff need not demonstrate . . . that alternative explanations are less likely." *Houck v. Substitute Trustee Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015).[19] A plaintiff need only allege parallel conduct along with some additional

---

[18] Russia's standard procedure involves finding partners in the target countries. ¶¶ 145, 147-48.

[19] The Campaign suggests that WikiLeaks's "accuracy" policy is a more plausible explanation for why the conspirators did not redact any private information. Mot. 11. But that supposed policy has not stopped WikiLeaks from making edits and redactions, both before and after the DNC emails

material suggesting a meeting of the minds. *See SD3*, 801 F.3d at 430. Plaintiffs do that by showing parallel conduct, motive, intent, opportunity, behavior against seeming self-interest, a cover-up, and a parallel federal investigation. The law does not require more.

*The Campaign's specific-intent argument fails on facts and law.* The Complaint alleges that the conspirators specifically targeted Plaintiffs. ¶¶ 18-19, 264-67. The Russian Government had large volumes of DNC emails and the conspirators released only a subset of those emails. They did so on the eve of the Democratic convention, ¶ 181—just when the targeting of the finance team and the donors "would cause the most possible harm." ¶ 186. Six of the seven email accounts selected for release (including Mr. Comer's) were from the finance team. ¶¶ 18, 177. Those accounts were certain to contain the private financial information of donors such as Mr. Cockrum and Mr. Schoenberg. ¶¶ 275, 283, 291. These facts indicate that the finance team was specifically targeted and that the release of donors' private financial information was not an accident.

Moreover, specific intent is not an element of civil conspiracy liability. The minimum plaintiffs need to show is that the torts were acts taken by a co-conspirator in furtherance of unlawful conspiracy.[20] The conspiracy alleged here violates multiple federal laws. *See* n.5. So the Campaign is still liable even if it's right—and it's not—that it did not intend to attack the finance

---

were released. Also, self-serving unsworn hearsay evidence from Twitter, Mot. Ex. 10, should not be considered on a motion to dismiss.

[20] This is the law in Maryland, *Mackey*, 892 A.2d at 494-95, New Jersey, *Morgan v. Union Cty. Bd. of Chosen Freeholders*, 633 A.2d 985, 999 (N.J. Super. Ct. App. Div. 1993), and Tennessee, *Putnam v. Putnam*, 1996 WL 740807, at *3 (Tenn. Ct. App. 1996). *See also Halberstam v. Welch*, 705 F.2d 472, 481 (D.C. Cir. 1983) ("A conspirator need not participate . . . in the wrongful action in order to be found liable. He need not even have planned or known about the injurious action."). The campaign's case to the contrary, Mot. 10, considers South Carolina law.

team. The torts were foreseeable acts committed in furtherance of an unlawful conspiracy.[21]

*The Campaign's CDA argument also fails.* Even if the Communication Decency Act (CDA) immunized *WikiLeaks* (and it does not[22]), the Campaign would remain liable. Immunity for one co-conspirator does not immunize the others. *Dennis v. Sparks*, 449 U.S. 24, 27 (1980).

## 2. Aiding and abetting.

Maryland, New Jersey, and Tennessee all impose aiding-and-abetting liability when a defendant was aware of its role in tortious activity and knowingly provided substantial assistance.[23] Here, the Campaign knew that Russian intelligence had stolen emails that surely would contain private information. ¶¶ 19, 275, 283, 291. With that knowledge, the Campaign substantially assisted in the release of the emails. It encouraged the release, advised the Russians about what and when to release, promised policy favors in return, and actively participated in the coverup. ¶¶ 154, 177-79, 191, 207, 209-52, 256, 261, 264, 273, 289, 297. That constitutes substantial assistance.[24]

---

[21] Such a theory of liability would not be pre-empted under federal law. Mot. 28-29. 11 C.F.R. § 108.7(b) prohibits states from establishing their own contribution limits; it doesn't suspend the operation of civil tort law against federal campaigns (which would be the basis of liability here).

