## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

ROY COCKRUM, *et al.*,            )
                                  )
                  Plaintiffs,     )
                                  )
v.                                )        Civil Action No. 3:18–CV–484–HEH
                                  )
DONALD J. TRUMP FOR               )
PRESIDENT, INC.,                  )
                                  )
                  Defendant.      )

### MEMORANDUM OPINION
#### (Granting Defendant's Motion to Dismiss Amended Complaint)

### I.   BACKGROUND

Plaintiffs[1] in this case seek damages for injuries resulting from the unauthorized

publication of their personal information on the internet.  Plaintiffs allege that their

information was illegally obtained by Russian intelligence operatives during the

Russians' hack of computer servers belonging to the Democratic National Committee

("DNC" or the "Committee").  The Amended Complaint alleges that "[a]gents of the

Trump Campaign, acting on behalf of the Campaign, met with—and were otherwise in

contact with—Russian officials or their agents on numerous occasions during the spring

and summer of 2016." (Am. Compl. ¶ 15, ECF No. 8.)  During this period, the Kremlin

alerted Donald J. Trump for President, Inc. (the "Campaign" or "Defendant") that it

---

[1] None of the Plaintiffs in this case held significant positions in Hillary Clinton's 2016
presidential campaign.  Roy Cockrum and Eric Schoenberg were financial contributors to the
Democratic National Committee ("DNC").  Scott Comer is a former mid-level staffer on the
DNC finance team.

possessed stolen DNC emails and could publicize them in order to harm the DNC and

Mr. Trump's political opponent, Hillary Clinton, thereby helping the Campaign win the

2016 presidential election. (*Id.* ¶ 2.) In return, the Campaign and the Russian regime

allegedly agreed that the Campaign would provide political benefits to Russia. (*Id.*)

Following this coordination of effort, and at the direction of the Campaign and Russian

agents, "the emails were then released by WikiLeaks, which joined the conspiracy as a

trusted Russian intermediary." (*Id.*)

According to the Amended Complaint, "[i]n order to defeat Secretary Clinton and

help elect Mr. Trump, hackers working on behalf of the Russian government," (*id.* ¶ 86),

allegedly converted "voluminous amounts of data, including emails and other documents

sent to and from thousands of individuals. Some of those individuals were staff members

of the DNC; some were donors; and some were other supporters, members of the media,

or other private citizens." (*Id.* ¶ 10.) "On July 22, 2016, WikiLeaks posted thousands of

private emails on the Internet. These emails were made available to anybody in the world

with a web browser." (*Id.* ¶ 43.) As a result of the publication of the Plaintiffs' personal

information, which allegedly included emails, social security numbers, dates of birth,

home addresses, phone numbers, and banking relationships, they allegedly sustained

significant personal and financial damage. (*Id.* ¶ 44.) This lawsuit followed.

Plaintiffs' Amended Complaint alleges three discrete causes of action. In Count I,

they allege a conspiracy to intimidate lawful voters from giving support or advocacy to

electors for president and to injure citizens in person or property on account of such

2

support or advocacy in violation of 42 U.S.C. § 1985(3).[2]  (*Id.* ¶¶ 257–70.)  Count II

seeks damages for public disclosure of private facts as to Mr. Cockrum in violation of

Tennessee law (civil conspiracy and aiding and abetting liability).  (*Id.* ¶¶ 271–78.)  The

third count is a claim of public disclosure of private facts as to Mr. Comer in violation of

Maryland law (civil conspiracy and aiding and abetting liability).  (*Id.* ¶¶ 279–86.)  Count

IV alleges public disclosure of private facts as to Mr. Schoenberg in violation of New

Jersey law (civil conspiracy and aiding and abetting liability).  (*Id.* ¶¶ 287–94.)  Count V

is a claim for intentional infliction of emotional distress as to Mr. Comer in violation of

Maryland law (civil conspiracy and aiding and abetting liability).  (*Id.* ¶¶ 295–303.)

During oral argument, Plaintiffs moved to dismiss Count VI, which seeks damages for

civil conspiracy in violation of the common law.  Counsel represented to the Court that it

wished to dismiss Count VI because the theory underlying this cause of action is

integrated into the preceding counts.  Consequently, the Court will grant counsel's oral

motion, and Count VI will be dismissed.

Presently before the Court is Defendant's Motion to Dismiss the Amended

Complaint filed pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion," ECF

No. 22.)  Both the Plaintiffs and the Campaign have filed extensive memoranda

supporting their respective positions on the pending Motion.  The Court heard oral

argument on January 24, 2019.  The parties were then directed to file supplemental

memoranda addressing the choice of law governing Counts II, III, and IV.  The parties

---

[2] During oral argument, Plaintiffs characterized the Campaign's strategy as a conspiracy to weaponize the hacked information in order to dissuade participation in or contributions to the Clinton Campaign.

have done so, and the matter is now ripe for this Court's review.

## II.   STANDARD OF REVIEW

The well-pleaded facts contained within the Amended Complaint both inform and constrain this Court's review of the Campaign's Motion at this stage. The task at hand is to determine the sufficiency of the Amended Complaint, "not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering a motion to dismiss, a plaintiff's well-pleaded allegations are taken as true and the complaint must be viewed in the light most favorable to the plaintiff. *T.G. Slater & Son, Inc. v. Donald P. & Patricia A. Brennan LLC*, 385 F.3d 836, 842 (4th Cir. 2004). At this stage of the proceedings, the record is one dimensional, focusing solely on the adequacy of the Amended Complaint.

A Rule 12(b)(6) motion to dismiss "should not be granted unless it appears certain that the plaintiff can prove no set of facts which would support its claim and would entitle it to relief." *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). The Court, however, "need not accept the legal conclusions drawn from the facts, and [it] need not accept as true unwarranted inferences, unreasonable conclusions or arguments." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009) (quoting *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008)).

To survive Rule 12(b)(6) scrutiny, a plaintiff must provide more than merely "labels and conclusions," or a "formulaic recitation of the elements of a cause of action. . . . " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Instead, a plaintiff

must allege facts sufficient "to raise a right to relief above the speculative level," by stating a claim, that is "plausible on its face" rather than merely "conceivable." *Id.* at 555, 570, 586 (internal citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

## III.   ANALYSIS

As a threshold challenge, the Campaign argues that its alleged publication of the information hacked by Russian operatives, and acquired from WikiLeaks, was First Amendment protected because the Campaign did not participate in its actual acquisition and the information, at least in part, involved information of public concern.[3] The Court will address this argument first because it effects the viability of all of Plaintiffs' claims. The Court will then turn to the Campaign's individual arguments with respect to Counts I–V.

### A. Applicability of the First Amendment to Plaintiffs' Claims

The Campaign's First Amendment argument relies heavily on *Bartnicki v. Vopper*, 532 U.S. 514 (2001). In *Bartnicki*, an unlawfully-intercepted cellphone conversation was turned over to the media who then broadcasted the tape. *Id.* at 518–19. The Court in *Bartnicki* premised its analysis on the well-settled principle that when "a newspaper

---

[3] Counsel for Plaintiffs noted during oral argument that approximately 22,000 of these emails involved personal information of DNC operatives. According to the Amended Complaint, WikiLeaks's website specifically described these emails as being part of its release. (Am. Compl. ¶ 43.)

lawfully obtains truthful information about a matter of public significance [] state

officials may not constitutionally punish publication of the information, absent a need . . .

of the highest order." *Id.* at 527 (second alteration in original) (quoting *Smith v. Daily

Mail Publ'g Co.*, 443 U.S. 97, 103 (1979)); *see also Florida Star v. B.J.F.*, 491 U.S. 524,

533 (1989) (quoting same).  The Supreme Court in *Bartnicki* also drew guidance from

*New York Times Co. v. United States*, 403 U.S. 713 (1971) (per curiam), where the Court

upheld the right of the press to publish information of great public concern obtained from

documents stolen by a third party. *Bartnicki*, 532 U.S. at 528.