[22] WikiLeaks' immunity would turn on whether WikiLeaks was "responsible . . . for the creation or development of" the email releases, 47 U.S.C. § 230, or mechanically filtered other parties' messages in line with the "traditional editorial function" of a website operator, *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 258 (4th Cir. 2009). The Complaint alleges that WikiLeaks acted as an instrument of Russian intelligence (*i.e.*, as a cut-out), not as a neutral, independent platform. ¶¶ 2, 175-77. Under the alleged facts, WikiLeaks would not be immune.

[23] *See Natarajan v. Raju*, 2017 WL 386540, at *2 (D. Md. 2017); *Tarr v. Ciasulli*, 853 A.2d 921, 929 (N.J. 2004); *Cecil v. Hardin*, 575 S.W.2d 268, 272 (Tenn. 1978). The requirement of "knowledge" is not a specific-intent requirement. *See Saadeh v. Saadeh, Inc.*, 819 A.2d 1158, 1171 (Md. 2003); *Failla v. City of Passaic*, 146 F.3d 149, 156-57 (3d Cir. 1998) (applying New Jersey law).

[24] *See, e.g.*, Restatement (First) of Torts § 876(b) cmt. b; *Lawson v. E. Orange Sch. Dist.*, 2017 WL 751425, at *3 (D.N.J. 2017) (providing false version of events to investigators supports aiding-and-abetting liability); *cf. Great Am. Ins. Co. v. Nextday Network Hardware Corp.*, 73 F. Supp. 3d 636, 643 (D. Md. 2014) (helping to distribute already stolen goods can aid and abet conversion).

**E.  The First Amendment does not bar the long-established private-facts and emotional-distress torts.**

The Campaign asks this Court to become the first to hold that the private-facts tort violates the First Amendment on its face because it imposes liability for truthful speech and that the emotional-distress tort violates the First Amendment when "applied to" such speech. Mot. 14.

This attack on long-established tort law asks this Court to do what *Bartnicki* warns against: "answer[ing] categorically whether truthful publication may ever be punished consistent with the First Amendment." *Bartnicki*, 532 U.S. at 529. Indeed, each of the Court's decisions evaluating the "sensitivity and significance of the interests presented in clashes between the First Amendment and privacy rights counsel" are decided on "limited principles that sweep no more broadly than the appropriate context of" a particular case. *Bartnicki*, 532 U.S. at 529; *Snyder*, 562 U.S. at 460; *Florida Star*, 491 U.S. at 533. There is no basis for this Court to break new constitutional ground.

The private-facts tort stays on the right side of the First Amendment because the newsworthiness element bakes in that Amendment's requirements. *See Toffloni*, 572 F.3d at 1212. If a fact is true and newsworthy, its disclosure is not tortious no matter how "offensive or disagreeable" it may be. But the information at issue here is not of public interest. And the emotional-distress tort is not being "applied" here to "punish" the Campaign for truthful statements that are of public interest. Mot. 14-15. That tort is being applied to punish the Campaign for engaging in an intentionally intimidating and unlawful course of conduct that sought to make the disclosure of Mr. Comer's stolen private information the cost of exercising his First Amendment rights. Although the First Amendment sometimes can furnish a defense in emotional-distress suits, that defense does not apply here because Plaintiffs are not public figures and the wrongfully disclosed emails that create liability were of no public concern.

The Campaign suggests that its conduct deserves heightened protection because it occurred

during a political campaign. Mot. 15. But the Campaign cites only inapposite cases concerning criminal prohibitions on (1) candidate endorsements by political parties, *Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214, 216-17 (1989), and (2) *any* statements referring to a candidate for federal office, *Citizens United v. FEC*, 558 U.S. 310, 321 (2010). Both of those prohibitions affected core political speech. By contrast, this case is about private information that happened to belong to donors and campaign aides. Allowing civil liability neither "hampers the ability of a party [or candidate] to spread its message [nor] hamstrings voters seeking to inform themselves about the candidates and the campaign issues." *Eu*, 489 U.S. at 223. To the contrary, it is the Campaign's position that chills political speech, because a license to publicize the private information of anyone who participates in elections will discourage people from participating.