    *Bartnicki* is distinguishable from the immediate case in several respects.  Here,

unlike *Bartnicki*, the Campaign is alleged to have conspired with the Kremlin and

WikiLeaks prior to the information being released and for its own benefit.  The Amended

Complaint alleges that

> In June 2016, six weeks after learning that the Russians had "dirt" that they
> were willing to use to benefit the Campaign, senior Trump Campaign
> officials met with an agent of the Russian regime . . . . According to email
> correspondence regarding the meeting that Donald Trump Jr. made public
> on his Twitter account, rather than avoiding coordination with a foreign
> government that was attempting to interfere in a U.S. election, Mr. Trump
> Jr. responded over the email: "If it's what you say I love it especially later
> in the summer."

(Am. Compl. ¶ 15.)  Furthermore, the information at issue in *Bartnicki* pertained to a

contemplated act of violence[4], clearly a matter of public concern.  532 U.S. at 519, 525,

540.

---

[4] In *Bartnicki*, a union official, who was frustrated with the progress of collective bargaining
negotiations, stated during an intercepted telephone call that, if the school board remained
intransigent, they may have "[t]o blow off their front porches . . . ." 532 U.S. at 519.

At this stage of the proceedings, the Court's analysis of the Defendant's 12(b)(6) Motion is limited to the four corners of the Amended Complaint. *E. I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 449 (4th Cir. 2011). The Amended Complaint discloses in considerable detail the alleged interactions between the Campaign and Russian operatives to arrange for the publication of the stolen information. The Amended Complaint provides specific dates and identifies participants in conversations and meetings concerning publication of the stolen DNC emails. For example, Paragraph 113 of the Amended Complaint reads,

> [a]ll told, during the four months and eight days between March 14, 2016, when Mr. Papadopoulos first made contact with a Russian agent, and July 22, 2016, when the stolen DNC emails were released on WikiLeaks, agents and associates of the Trump Campaign had at least 41 separate contacts with Russian agents.

(Am. Compl. ¶ 113.) Collectively, the detailed descriptions of conversations and meetings between representatives of the Campaign and Russian operatives is more than ample at this point to provide a plausible factual basis for Plaintiffs' allegation that the Campaign was aware that the stolen information had been unlawfully obtained.[5]

The second facet of the Campaign's First Amendment challenge is its contention that the disclosed information dealt with matters of public concern. This is a closer question, particularly since the information was at least in part related to a political campaign and a candidate's supporters. The Campaign maintains that the disclosure may have contained some peripheral private information concerning the individual Plaintiffs,

---

[5] At this stage of the proceedings, the truthfulness of Plaintiffs' allegations is not at issue, but rather their sufficiency, if proven.

but it was overshadowed by information concerning the Clinton Campaign and the DNC,

including the Committee's hostility towards Senator Bernie Sanders and Hispanic voters.

(*Id.* ¶ 188.) The Amended Complaint, however, alleges that approximately 22,000 of the

emails contained personal information. (*Id.* ¶¶ 43–44.)

The Supreme Court staked out the boundaries of speech of public concern in

*Snyder v. Phelps*, 562 U.S. 443 (2011). "Speech deals with matters of public concern

when it can 'be fairly considered as relating to any matter of political, social, or other

concern to the community,' or when it 'is a subject of legitimate news interest . . . .'" *Id.*

at 453 (first quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983); then quoting *San Diego

v. Roe*, 543 U.S. 77, 83–84 (2004) (per curiam)). The Campaign urges the Court to focus

on the "'content, form, and context' of the speech . . . in the aggregate, not line by line."

(Def.'s Br. Supp. Mot. Dismiss 6 (quoting *Snyder*, 562 U.S. at 453), ECF No. 23.) The

Campaign also draws the Court's attention to *Florida Star*, wherein the Campaign argues

the Supreme Court adopted a holistic approach in evaluating publications. The

Campaign maintains that

> Every disclosed email was (1) a work email (2) sent or received by a
> political operative (3) during a presidential campaign. Every disclosed
> email thus inherently addressed politics, elections, and campaigns—all
> paradigmatic issues. . . . They revealed the Democratic Party's conduct
> during its presidential primaries—which are public processes 'structur[ed]
> and monitor[ed]' by the state. *Cal. Democratic Party v. Jones*, 530 U.S.
> 567, 572 (2000).

(Def.'s Br. Supp. Mot. Dismiss 8.) At this phase of the case, the content of these 22,000

emails is not before the Court.

Plaintiffs rejoin that the Campaign's categorization of speech of public concern

casts too wide a net. (Pls.' Mem. Opp'n Mot. Dismiss 8, ECF No. 30.) They maintain that the First Amendment does not protect large amounts of private information with some isolated facts of public concern. (*Id.*) Even if some of the emails were arguably newsworthy, Plaintiffs contend that thousands were not. (*Id.* at 6.) Plaintiffs distinguish the cases relied upon by the Campaign to support its argument that an entire disclosure is constitutionally protected if even part relates to matters of public importance. (*Id.* at 6–7.) In contrast to the claims presently before the Court, Plaintiffs note that none of the cases relied upon by the Campaign—*Snyder*, *Bartnicki*, or *Florida Star*—involved disclosure without any effort to remove sensitive, private information or intentional disclosures of private information for the purposes of intimidation.[6] (*Id.* at 7.) Plaintiffs argue that "to properly balance freedom of the press against the right of privacy, *every private fact disclosed* in an otherwise truthful, newsworthy publication, must have *some substantial relevance* to a matter of legitimate public concern." (*Id.* (quoting *Gilbert v. Med. Econ. Co.*, 665 F.2d 305, 308 (10th Cir. 1981); *id.* at 7 n.4 (citing *Toffoloni v. LFB Publ'g Grp., LLC*, 572 F.3d 1201, 1211 (11th 2009)).

In drawing the boundaries between privacy and public concern, the Eleventh Circuit in *Toffoloni* drew heavily from the Restatement (Second) of Torts § 652D. "The Restatement recognizes that, although an individual may be rendered subject to public scrutiny by some newsworthy event, '[t]he extent of the authority to make public private facts is not . . . unlimited.'" *Toffoloni*, 572 F.3d at 1211 (quoting Restatement (Second)

---

[6] During oral argument, counsel for the Campaign stressed that it was unaware that the emails published by WikiLeaks included Plaintiffs' personal information. In its view, it was WikiLeaks's obligation to purge personal emails.

of Torts § 652D cmt. h.).