Finally, the Campaign asserts that both torts are void for vagueness because their elements feature terms like "highly offensive" and "outrageous." Mot. 15-16.[25] Tort law routinely uses such terms, and the Campaign cites no case holding a tort unconstitutionally vague on that ground. In fact, the Court recently reviewed an emotional distress claim without ever suggesting that the tort might be unconstitutionally vague. *See Snyder*, 562 U.S at 451-59.

### III.  The Campaign conspired to violate federal rights protected by § 1985(3).

In conspiring to arrange publication of the hacked emails, the Campaign aimed to do more than create negative publicity for its opponent. It aimed to injure the people whose private information was made public. By making the DNC finance team toxic, and by demonstrating that anyone communicating with that team risked exposure to identity theft, the Campaign sought to

---

[25] The Campaign points to *Miller v. California*, Mot. 16, but *Miller* has no bearing on this case. *First*, *Miller* concerned a criminal obscenity *statute*, not a tort. 413 U.S. 15, 16 n.1 (1973). *Second*, the Court's decision invalidating the provision in *Miller* did not mention vagueness. The remaining cases the Campaign cites to support its challenge involve either statutory crimes or the rejection of as-applied challenges to claims brought by public figures, which Plaintiffs are not.

deter future communications between the finance team and potential donors, thus preventing future contributions of support. ¶¶ 18-19, 30, 208, 263-67. Plaintiffs were injured as a result and thus have causes of action under the support-or-advocacy clauses of 42 U.S.C. § 1985(3).

The Campaign denies liability on the grounds that (1) the Complaint fails to allege the necessary conspiratorial intent; (2) the support-or-advocacy clauses only cover conspiracies involving state action; (3) the Campaign cannot be held liable on a *respondeat superior* theory; and (4) *Bartnicki* bars liability under § 1985(3). Each argument fails.

### A.  The plain language of the statute gives Plaintiffs a cause of action.

The third clause of § 1985(3) confers a cause of action on anyone injured by a conspiracy to prevent any citizen, "by force, intimidation, or threat . . . from giving his support or advocacy . . . toward or in favor of the election" of a candidate for federal office. The fourth clause gives a cause of action to anyone injured by a conspiracy "to injure any citizen in person or property on account of such support or advocacy."

Plaintiffs have causes of action under both clauses. By publicizing the complete mailboxes of finance-team members, the conspirators threatened potential identity theft as the price of being a part of or doing business with the campaign's fundraising arm. Per clause three, that was an attempt to use intimidation or threat to prevent citizens from giving support to political candidates. The conspirators also worked to expose private information to public view and to expose campaign donors to identity theft. Per clause four, they conspired to injure citizens on account of their support or advocacy for candidates for federal office.

The Campaign argues that "intimidation" and "threat" refer only to actions that create fear of *physical* harm and that "injury" in § 1985(3) is limited to *physical* injury. Mot. 18. But the Supreme Court has held that "injury" under § 1985 need not be physical. *See Haddle v. Garrison*,

525 U.S. 121, 125-27 (1998). Courts also have ruled that plaintiffs may state claims for "intimidation" or "threat" under § 1985 even where there is no prospect of physical harm. *See, e.g.*, *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1034 (11th Cir. 2000).

And that makes sense. The statute contains no words limiting coverage to physical violence. Indeed, Congress chose *not* to impose such a limitation. Section 1985(3) was passed in the Civil Rights Act of 1871. In the course of enacting that law, Congress considered and rejected language that would have imposed liability for the physical destruction of property and for bodily injury if done with "force or violence." *See* Cong. Globe, 42d Cong., 1st Sess. 755 (1871) (proposing language); *id.* at 804 (statement of Mr. Poland, noting the House's disagreement). Congress knew how to expressly limit a provision of this statute to cases of physical violence when it wanted to do so. But Congress placed no such limitation on the support-or-advocacy clauses.[26] And the Campaign's only support for its claim that "intimidation," "threat," and "injury" all require physical harm comes from cases having nothing to do with § 1985.[27]

The Campaign warns that reading "injury" in § 1985(3) as the Supreme Court did in *Haddle* would create liability for normal political activity, from the heckling of speakers to journalistic criticism of prominent donors. Mot. 19.[28] But *Haddle*'s holding is clear: the statute is not limited

---

[26] Congress did include such language elsewhere in the Act. *See* ch. 22, § 1, 17 Stat. 13, 13 (unlawful to conspire to "*by force* to seize, take, or possess any property of the United States").