The difficulty confronted by the Court at this juncture is the scant record at hand. The Amended Complaint exhaustively details the personal information concerning the Plaintiffs that was allegedly disclosed and the injuries they sustained. Aside from a generalized description of the information pertaining to the DNC, its contributors, and the Clinton Campaign, there is very little detail concerning the specific nature of the information or its significance to the political campaign. This Court is aware that a determination of whether a communication is a matter of public concern is an issue of law to be determined based on its content, political impact, and interest to the community. *Snyder v. Phelps*, 580 F.3d 206, 220 (4th Cir. 2009). Equally important is the abiding principle that Plaintiffs' well-pleaded allegations are taken as true and the complaint must be viewed in the light most favorable to the plaintiff at this stage.[7] Without more specific detail as to the import of the emails of public concern, versus the volume of private and arguably embarrassing personal information, this Court is unable to determine, with any degree of certainty, whether Plaintiffs' otherwise plausible factual claims are well founded.[8] Relying solely on the allegations contained in the Amended

---

[7] The Court is also mindful of the contextual framework in this case—a conspiracy to publish private information to dissuade political participation. Conspiracy jurisprudence, which is infrequently encountered in the civil context, makes co-conspirators liable for the tortious acts of their confederates under familiar principles of agency. However, the tortious acts for which they are being held accountable must be reasonably foreseeable and in furtherance of the conspiracy. *See United States v. Aramony*, 88 F.3d 1369, 1379 (4th Cir. 1996); *Nye & Nissan v. United States*, 336 U.S. 613, 618 (1949).

[8] A number of emails and documents were attached to the Amended Complaint and may be considered by the Court if their authenticity is not disputed. *See Blankenship v. Manchin*, 471 F.3d 523, 526 n.1 (4th Cir. 2006). However, the sample is insufficient for reliable quantitation

Complaint, as it must at this juncture, the Court finds that the Campaign's release of the hacked emails from the DNC do not warrant First Amendment protection.

## B. Plaintiffs' Claim Under 42 U.S.C. § 1985(3) (Count I)

Turning to the core claims of the Amended Complaint, Count I seeks damages for "Conspiracy to Intimidate Lawful Voters from Giving Support or Advocacy to Electors for President and to Injure Citizens in Person or Property on Account of Such Support or Advocacy in Violation of 42 U.S.C. [§] 1985(3)." (Am. Compl. 65.) Plaintiffs theorize that § 1985(3)'s "support or advocacy clauses," create an independent, substantive cause of action that does not require a litigant to plead the violation of a substantive constitutional right. However, for the reasons that follow, Plaintiffs' reasoning is contrary to the Supreme Court's historical interpretation of § 1985(3). Therefore, the Court's analysis will begin with some historical context before turning to the merits of Count I.

### 1. The Supreme Court's Interpretation of 42 U.S.C. § 1985(3)

Subsection 1985(3) prohibits civil conspiracies that interfere with "'equal protection of the laws' and 'equal protection of privileges and immunities under the laws' ... [and] the right to support candidates in federal elections." *Kush v. Rutledge*, 460 U.S. 719, 724 (1983). The statute was enacted during the Reconstruction Era under § 2 of the Civil Rights Act of 1871—the so-called Ku Klux Klan Act. *See Id.*; *see also United Bhd. of Carpenters, Local 610 v. Scott*, 463 U.S. 825, 839 (1983) (Blackmun, J., dissenting)

---

by subject matter. According to the Amended Complaint, "tens of thousands of emails and attachments were dumped on the Internet." (Am. Compl. ¶ 26.)

("The Ku Klux Klan Act was the Reconstruction Congress' response to politically

motivated mob violence in the postbellum South.")  When Congress enacted § 1985(3),

its purpose was to combat the Klan's efforts "to resist and to frustrate the intended affects

of the Thirteenth, Fourteenth, and Fifteenth Amendments." *Carpenters*, 463 U.S. at 837.

The full text of § 1985(3) states as follows[9]:

> If two or more persons in any State or Territory conspire or go in disguise
> on the highway or on the premises of another, for the purpose of depriving,
> either directly or indirectly, any person or class of persons of the equal
> protection of the laws, or of *equal privileges and immunities under the*
> *laws*; or for the purpose of preventing or hindering the constituted
> authorities of any State or Territory from giving or securing to all persons
> within such State or Territory *the equal protection of the laws*;

> [O]r if two or more persons conspire to prevent by force, intimidation, or
> threat, any citizen who is lawfully entitled to vote, *from giving his support*
> *or advocacy in a legal manner*, toward or in favor of the election of any
> lawfully qualified person as an elector for President or Vice President, or as
> a Member of Congress of the United States; *or to injure any citizen in*
> *person or property on account of such support or advocacy*[10];

---

[9]The text of §1985(3) in the official Code appears as a single, unbroken provision.  The Court
has inserted breaks in § 1985(3)'s text to better visualize its three main components.

[10] The first two clauses of § 1985(3) address civil conspiracies that deprive persons of "the equal
protection of the laws, or of equal privileges and immunities under the laws . . . ." (hereinafter as
the "equal protection clauses"). *Id.* In *Griffin v. Breckinridge*, the Supreme Court held that a
civil conspiracy must be motivated by a "class-based, invidiously discriminatory animus," to
violate this portion of § 1985(3). 403 U.S. 88, 102 (1971).
 The third and fourth clauses (hereinafter as the "support or advocacy clauses") pertain to
conspiracies that prevent a person from giving "support or advocacy" to a candidate for federal
office, or injure a person as a result thereof.  The Supreme Court found in *Kush v. Rutledge*, that
the "class-based, invidiously discriminatory animus," requirement did not apply to portions of
§ 1985(3), such as the support or advocacy clauses, that did not contain the statute's equal
protection language. *See* 460 U.S. at 726 ("Th[is] legislative background [from *Griffin*] does not
apply to the portions of the statute that prohibit interference with . . . federal elections.").  The
final clause of the statute provides the remedy for any violation of 42 U.S.C. § 1985(3).
 Despite these distinctions, and critical to the outcome of Count I, the Supreme Court has
consistently interpreted § 1985(3) in its entirety as being purely remedial in nature, meaning that
§ 1985(3) does not provide any substantive rights, and the rights it vindicates must be found

> [I]n any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3) (2012) (emphasis and separation added).

Subsection 1985(3) was enacted pursuant to Congress's power to enforce the Thirteenth, Fourteenth, and Fifteenth Amendments. *Carpenters,* 463 U.S. at 837. As a result, the Supreme Court has consistently reiterated the subsection's remedial purpose. *See id.* at 833 ("The rights, privileges, and immunities that § 1985(3) vindicates must be found elsewhere . . . ."); *see also Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 372 (1979)[11] ("Section 1985(3) provides no substantive rights itself; it merely provides a remedy for violation of the rights it designates."). Therefore, a claim brought under § 1985(3) must be tied to the violation of a substantive constitutional right.

Generally, because a § 1985(3) claim protects a substantive constitutional right, a litigant's § 1985(3) claim is often constrained by the need to plead state action. For example, if an alleged conspiracy violates a constitutional right that by definition is only applicable against the federal government (or the states through the Due Process Clause,

---

elsewhere. *See, e.g., Carpenters,* 463 U.S. at 833; *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 372 (1979).

[11] In *Novotny*, a plaintiff argued that Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, provided the necessary right for him to bring a claim under § 1985(3). 442 U.S. at 370. The Supreme Court concluded that a statutory right created after § 1985(3) was enacted, like Title VII, could not serve as the basis for a § 1985(3) claim. *Id.* at 377–78. In his concurring opinion, Justice Powell affirmed the majority's reasoning and stated that § 1985(3) claims were solely limited to rights derived from the Constitution. *Id.* at 379 (Powell, J., concurring).

see *McDonald v. City of Chicago*, 561 U.S. 742, 763 (2010)), then the litigant must allege that "the state is involved in the conspiracy or that the aim of the conspiracy is to influence the activity of the state." *Carpenters*, 463 U.S. at 830.