[27] The cases the Campaign cites to argue that "intimidation" and "threat" must involve the prospect of bodily harm are about an armed-bank-robbery statute and a rape statute. Mot. 18. And the cases that the Campaign cites to argue that "injury" requires physical injury are all state-law cases about circumstances in which economic loss alone creates no tort liability. Mot. 18.

[28] Relying on *Carpenters*, the Campaign warns "principles of federalism" argue against reading § 1985(3) as governing "campaign tactics in both state and federal elections." Mot. 19 (quoting *Carpenters v. Scott*, 463 U.S. 825, 836 (1983)). But the federalism concern in *Carpenters* has nothing to do with the support-or-advocacy clauses, which apply only to *federal* elections. *Carpenters* was concerned that a broad reading § 1985(3)'s *first clause* might overstep the bounds of federalism by imposing regulations on state elections as well as on federal ones. *See* 463 U.S. at 827.

24

to physical injury. Moreover, the Campaign's fears are unwarranted. No action would lie under § 1985(3) in any of the scenarios the Campaign warns about, because in none of them could a plaintiff show legal injury, physical or otherwise. Political heckling causes no cognizable injury, and neither does (truthful) journalistic criticism. But exposure to identity theft does. *See Hutton v. Nat'l Bd. of Exam'rs in Optometry*, 892 F.3d 613, 622 (4th Cir. 2018).

### B. The Complaint alleges conspiratorial intent.

The Complaint alleges that the conspiracy intended to injure DNC staffers and donors, and to demonstrate that donors were at risk of identity theft, in order to deter people from supporting the Campaign's opponent. ¶¶ 18-19, 30, 208, 263-67. To be sure, intimidating and injuring the DNC finance team and Democratic donors were not the conspiracy's *sole* aims. But a plaintiff never needs to show that conspirators acted *only* for a specific purpose. A "single conspiracy may have several purposes, but if one of them—whether primary or secondary—be the violation of a federal law, the conspiracy is unlawful." *Anderson v. United States*, 417 U.S. 211, 226 (1974). Similarly, it is no defense that the Campaign's ultimate objective was to win an election. To say that the Campaign is immune because its ultimate purpose was to win "is akin to saying that a bank robber lacks *mens rea* . . . because his ultimate objective was to make money, not to commit robbery." *Libertad v. Welch*, 53 F.3d 428, 446 (1st Cir. 1995).

The Campaign also argues that the support-or-advocacy clauses cover only conspiracies that intend to harm particular persons, not conspiracies aimed at groups like the DNC finance team or Democratic donors. Mot. 23. This contention would not help the Campaign even if it were true, because the conspiracy did target particular persons. At the very least, it aimed to injure the specific people whose email boxes were released to the world, including Mr. Comer. ¶¶ 18-19, 43, 264-67. And once a conspiracy comes within the coverage of § 1985, any person injured as a consequence

of the conspiracy can sue, regardless of whether they were the target.[29]

Moreover, it is not true that the support-or-advocacy clauses only cover conspiracies against specified persons. The Campaign argues that § 1985(3)'s first clause speaks of denying equal protection to any "class of persons" while the support-or-advocacy clauses speak only of "any citizen." The Campaign reads that to imply that the support-or-advocacy clauses do not cover conspiracies against *classes* and concludes that conspiracies against Democratic donors *as a group* are not actionable. Mot. 23. Thus, the Campaign's view would produce the absurd result that the support-or-advocacy clauses would not cover a conspiracy to leave a bomb at the DNC's get-out-the-vote headquarters because it would not be a conspiracy aimed at a specific individual.