The Supreme Court's decision in *Carpenters v. Scott* is an illustrative example of a § 1985(3) claim that was deficient, in part, due to a failure to plead state action.[12] *Id.* at 830. The question in *Carpenters* was whether plaintiffs could bring a lawsuit for damages under the equal protection clauses of § 1985(3). *Id.* There, non-union plaintiffs claimed they were targeted, attacked, and injured by a labor union conspiracy. *Id.* at 828. Both the district court and the Fifth Circuit (sitting en banc) concluded that plaintiffs' § 1985(3) claim was viable because the labor union violated plaintiffs' First Amendment right to freely associate. *Id.* at 830. On appeal, however, the Supreme Court reversed. *Id.* at 839. The Supreme Court reasoned that the First Amendment was inapplicable because defendants were private citizens, not government actors, and therefore, there was no state action that triggered the First Amendment's protection. *Id.* at 830. Because no other substantive right supported plaintiffs' claim, the Court concluded that "an alleged conspiracy to infringe First Amendment rights is not a violation of § 1985(3) unless it is proved that the state is involved in the conspiracy or that the aim of the conspiracy is to influence the activity of the state." *Id.* at 830–31.

Similarly, in *Bellamy v. Mason's Stores, Inc.*, the Fourth Circuit affirmed the dismissal of a § 1985(3) claim due to an absence of state action. 508 F.2d 504, 506 (4th

---

[12] While the claim in *Carpenters* was brought under the equal protection clauses of § 1985(3), the case is nevertheless analogous to the claim at hand because the substantive right at issue was construed as a violation of the First Amendment.

Cir. 1974).  There, the plaintiff was a Klu Klux Klan member whose employment was

terminated based on his Klan affiliation.  *Id.* at 505.  In dismissing the plaintiff's civil

conspiracy claim, the Fourth Circuit stated:

> [T]he language of equal protection . . . cannot be interpreted to mean that
> persons who conspire *without involvement of government* to deny another
> person the right of free association are liable under [§ 1985(3)] . . . . [T]he
> right of association derives from the first amendment—itself framed as a
> prohibition against the federal government and not against private persons.

*Id.* at 506–07 (emphasis added).  In addition to this formidable authority, the Eighth

Circuit reached a similar conclusion in a § 1985(3) case that was brought under the

support or advocacy clauses of § 1985(3).  *See Federer v. Gephardt*, 363 F.3d 754, 760

(8th Cir. 2004) ("Because [plaintiff's] complaint is based upon a First Amendment claim,

and no state or federal government action is properly alleged, [plaintiff's] claim based on

the support and advocacy provision of § 1985(3) was properly dismissed.").

In summary, the Supreme Court has interpreted § 1985(3) as being remedial in

nature, and therefore, any viable claim must allege the violation of a preexisting

constitutional right.  Where the right is contingent on state action, a litigant must plead

state action as part of his claim.  Accordingly, a court's assessment of any § 1985(3)

claim begins with the threshold question: what is the constitutional right at issue?  This

Court's analysis of Count I therefore begins by determining the right Plaintiffs seek to

vindicate, and then focuses on whether Plaintiffs pleaded sufficient facts to support their

claim.

## 2.  Plaintiffs' § 1985(3) Claim Fails in the Absence of State Action

In Count I, Plaintiffs contend they have alleged a viable claim under § 1985(3)'s support or advocacy clauses. (Pls.' Mem. Opp'n Mot. Dismiss 23.)  The Amended Complaint states, "one or more conspirators caused to be published on the Internet hacked DNC emails containing private facts about Plaintiffs . . . including Plaintiffs', lawful *support and advocacy* for a candidate for President." (Am. Compl. ¶ 263 (emphasis added).)  Plaintiffs further allege that "[a]s a natural and foreseeable result of the conspiracy, Plaintiffs, among other persons, were injured in their persons and property." (*Id.* ¶ 268.)

The Campaign, on the other hand, argues that Plaintiffs claim under § 1985(3) must be dismissed because (i) the alleged conspiracy did not involve physical violence, or the threat thereof; (ii) *the alleged conspiracy does not allege state action*;  (iii) Plaintiffs were not the intended target of the alleged conspiracy; and (iv) because Plaintiffs improperly attempt to hold the Campaign liable under a theory of respondeat superior. (Def.'s Br. Supp. Mot. Dismiss 17–24.)  The Court agrees with the Campaign that Plaintiffs' claim under Count I must be dismissed based on the absence of state action—a necessary component of Plaintiffs' § 1985(3) claim.  Furthermore, because this factor is by itself dispositive of Count I, the Court need not address the Campaign's alternative arguments.

Plaintiffs and the Campaign agree that the equal protection clauses of § 1985(3) are vehicles for asserting rights that are established elsewhere. (Pls.' Mem. Opp'n Mot.

Dismiss 27; Def.'s Br. Supp. Mot. Dismiss 21.)  However, the parties disagree as to whether the same constraint applies to the statute's support or advocacy section.

Reading the statute as a whole, the Campaign argues that § 1985(3) is purely remedial, and therefore, a litigant must allege the violation of a substantive constitutional right.  The Campaign states, "Section 1985(3) is thus designed to enforce preexisting constitutional rights against state action, not to create new rights against private action.  Indeed, the enforcement clauses empower Congress only to enact 'remedial' laws enforcing preexisting rights; they do not empower it to enact 'substantive' laws expanding those rights."  (Def.'s Br. Supp. Mot. Dismiss 21–22 (emphasis omitted) (citation omitted).)  Therefore, the Campaign argues Plaintiffs must allege a substantive right for Count I to proceed.  Furthermore, because Plaintiffs' claim seeks to vindicate First Amendment rights, they must also allege state action.  (*See id.*)

Plaintiffs counter, however, that § 1985(3)'s support or advocacy clauses create their own substantive right.  The Response to Defendant's Motion states:

> [T]he support-or-advocacy clauses are *not* exercises of Congress's power to enforce the Reconstruction Amendments.  Instead, they exercise Congress's power to protect the integrity of federal elections.  That is why "the 'support and advocacy' clause of Section 1985(3) . . . unlike the equal protection part of Section 1985(3) does not require . . . violation of a separate substantive right."

(Pls.' Mem. Opp'n Mot. Dismiss 27) (internal citations omitted) (quoting *League of United Latin Am. Citizens–Richmond Region Council 4614 v. Pub. Interest Legal Found.,* No. 1:18-CV-00423, 2018 WL 3848404, at *6 (E.D. Va. Aug. 13, 2018) [hereinafter as "LULAC"].  Plaintiffs rely on *Ex parte Yarbrough* (The Ku-Klux Cases), 110 U.S. 651

(1884), to argue that the support or advocacy clauses of § 1985(3) were enacted pursuant

to Congress's power to protect federal elections, not the Reconstruction Amendments.