The Campaign's interpretation misreads the statute and runs contrary to Supreme Court precedent. In particular, the Campaign's argument depends on treating any conspiracy against a group as a conspiracy against a "class." The Supreme Court has rejected that view. *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269 (1993) ("class" in § 1985(3) is more than a group of people whose conduct is targeted). The "class of persons" language in § 1985(3) appears in clause (1), which covers conspiracies *to deny equal protection*, and it has a specialized meaning appropriate to that context. A conspiracy against a racial group is class-based for purposes of § 1985(3). *See Griffin*, 403 U.S. at 102. A conspiracy against members of a political party is not. *Harrison v. KVAT Food Mgmt.*, 766 F.2d 155, 161 (4th Cir. 1985). Accordingly, a group of Democrats alleging a conspiracy to deny them *equal protection* could not state a claim as a "class of persons" under clause (1). *Id.* But the absence of "class of persons" language from the support-

---

[29] See 42 U.S.C. § 1985(3) ("[I[f one or more [conspirators] do, or cause to be done, any act in furtherance of the object of such conspiracy, *whereby another is injured* in his person or property . . . *the party so injured* . . . may have an action for the recovery of damages[.]"); *see, e.g.*, *Griffin v. Breckenridge*, 403 U.S. 88, 103 (1971) (§ 1985 claim by a plaintiff who was not the target).

or-advocacy clauses does not mean that they cover only conspiracies against specific individuals. It means only that plaintiffs with claims under the support-or-advocacy clauses need not show animus aimed at them on the basis of some special group trait, as is necessary in cases under § 1985(3)'s first clause. *See Kush v. Rutledge*, 460 U.S. 719, 726 (1983) (only plaintiffs proceeding under portions of § 1985 worded in terms of equal protection must show class-based animus).

### C.  The support-or-advocacy clauses reach conspiracies by private parties.

On the theory that the support-or-advocacy clauses are vehicles for asserting rights guaranteed elsewhere, the Campaign characterizes Plaintiffs' claim as resting on a First Amendment right that cannot be asserted against non-state actors like the Campaign. Mot. 20-21. But Judge O'Grady has rejected that argument. *See LULAC v. Pub. Interest Leg. Found.*, 2018 WL 3848404, at *5-6 (E.D. Va. 2018). This Court should too.

The equal-protection clauses of § 1985(3)—clauses (1) and (2) of the subsection—are indeed vehicles for asserting rights established elsewhere. *See Great Am. Fed. Sav. & Loan v. Novotny*, 442 U.S. 366, 372 (1979). That is because § 1985's equal protection clauses exercise Congress's authority to enforce the Reconstruction Amendments. *See, e.g.*, *Griffin*, 403 U.S. at 105-07. But the support-or-advocacy clauses are *not* exercises of Congress's power to enforce the Reconstruction Amendments. Instead, they exercise Congress's power to protect the integrity of federal elections. *See Ex parte Yarbrough*, 110 U.S. 651, 657-58, 660-61, 665-66 (1884); *see also United States v. Carmichael*, 685 F.2d 903, 908-09 (4th Cir. 1982) (Congress may regulate any activity that potentially corrupts federal elections). That is why "the 'support and advocacy' clause of Section 1985(3) . . . unlike the equal protection part of Section 1985(3) does not require . . . violation of a separate substantive right." *LULAC*, 2018 WL 3848404, at *6. For the same reason, the support-or-advocacy clauses have no state-action limitation. *See, e.g.*, *Yarbrough* 110 U.S. at

665-66; *Paynes v. Lee*, 377 F.2d 61, 64 (5th Cir. 1967); *LULAC*, 2018 WL 3848404, at *4-5.[30]

The Campaign also relies on Eighth Circuit decisions holding that the support-or-advocacy clauses create causes of action to vindicate First Amendment rights. *See* Mot. 22 (citing *Federer v. Gephardt*, 363 F.3d 754 (8th Cir. 2004); *Gill v. Farm Bureau Life Ins.*, 906 F.2d 1265 (8th Cir. 1990)). But that contradicts the Court's decision in *Yarbrough*, which treats the support-or-advocacy clauses as independently substantive.[31] Moreover, reading the support-or-advocacy clauses as merely offering remedies for violations of First Amendment rights (or any other constitutional right) would make those clauses superfluous; conspiracies to violate preexisting rights already are actionable under § 1985(3)'s first clause. *See Carpenters*, 463 U.S. at 830.