(Pls.' Mem. Opp'n Mot. Dismiss 27.)  As a result, Plaintiffs maintain that pleading a

substantive constitutional right is not required under Count I.  (*Id.*)

The Court finds, however, that Plaintiffs' reasoning is flawed because it diverges

significantly from the Supreme Court's interpretation of § 1985(3), specifically by

asserting that § 1985(3) creates its own substantive right to "support or advocate" for a

political candidate.  Contrary to Plaintiffs' interpretation of *Yarbrough*, the Supreme

Court's holding in that case was based in part on Congress's Article I, Section 4 powers[13]

*and* the Fifteenth Amendment's substantive right to vote.  *See Yarbrough*, 110 U.S. at

665. ("[T]his fifteenth article of amendment does, *proprio vigore*, substantially confer . . .

the right to vote, *and congress has the power to protect and enforce that right*." (second

emphasis added)).  This effectively undercuts Plaintiffs' position that the support or

advocacy clauses create a stand-alone substantive right of action, and undermines their

contention that they are not required to allege the violation of a substantive constitutional

right, such as the right to vote to plead a viable claim.  *See United States v. Classic*, 313

U.S. 299, 314 (1941) ("The right of the people to [vote], whatever its appropriate

constitutional limitations . . . is a right established and guaranteed by the

Constitution . . . .").

---

[13] "This section declares that 'the times, places, and manner of holding elections for senators and representatives shall be prescribed in each state by the legislature thereof; but the congress may at any time make or alter such regulations, except as to the place of choosing senators.'" *Yarbrough*, 110 U.S. at 660 (quoting U.S. Const. art. I, § 4, cl. 1).

18

Plaintiffs' interpretation of § 1985(3) also faces a formidable arsenal of countervailing Supreme Court authority that Plaintiffs cannot overcome. Plaintiffs cite no Supreme Court or federal appellate authority that supports their interpretation of § 1985(3).[14] In addition, and consistent with the Campaign's arguments, the Supreme Court has stated explicitly that "[§] 1985(3) provides no substantive rights itself; it merely provides a remedy for violation of the rights it designates." *Novotny*, 442 U.S. at 372; *see also Carpenters*, 463 U.S. at 833 ("The rights, privileges, and immunities that § 1985(3) vindicates must be found elsewhere . . . ."). This Court recognizes that the claims in *Novotny* and *Carpenters* were brought under § 1985(3)'s equal protection clauses; however, in rendering those decisions the Supreme Court interpreted § 1985(3) *as a whole* when describing the statute's remedial nature. Certainly, the Supreme Court could have distinguished its interpretation of specific clauses within the statute, but it elected not to do so. Furthermore, the fact that the Supreme Court has interpreted some aspects of § 1985(3)'s clauses differently, *see supra* footnotes 10–11, bolsters the conclusion that the Court chose not to do so elsewhere—namely with respect to the statute's remedial nature by requiring the vindication of substantive constitutional rights.

---

[14] Plaintiffs contend their interpretation of § 1985(3) is supported by a recent district court opinion from our sister division in Alexandria, Virginia. *See LULAC,* 2018 WL 3848404, at *6 (stating "a claim under the 'support and advocacy' clause of Section 1985(3), which unlike the equal protection part of Section 1985(3) does not require allegations of a race or class-based, invidiously discriminatory animus or violation of a separate substantive right."). The Court notes that these cases are factually distinct. While Plaintiffs' allegations in this case most closely align with a violation of the First Amendment, the violation of which requires state action, the right at issue in LULAC was the right to vote, which is not contingent upon state action.

Accordingly, this Court will follow the Supreme Court's historically consistent interpretation, as it must, and conclude that § 1985(3) is purely remedial.

Therefore, in order to plead a viable claim under Count I, Plaintiffs must allege the violation of a substantive constitutional right coupled with state action. Plaintiffs fail to do so. As noted, the first step in evaluating a § 1985(3) claim is determining the constitutional right that a litigant seeks to vindicate. Contrary to Plaintiffs' reasoning, the U.S. Constitution does not specifically protect a person's "support and advocacy . . . [for] a candidate for President." (Am. Compl. ¶ 267.) However, the First Amendment does protect the freedom of speech and the freedom to peacefully assemble from government intrusion. U.S. Const. amend. I. Based on the rights they seek to protect, Plaintiffs' claim will therefore be construed as alleging violations of the First Amendment. *See Carpenters*, 463 U.S. at 829–30 (construing the plaintiffs' claims under the First Amendment where a civil conspiracy violated the right of non-union persons to freely and non-violently associate with other non-union employees); *see also Gill v. Farm Bureau Life Ins. Co. of Mo.*, 906 F.2d 1265, 1271 (8th Cir. 1990) (dismissing plaintiff's § 1985(3) claim because "[t]here is no recognized constitutional right to be a [political] fund-raiser, free from governmental regulation or private pressure.").[15]

---

[15] The Court distinguishes *the right to vote* from Plaintiffs' claims, which in effect, allege their right to give "support or advocacy" to their preferred candidate was frustrated. Significantly, Plaintiffs do not allege that the Campaign prevented them from voting. *See Gill*, 906 F.2d at 1270 ("The independent constitutional right relating to federal elections as part of the basic institutions and processes of the national government is limited, under existing case law, to the right to vote—to cast a ballot and have it honestly counted.") (citing *Classic*, 313 U.S. at 315; *United States v. Mosley*, 238 U.S. 383, 386 (1915)).

So viewed, Plaintiffs fail to plead sufficient facts to support their § 1985(3) claim because the First Amendment requires state action. *See Carpenters*, 463 U.S. at 830–31. Plaintiffs plainly acknowledge in the Amended Complaint that the Campaign is a private entity. The Amended Complaint states, "Defendant is Donald J. Trump for President, Inc. (the "Trump Campaign"), *a Virginia corporation* formed for the purpose of electing Donald Trump to the presidency." (Am. Compl. ¶ 9 (emphasis added).) Taking this fact to its logical conclusion, the Campaign is incapable of state action because it is a private entity. The Court therefore agrees with the Campaign's assertion that Plaintiffs' failure to plead state action is fatal to Count I, and that Count will be dismissed with prejudice.

### C. Plaintiffs' State-Law Claims (Counts II–V)

In addition to their § 1985(3) claim, Plaintiffs allege four state-law tort claims. For each claim, Plaintiffs allege that the Campaign conspired to commit the underlying tort, or in the alternative aided and abetted its commission. Three of these claims allege the tort of public disclosure of private facts for each respective Plaintiff. (Am. Compl. ¶¶ 60–71.) In the final claim, Plaintiff Comer alleges intentional infliction of emotional distress. (*Id.* ¶¶ 71–72.)

### 1. Public Disclosure of Private Facts (Counts II–IV)

Counts II–IV of the Amended Complaint allege individual claims of public disclosure of private facts against the Campaign. (*Id.* ¶¶ 60–71.) The Campaign seeks dismissal of these claims arguing that Virginia's choice-of-law rules do not result in the application of Maryland, New Jersey, or Tennessee law, as asserted by Plaintiffs. (Def.'s Br. Supp. Mot. Dismiss 11–14.) Instead, the Campaign contends that the substantive law

of New York applies, and if not New York, then Virginia's substantive law. (*Id.*) The Campaign maintains that, unlike the states proffered by Plaintiffs, neither New York nor Virginia recognize a common-law cause of action for public disclosure of private facts. (Def.'s Suppl. Resp. Br. 1, ECF No. 89.) Thus, as a threshold matter, the Court must determine which state's substantive law applies to each claim. Given its critical nature, the parties submitted supplemental briefing on this issue.