### D. The Campaign is liable under § 1985 for the actions of its agents.

Citing *Monell*, 436 U.S. 658 (1978), the Campaign says that federal civil-rights statutes do not create *respondeat superior* liability. Mot. 23-24. But *Monell* held nothing about federal civil-rights laws in general. It held that § 1983's language and legislative history precludes *respondeat superior* liability. *See* 436 U.S. at 691-92 & n.57. Neither that holding nor that analysis applies to § 1985, because the features of § 1983 that *Monell* relied upon have no analogue in § 1985. *See id.* at 691-92. Moreover, the rule against *respondeat superior* in § 1983 is animated by the "federalism

---

[30] The Campaign claims that support-or-advocacy cases recognizing a cause of action against private parties do so only because the conspiracies at issue targeted a pre-existing right to vote. Mot. 22. But the cases say that plaintiffs proceeding under those clauses need not show violations of any preexisting rights. *See, e.g.*, *LULAC*, 2018 WL 3848404, at *6.

[31] It also makes no sense to conclude that the Civil Rights Act of 1871 included two clauses that merely offer voters a remedy for First Amendment violations. In 1871, the First Amendment ran only against the federal government. So, if the Campaign is correct, then a plaintiff in the 1870s could have only brought a support-or-advocacy claim against a federal actor. That cannot possibly be right because it would mean that the support-or-advocacy clauses would have been of no use in the 1870s to citizens who suffered politically motivated attacks by Klansmen. (Klansmen certainly were not *federal government* officials.)

concerns" that would arise if § 1983 made local governments liable for actions not their own, *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 415 (1997), and by the need to prevent § 1983 from forcing municipalities to shift funds to pay § 1983 judgments, *see City of Canton v. Harris*, 489 U.S. 378, 400 (1989) (O'Connor, J., concurring in part and dissenting in part). So even if § 1985 were treated analogously to § 1983 when the defendant is a municipality, the analogy is out of place when the defendant is a private corporation. The Campaign cites no case in which a private defendant has successfully defended against a § 1985(3) claim on this ground.

The issue also is immaterial. Plaintiffs need not rely on *respondeat superior*; they assert that senior officials, with authority to act for the Campaign, engaged in the conspiracy on the Campaign's behalf. ¶¶ 2, 4, 15, 16, 29, 42, 89, 94, 154, 208, 209. Corporations act through their agents, and agents' actions on behalf of the corporation create corporate liability. *See* 16 Am. Jur. 2d Conspiracy § 56. That is how liability works under § 1985. *See Painter's Mill Grille v. Brown*, 716 F.3d 342, 352 (4th Cir. 2013) (in § 1985 actions, "the agents' acts are the corporation's own").

### E. *Bartnicki* does not govern the constitutionality of § 1985(3).

Unlike the laws at issue in *Bartnicki* and *Florida Star*, which facially regulated expression, the support-or-advocacy clauses are "content-neutral regulation of conduct." *Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993). That means strict scrutiny is inappropriate.[32]

Courts determining content neutrality ask whether the text of the statute "confers benefits or imposes burdens based upon the content of the speech it regulates," and whether the statute's "purpose is to regulate speech because of the message it conveys." *Satellite Broad. & Commc'n*

---

[32] *See, e.g.*, *Roberts v. U.S. Jaycees*, 468 U.S. 609, 628 (1984); *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984); *cf. R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 389 (1992) ("[S]ince words can . . . violate laws directed not against speech but against conduct . . . a particular content-based subcategory of a proscribable class of speech can be swept up incidentally . . . .").

*Ass'n v. FCC*, 275 F.3d 337, 353-54 (4th Cir. 2001). Neither prong is triggered by the support-or-advocacy clauses. Those clauses bar no topic from discussion—one can violate them without speaking at all—and their purpose is to protect federal elections, not to restrict speech. *See Am. Life League, Inc. v. Reno*, 47 F.3d 642, 650 & n.2 (4th Cir. 1995) (voter-intimidation ban is a viewpoint- and content-neutral regulation of conduct).[33]

So the clauses are valid: they "further[] an important or substantial governmental interest . . . unrelated to the suppression of free expression," and the "incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 376-77 (1967). Protecting elections is an interest important enough to overcome incidental burdens on expression. *See John Doe #1 v. Reed*, 561 U.S. 186, 197 (2010); *id.* at 201. Indeed, it is a compelling interest. *See Burson v. Freeman*, 504 U.S. 191, 199 (1992) (plurality opinion). Tailoring is no harder. Section 1985 imposes no more burden than necessary; it reaches only conspiracies to use force, intimidation, or threat, or to cause legally cognizable injuries. That falls well within the government's "considerable latitude" to "employ the means of its choosing so long as the . . . regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation and does not burden substantially more speech than is necessary to further that interest." *Satellite Broad.*, 275 F.3d at 364.