A federal district court exercising diversity jurisdiction applies the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941). Where state law is unclear, a district court must predict how the state's highest court would decide the issue. *Wells v. Liddy*, 186 F.3d 505, 527–28 (4th Cir. 1999) (citing *Liberty Mut. Ins. Co. v. Triangle Indus.*, 957 F.2d 1153, 1156 (4th Cir. 1992); *Brendle v. General Tire & Rubber Co.* 505 F.2d 243, 245 (4th Cir. 1974)). "Virginia applies the *lex loci delicti*, the law of the place of the wrong, to tort actions . . . ." *Milton v. IIT Research Inst.*, 138 F.3d 519, 521 (4th Cir. 1998); *McMillan v. McMillan*, 253 S.E.2d 662, 663 (Va. 1979) (affirming *lex loci delicti* as the settled rule in Virginia and declining to adopt the balancing test set forth in the Restatement (Second) of Conflict of Laws). According to *lex loci delicti* ("*lex loci*"), a court applies "the law of the state in which the wrongful act took place, wherever the effects of that act are felt." *Milton*, 138 F.3d at 522. Stated another way, the place of the wrong is "where 'the last event necessary to make an act liable for an alleged tort takes place.'" *Quillen v. Int'l Playtex, Inc.*, 789 F.2d 1041, 1044 (4th Cir. 1986) (quoting *Miller v. Holiday Inns, Inc.*, 436 F. Supp. 460, 462 (E.D. Va. 1977)). The Supreme Court of Virginia has not applied *lex*

*loci* to a common-law claim of public disclosure of private facts, thus this Court must predict how it would apply the doctrine here.

In choosing to maintain the *lex loci* approach, the Supreme Court of Virginia recognized "the uniformity, predictability, and ease of application" as grounds for its continued use. *McMillan*, 253 S.E.2d at 664. As this case demonstrates, however, determining the place of the wrong can be an elusive undertaking. In an effort to determine which state's law to apply, the Court will consider the parties' arguments with respect to (1) the proper application of *lex loci*, (2) the elements of the public disclosure of private facts tort, and (3) the approach for identifying the place of the wrong where the act of publication marks completion of the tort.

The parties present competing approaches for applying *lex loci* to identify the place of the wrong. Relying on *Milton*, the Campaign suggests that the place of the wrong in a *lex loci* analysis is always the place of the wrongful act. (Def.'s Suppl. Resp. Br. 2.) In *Milton*, the plaintiff argued that, after termination of his employment in Maryland, the place of the wrong in his action for wrongful discharge was his state of residence, Virginia. *Milton*, 138 F.3d at 521–22. Milton reasoned that the effects of the injury were felt in Virginia, thus "making that state the *loci delicti*, or place of the injury." *Id.* at 521. The Fourth Circuit rejected Milton's argument, concluding that "Virginia clearly selects the law of the place *where the wrongful act occurred*, even when that place differs from the place where the effects of the injury are felt." *Id.* at 522 (emphasis added). In effect, the Campaign therefore argues that the place of the wrong is

where the tortious conduct occurred—regardless of whether the actual cause of action had accrued at the time the tortious act was done. (*See* Def.'s Suppl. Resp. Br. 2.)

However, contrary to the Campaign's reasoning, the *Milton* court's use of the term "wrongful act" carried a precise meaning. Quoting the Supreme Court of Virginia, the *Milton* court noted that "'[t]he word 'tort' has a settled meaning in Virginia. A tort is any civil wrong or injury; a wrongful act.'" *Milton*, 138 F.3d at 522 (quoting *Buchanan v. Doe*, 431 S.E.2d 289, 291 (Va. 1993)). Accordingly, because the wrongful act is the *tort itself*, a court must look to the nature of the tort in determining the place of the wrong. In *Milton*, the tort was actionable upon the plaintiff's termination. Depending on the tort, however, the cause of action may not accrue until sometime after a defendant's act is complete. *See, e.g.*, Restatement (First) of Conflict of Laws § 377 cmt. a, n.4 ("When a person sustains loss by fraud, the place of the wrong is where the loss is sustained, not where fraudulent representations are made."). Such instances require an analysis tailored to the tort at hand.

As Plaintiffs point out, the Fourth Circuit adopted such an analysis in *Quillen*. In *Quillen*, the plaintiff purchased a product in Tennessee and later became ill from use of that product at her home in Virginia. 789 F.2d at 1042–43. The plaintiff argued that the district court erred in that case by applying Virginia law to her strict liability claim rather than Tennessee law, given that she had purchased the product in Tennessee and was later hospitalized there after falling ill in Virginia. *Id.* at 1044. In addressing the plaintiff's argument, the Fourth Circuit explained that "[t]he place of the wrong for purposes of the *lex loci delicti* rule . . . is defined as the place where 'the last event necessary to make an

24

act liable for an alleged tort takes place.'" *Id.* (quoting *Miller*, 436 F. Supp. at 462).  The court in *Quillen* looked to the point of completion of the tort—based on its elements—to determine the place of the wrong.  *Id.*  Because the plaintiff's cause of action did not accrue until she became ill in Virginia, the *Quillen* court found that Virginia, not Tennessee, was the place of the wrong.  *Id.*

Accordingly, this Court finds that, reading the Fourth Circuit's guidance in *Milton* and *Quillen* together, a proper application of *lex loci* requires a tort-by-tort analysis of when a tort is alleged to have been completed to determine the place of the wrong. Applying this rule, the Court now turns to an analysis of the specific tort alleged in Counts II–IV—public disclosure of private facts.

In order to determine when the wrongful act in a claim for public disclosure of private facts is complete, the Court must determine the tort's elements, an issue on which the parties are unable to reach a consensus.  Unfortunately, the Court draws guidance from a finite well of authority.

Plaintiffs contend that the substantive law of each Plaintiff's home state— Maryland, New Jersey, and Tennessee—govern their respective claims.  (Pls.' Mem. Opp'n Mot. Dismiss 9–10.)  Each claim was pleaded in the Amended Complaint under the express presumption that the designated states' law would apply.  (Am. Compl. ¶¶ 60–71.)  The crux of Plaintiffs' argument is that these states represent the place of the wrong because the private disclosure of public facts tort was completed when the Plaintiffs were injured in their home states.  (Pls.' Suppl. Br. 4–6, ECF No. 86.)  As articulated by Plaintiffs, the analysis "necessarily turns on the elements of the specific

tort at issue." (*Id.* at 1.)  Consequently, the tort's elements control the determination of

the last event necessary for the Defendant to be liable, which they contend was each

Plaintiff's injury. (*Id.* at 4–6.)  This argument, however, depends on whether actual

injury to the plaintiff is a necessary element of the alleged tort itself, as opposed to an

element of damage.

Public disclosure of private facts is a sparsely litigated invasion of privacy tort.

The Restatement (Second) of Torts provides that:

> One who gives publicity to a matter concerning the private
> life of another is subject to liability to the other for invasion
> of his privacy, if the matter publicized is of a kind that
> (a) would be highly offensive to a reasonable person, and
> (b) is not of legitimate concern to the public.

Restatement (Second) of Torts § 652D.  According to the Restatement's articulation, the

tort requires publicity and satisfaction of several criteria with respect to the content of the

published information.

Although not recognized in every jurisdiction, this cause of action has been

acknowledged by courts in Maryland, New Jersey, and Tennessee.  However, in the few

instances in which the tort has been litigated in those states, the state courts' articulation

of the elements tracks closely with that of the Restatement.  *See, e.g., Lindenmuth v.*

*McCreer*, 165 A.3d 544, 556 (Md. App. 2017) ("Under Maryland law, this invasion of

privacy tort is cognizable where one 'gives publicity to a matter concerning the private

life of another' and 'the matter publicized is of a kind which (a) would be highly

offensive to a reasonable person, and (b) is not of legitimate concern to the public.'"