## CONCLUSION

The Campaign's motion to dismiss should be denied.

Respectfully submitted,

Date: Nov. 8, 2018.                  /s/ *April H. Pullium*
                                     APRIL H. PULLIUM

---

[33] *See also Yarbrough*, 110 U.S. at 662 (support-or-advocacy clauses ensure that the "officers . . . chosen" represent "the free and uncorrupted choice of" the electorate).

Virginia Bar No. 90994
Bredhoff & Kaiser, P.L.L.C.
805 15th St. N.W.
Washington, DC 20005
Tel: (202) 842-2600
Fax: (202) 824-1888
Email: apullium@bredhoff.com

*Counsel for Plaintiffs*
BENJAMIN L. BERWICK (MA Bar No. 679207)
(*pro hac vice*)
United to Protect Democracy
10 Ware St.
Cambridge, MA 02138
(909) 326-2911
Ben.Berwick@protectdemocracy.org

IAN BASSIN (NY Attorney Registration No.
4683439) (*pro hac vice*)
United to Protect Democracy
222 Broadway, 19th Floor
New York, NY 10038
Ian.Bassin@protectdemocracy.org

JUSTIN FLORENCE (D.C. Bar No. 988953) (*pro hac
vice*)
Justin.Florence@protectdemocracy.org
ANNE TINDALL (D.C. Bar No. 494607) (*pro hac
vice* application forthcoming)
Anne.Tindall@protectdemocracy.org
CAMERON KISTLER (D.C. Bar No. 1008922) (*pro
hac vice*)
Cameron.Kistler@protectdemocracy.org
United to Protect Democracy
2020 Pennsylvania Ave. NW, #163
Washington, DC 20006
(202) 856-9191

JESSICA MARSDEN (N.C. Bar No. 50855) (*pro hac
vice* application forthcoming)
United to Protect Democracy
106 S. Greensboro St, Suite E
Carrboro, North Carolina 27510
Telephone: (202) 672-4812
Facsimile: (929) 777-8428
jess.marsden@protectdemocracy.org

31

NANCY GERTNER (MA Bar No. 190140) (*pro hac vice* application forthcoming)
Fick & Marx
100 Franklin Street, 7th floor
Boston, MA 02110
(857) 321-8360
ngertner@fickmarx.com

RICHARD PRIMUS (MI Bar No. P70419) (*pro hac vice*)
The University of Michigan Law School*
625 S. State Street
Ann Arbor, MI 48109
(734) 647-5543
PrimusLaw1859@gmail.com

STEVEN A. HIRSCH (CA State Bar No. 171825) (*pro hac vice* application forthcoming)
shirsch@keker.com
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
(415) 391-5400

STEPHEN P. BERZON (CA State Bar No. 46540) (*pro hac vice* application forthcoming)
sberzon@altber.com
BARBARA J. CHISHOLM (CA State Bar No. 224656) (*pro hac vice* application forthcoming)
bchisholm@altber.com
DANIELLE E. LEONARD (CA State Bar No. 218201) (*pro hac vice* application forthcoming)
dleonard@altber.com
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
(415) 421-7151

* For identification purposes.

*Counsel for Plaintiffs*

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on November 8, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered parties.

Date: Nov. 8, 2018.

/s/ April H. Pullium
APRIL H. PULLIUM
Counsel for Plaintiffs
Virginia Bar No. 90994
Bredhoff & Kaiser, P.L.L.C.
805 15th St. N.W.
Washington, DC 20005
Tel: (202) 842-2600
Fax: (202) 824-1888
Email: apullium@bredhoff.com