(quoting *Furman v. Sheppard*, 744 A.2d 583, 588 (Md. App. 2000))); *Romaine v.*

*Kallinger*, 537 A.2d 284, 292 (N.J. 1988) ("The invasion of privacy by unreasonable publication of private facts occurs when it is shown that 'the matters revealed were actually private, that dissemination of such facts would be offensive to a reasonable person, and that there is no legitimate interest of the public in being apprised of the facts publicized.'" (quoting *Bisbee v. John C. Conover Agency*, 452 A.2d 689, 691 (N.J. Super. 1982); Restatement (Second) of Torts § 652D)); *Harris v. Horton*, 341 S.W.3d 264, 272 (Tenn. Ct. App. 2009) (quoting Restatement (Second) of Torts § 652D). Importantly, this Court has not found, nor have the Plaintiffs identified, a single instance in which courts from these states have found injury to a plaintiff to be a prerequisite element of the tort.

Plaintiffs draw the Court's attention to *Brown v. American Broadcasting Co.*, 704 F.2d 1296, 1302–03 (4th Cir. 1983), to support the proposition that injury is an element of the common-law tort of public disclosure of private facts. (Pls.' Suppl. Br. 4.) However, the Fourth Circuit, applying Virginia law, never reached the issue in that case. *Brown*, 704 F.2d at 1302–03. The Fourth Circuit noted only theoretically that "a strong argument can be made" that injury is a necessary element before actually holding that Virginia does not recognize the cause of action. *Id.* at 1302. In the jurisdictions whose law Plaintiffs seek to apply, they cite only to a model jury instruction from New Jersey that includes an injury element with no cited underlying authority. (Pls.' Suppl. Reply Br. 6, ECF No. 96.) Notably, according to the Restatement (Second) of Torts § 652H cmt. c, "[w]hether in the absence of proof of actual harm an action [based upon § 652D] might be maintained for nominal damages remains uncertain."

Since relevant tort jurisprudence is scant and inconclusive, this Court will adopt for the sake of analysis the elements of the common-law tort of public disclosure of private facts recognized in Maryland, New Jersey, and Tennessee, as Plaintiffs urge. Accordingly, this Court finds that no actual injury is required, and that the wrongful act of public disclosure of private facts was complete upon publishing Plaintiffs' personal information.

However, the Court's *lex loci* analysis still yields a subsidiary but critical issue—how to identify the place of the wrong, here, the point of publication, which completes the pivotal act of public disclosure. The parties equate the necessary analysis to an analogous publication-based tort, defamation. This Court notes, as it previously has, that it remains "far from clear" how the Supreme Court of Virginia would apply *lex loci* in "situations where [] defamatory content is 'published' in multiple jurisdictions, such as on a national television broadcast or . . . a website that can be accessed worldwide." *Kylin Network (Beijing) Movie & Culture Media Co. Ltd. v. Fidlow*, 2017 WL 2385343, at *3 n.2 (E.D. Va. June 1, 2017) (Hudson, J.).

Plaintiffs argue that even if the Court determines that publication marks the culmination of the tort, the place of the wrong is nonetheless the Plaintiffs' home states. (Pls.' Suppl. Br. 6.) Plaintiffs urge the Court to adopt an analysis in which "the legal injury [upon publication] is the location where the information was communicated to the public and caused reputational harm." (*Id.*) Plaintiffs maintain that rather than focusing on the location of reputational impact, as they argue would be the case with defamation, the Court should focus on the *personal nature* of the public disclosure of private facts;

28

that is, the indignation experienced by Plaintiffs following publication. (*Id.* at 7–8.) According to Plaintiffs, focusing on the personal nature of the injury would enable the Court to avoid this convoluted jurisdictional issue where reputational impact can occur in many places depending on where it is accessed. (*Id.* at 8.) The issue would then turn on where the *effects* of the injury are felt as opposed to where the wrong occurred. The Supreme Court of Virginia has explicitly rejected this reasoning. *See Jones v. R.S. Jones & Assocs., Inc.*, 431 S.E.2d 33, 34 (Va. 1993) (reiterating the rejection of the "most significant relationship" test recommended by the Restatement (Second) of Conflict of Laws §§ 145, 146); *see also Milton*, 138 F.3d at 522 (finding that an approach based on where the injury is felt would "effectively replace Virginia's traditional rule for tort cases with default application of the law of plaintiff's domicile.").

In contrast, the Campaign reasons that the place of the wrong is the location from which the information was published. (Def.'s Suppl. Resp. Br. 3.) To support this theory, the Campaign highlights decisions where federal district courts in Virginia have found the proper choice of law was the location of publication to the Internet. *See, e.g., ABLV Bank v. Ctr. for Advanced Def. Studies Inc.*, No. 1:14-CV-1118, 2015 WL 12517012, at *1 (E.D. Va. April 21, 2015) (applying Washington, D.C. law where an allegedly libelous report was published from the defendant's Washington, D.C. office); *Wiest v. E-Fense, Inc.*, 356 F.Supp.2d 604, 608 (E.D. Va. 2005) (applying the law of Virginia where the defendant published allegedly defamatory statements on its website because the corporate headquarters from which the website was controlled was located in

29

Virginia). The Court agrees that the publication analysis in the cases cited by the Campaign most closely aligns with the weight of Supreme Court of Virginia authority.

In the context of a defamation claim, the Supreme Court of Virginia has found that "[p]ublication sufficient to sustain common-law defamation is uttering the slanderous words to some third party so as to be heard and understood by such person." *Thalhimer Bros. v. Shaw*, 159 S.E. 87, 90 (Va. 1931). The Supreme Court of Virginia has further noted that "'[t]he mere depositing of a letter containing such matter in the post office would be a publication of it, although it never came to the hands of him for whom it was intended, if it came to those of anyone else . . . .'" *Davis v. Heflin*, 107 S.E. 673 (Va. 1921) (quoting 18 Am. & Eng. Enc. 1015 (2d ed. 1896)). Defamation and public disclosure of private facts are admittedly not identical claims, with the most obvious distinction being that the information published in the latter offense is true. Nonetheless, both have the common element of publication. Information published to the Internet is communicated in a form that is accessible by third parties worldwide. Based on this Court's analysis of closely related jurisprudence, it is of the opinion that the Supreme Court of Virginia would find that the place of the wrong in these claims for public disclosure of private facts is the place where the act of publication to the Internet occurred.

Predicated on this conclusion, the Campaign contends that this renders New York the place of the wrong because the Campaign's headquarters is located there. (Def.'s Br. Supp. Mot. Dismiss 12.) However, Plaintiffs did not allege that the Campaign physically published their information, but rather that they conspired to do so. While the conspiracy

30

was allegedly formed in New York, the underlying tort, the publication, was allegedly done at some later time by a third party, WikiLeaks. Accordingly, it would be inappropriate to designate New York as the place of the wrong.[16]

According to the Amended Complaint, Plaintiffs' "private information was published to the entire world during the 2016 presidential campaign" as a result of an alleged conspiracy between the Campaign and Russian agents to "to harm the DNC and Mr. Trump's opponent, Hillary Clinton, and help the Trump Campaign." (Am. Compl. ¶¶ 1–2.) Upon formation of the agreement, the Campaign and Russian agents allegedly directed WikiLeaks to publish the information online. (*Id.* ¶ 2.) While the Amended Complaint reveals that Wikileaks published the information to the Internet, it does not disclose the location from which the information was posted. Agents of WikiLeaks could have posted the DNC's information from countless locations around the world. Therefore, the Court cannot determine where the act of publication occurred based on the Amended Complaint. As a result, the Court will apply the law of the forum state, Virginia.[17]

---

[16] Defendant also argues that New York is the place of the wrong because the conspiracy was allegedly formed there. (Def.'s Br. Supp. Mot. Dismiss 12.) This argument fails, however, because the conspiracy is not alleged as a stand-alone tort. The tort, or wrongful act, at issue in Counts II–IV is the public disclosure of private facts. A civil conspiracy is predicated upon completion of an underlying civil wrong. *See, e.g., Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 317 (Va. 2014) ("[A]ctions for common law civil conspiracy and statutory business conspiracy lie only if a plaintiff sustains damages as a result of an act that is itself wrongful or tortious."). Thus, the location of the alleged agreement, in and of itself, does not represent the wrongful act and therefore does not identify the place of the wrong.

[17] Although neither the Supreme Court of Virginia nor the Fourth Circuit have resolved this point, numerous district courts in Virginia have applied the law of the forum state in a situation in which they were unable to determine the place of the wrong from the pleadings. *See Jeffrey J.*

As the Court has already noted, the Fourth Circuit considered whether Virginia recognizes a common-law right to privacy in *Brown*. 704 F.2d at 1302. As a result of a limited Virginia statutory right to privacy and the Supreme Court of Virginia's silence as to whether a broader common-law right exists, the *Brown* court declined to find that Virginia recognizes such a right. *Id.* The Supreme Court of Virginia later acknowledged its agreement. *See WJLA-TV v. Levin*, 564 S.E.2d 383, 394 n.5 (Va. 2002) (noting that public disclosure of private facts is not actionable in Virginia because the General Assembly implicitly excluded that cause of action from its statutory right to privacy). Therefore, this Court also finds that Virginia does not recognize a common-law right to privacy. Because no such cause of action exists in Virginia, the Court will dismiss Plaintiffs' claims for public disclosure of private facts without prejudice.

## 2. Intentional Infliction of Emotional Distress (Count V)

Finally, Plaintiff Comer alleges that Defendant conspired to commit intentional infliction of emotional distress ("IIED"), or in the alternative aided and abetted other alleged tortfeasors to that end. (Am. Compl. ¶¶ 295–303.) Applying Virginia's *lex loci* analysis, the Court will first look to the elements of IIED to determine the place of the wrong. A cause of action for IIED exists where "1) the wrongdoer's conduct was intentional or reckless; 2) the conduct was outrageous or intolerable; 3) there was a causal

---

*Nelson & Assocs. v. LePore*, 2012 WL 2673242, at *7 (E.D. Va. July 5, 2012) ("Because it is presently unclear where the allegedly wrongful acts took place, the Court will . . . apply Virginia law with respect to the tort related counterclaims."); *see also Overstock.com, Inc. v. Visocky*, 2018 WL 5075511, at *9 n.5 (E.D. Va. Aug. 23, 2018) ("Plaintiff has failed to provide any specific information as to where the wrongful acts . . . took place. Therefore, because Plaintiff has provided no information upon which to conduct a formal choice-of-law analysis, the [court] will utilize Virginia law, as the law of the forum state.").

connection between the wrongdoer's conduct and the resulting emotional distress; and 4) the resulting emotional distress was severe." *Supervalu, Inc. v. Johnson*, 666 S.E.2d 335, 343 (Va. 2008). Based on these elements, the tort of IIED is complete when a plaintiff experiences severe emotional distress. As alleged by Plaintiffs, this occurred in Plaintiff Comer's home state, Maryland. (Pls.' Mem. Opp'n Mot. Dismiss 10.) Thus, the Court will apply Maryland substantive law to Plaintiff Comer's IIED claim.

Importantly, under Maryland law, conduct sufficient to sustain a claim for IIED must be "extreme and outrageous."[18] *Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977). Moreover, "[i]t is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as extreme and outrageous . . . ." *Id.* at 615. The defendant's conduct must be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 614. The Court of Appeals of Maryland has made clear that "'recovery [for IIED] will be meted out sparingly, its balm reserved for those wounds that are truly severe and incapable of healing themselves.'" *Batson v. Shiflett*, 602 A.2d 1191, 1216 (Md. 1992) (quoting *Figueiredo-Torres v. Nickel*, 584 A.2d 69, 75 (Md. 1991)).

Plaintiff Comer's claim falls short of the mark. The alleged conduct— dissemination of Plaintiff Comer's emails involving workplace gossip and details

---

[18] The elements for IIED in Maryland are identical to those in Virginia, except that Maryland law articulates the second element as requiring "extreme and outrageous" conduct, *Harris*, 380 A.2d at 614, as opposed to "outrageous or intolerable" conduct under Virginia law, *Supervalu*, 666 S.E.2d at 343.

regarding a bout of stomach flu—is not "extreme and outrageous" under any standard of

measure. Plaintiff Comer undoubtedly experienced a great deal of stress following

publication of his private communications with colleagues; however, the high standard

for IIED claims is intended to "screen out claims amounting to 'mere insults, indignities,

threats, annoyances, petty oppressions, or other trivialities' that simply must be endured

as part of life." *Batson*, 602 A.2d at 1216 (quoting *Harris*, 380 A.2d at 614). When

weighed against claims for extreme and outrageous conduct upheld by the Court of

Appeals of Maryland,[19] the conduct alleged by Plaintiff Comer fails to pass muster.

Consequently, Plaintiff Comer's claim for IIED is also dismissed without prejudice.

## IV.   CONCLUSION

Based on the foregoing analysis, the Campaign's Motion to Dismiss filed pursuant

to Federal Rule of Civil Procedure 12(b)(6) will be granted. Count I will be dismissed

with prejudice because it is beyond revitalization, given the absence of the requisite state

action. Counts II through V will be dismissed without prejudice, and pursuant to

counsel's oral motion, Count VI will be dismissed without prejudice. Finally, while this

Court finds Plaintiffs' Amended Complaint fails to plead plausible and legally viable

---

[19] In *Batson*, the Court of Appeals of Maryland cited several of the rare instances in which claims for IIED have been upheld. *Batson*, 602 A.2d at 1216. These cases involved situations in which a "psychologist had sexual relations with the plaintiff's wife during the time when he was treating the couple as their marriage counselor," a "physician did not tell nurse with whom he had sexual intercourse that he had herpes," and a "worker's compensation insurer's 'sole purpose' in insisting that claimant submit to psychiatric examination was to harass her and force her to abandon her claim or to commit suicide." *Id.* (citing *Figueiredo-Torres v. Nickel*, 584 A.2d 69 (Md. 1991); *B.N. v. K.K.*, 538 A.2d 1175 (Md. 1988); *Young v. Hartford Accident & Indemnity*, 492 A.2d 1270 (Md. 1985)).

claims as crafted, it offers no assessment of the veracity of the factual assertions underlying Plaintiffs' claims.

An appropriate Order will accompany this Memorandum Opinion.

/s/
_____
Henry E. Hudson
Senior United States District Judge

Date: March 15, 2019
Richmond, Virginia